*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 59**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

In the Matter of the Adoption of B.B., a minor,

E.T.,
*Appellant,*

*v.*

R.K.B. and K.A.B.,
*Appellees.*

No. 20150434
Filed August 31, 2017

On Certification from the Court of Appeals

Third District, Salt Lake
The Honorable Ryan M. Harris
No. 142900417

Attorneys:

Angilee K. Dakic, Salt Lake City, for appellant

Larry S. Jenkins, Lance D. Rich, Salt Lake City, for appellees

JUSTICE HIMONAS authored the opinion of the Court with respect to Parts II.B., II.D., and III, in which JUSTICE DURHAM and JUSTICE PEARCE joined; and a dissenting opinion with respect to Parts I, II.A., and II.C, in which JUSTICE DURHAM joined.

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court with respect to Part I of his opinion, in which CHIEF JUSTICE DURRANT and JUSTICE PEARCE joined; and a dissenting opinion with respect to Part II of his opinion, in which CHIEF JUSTICE DURRANT joined.

JUSTICE HIMONAS, opinion of the Court as to Parts II.B., II.D., and III:

**INTRODUCTION**

¶ 1    Contested adoptions are gut-wrenching, and the longer they remain in flux, the greater the toll on the biological parents, the prospective adoptive parents, family members, and, most significantly, the child. But no one is better off for "judicial shortcuts, intentional or unintentional, which reach an expeditious result but fail to recognize the fundamental nature of the right of [biological] parents to the care, custody, and management of their child." *In re Adoption of L.D.S.*, 155 P.3d 1, 8 (Okla. 2006), *as supplemented on reh'g*, No. 250 (Mar. 6, 2007). "In fact, the best interests of the child can be served in no legitimate manner except in obedience to the policies and procedures mandated by law." *Id.* So it is vital that the courts of this state, this court included, take care to ensure that adoption proceedings are as free as possible from fatal defects. Regrettably, this case is septic: Birth Mother admitted to having perpetrated a fraud on the district court and suborning perjury from her brother-in-law, all in an effort to keep Birth Father from intervening in the proceedings, and all against the backdrop of what I believe was untimely and therefore invalid consent.

¶ 2    Procedurally, this case is before us on certification from our court of appeals, the central issue presented by the parties being whether the district court got it right when it denied Birth Father's motion to intervene. Because both Birth Father and Birth Mother are members of the Cheyenne River Sioux Tribe and B.B. is eligible for enrollment in the tribe, the Child is an Indian child. Hence, in my view, we have to consider the interplay between the Indian Child Welfare Act (ICWA) and Birth Father's attempt to intervene, the application of ICWA to Birth Mother's consent, and the impact her invalid consent has on these proceedings.[1] I view these inquiries as raising the issues of (1) whether a district court has subject matter jurisdiction over an adoption proceeding where neither biological parent has validly consented to the adoption and where the order terminating their parental rights is therefore void, (2) whether the jurisdictional issue is properly before us by virtue of Birth Father's right to challenge the validity of Birth Mother's consent and the order terminating his

_____

[1] I refer to E.T., the unmarried biological father, as "Birth Father," C.C., the unmarried biological mother, as "Birth Mother," and B.B. as the "Child."

parental rights, and (3) whether Birth Father is a "parent" for purposes of ICWA and entitled to intervene in the proceedings below.

¶ 3    The court is not of one mind on the issues. With respect to issue 1, a minority of this court would hold that where, as here, neither biological parent has validly consented to the adoption nor had their parental rights otherwise terminated, our courts lack subject matter jurisdiction to go ahead with adoption proceedings. With respect to issue 2, the minority would further hold that Birth Father has standing under our traditional approach to standing, and the right, under section 1914 of ICWA, to challenge Birth Mother's consent and the termination order and to argue the lack of subject matter jurisdiction. And with respect to issue 3, which is separate from the jurisdictional questions, a majority of this court holds that Birth Father is a "parent" under ICWA and, as such, is entitled to participate in the proceedings below on remand. The decision of the district court is therefore reversed and the matter remanded for proceedings consistent with this opinion.[2]

---

[2] Put a little differently, this case implicates issues of subject matter jurisdiction and statutory interpretation. The subject matter jurisdiction issue turns on whether we may void the termination of Birth Mother's parental rights by holding that Birth Mother failed to give valid consent, and that, therefore, the district court lacked subject matter jurisdiction to terminate her parental rights. But the majority of the court—Chief Justice Durrant, Associate Chief Justice Lee, and Justice Pearce—holds that this issue is not properly before us and therefore does not reach the issue of Birth Mother's consent.

On the statutory interpretation question, which turns on whether Birth Father is a "parent" under ICWA, a majority of the court—Justices Himonas, Durham, and Pearce—holds that Birth Father qualifies as a parent because he met the federal standard for acknowledging or establishing paternity. The dissent would hold that there is no federal standard for acknowledging or establishing paternity, and that Birth Father's failure to follow Utah procedures for acknowledging or establishing paternity means that he is not a parent under ICWA. Because the court concludes that Birth Father is a parent under ICWA, it also holds that he has a right to notice and to intervene in the adoption proceedings, reversing the district court's contrary conclusion and remanding for further proceedings.

## BACKGROUND

¶ 4    In December 2013, Birth Father and Birth Mother were in a committed relationship and engaged in sex leading to the conception of the Child.[3] Both Birth Father and Birth Mother are members of the Cheyenne River Sioux Tribe, and they resided together on the Cheyenne River Sioux Reservation in South Dakota at the time of conception and for the first six months of Birth Mother's pregnancy. Birth Father supported Birth Mother during her pregnancy, paying for her phone bill and their rent, utilities, and groceries. Six months into the pregnancy, in June or July 2014, Birth Mother moved to Utah to be closer to friends and family. Birth Father was to join her later, once she was settled into their new apartment.

¶ 5    For the first few weeks after Birth Mother's move to Utah, she and Birth Father stayed in contact over the phone, but after Birth Mother encountered a former boyfriend, she cut off all contact with Birth Father. She stopped calling Birth Father, stopped answering his calls, and even changed her phone number. At Birth Mother's request, mutual friends told Birth Father that she was fine and would soon return to South Dakota. Birth Father indicated that he "figured . . . [she] just needed some space" and that she "would return to South Dakota before she delivered [their] baby, or that she and the baby would return together after the delivery."

¶ 6    On August 29, 2014, Birth Mother gave birth to the Child in Utah. Twenty-four hours and six minutes later, she signed a form titled "Relinquishment of Parental Rights and Consent of Natural Birth Mother to Adoption" in the presence of a notary public and an adoption agency representative. Birth Mother also signed a Statement Concerning Birth Father, naming her brother-in-law, rather than Birth Father, as the biological father. Based on Birth Mother's misrepresentations concerning the biological father, the adoption agency and counsel for the adoptive parents had the brother-in-law sign a sworn affidavit declaring that he was the Child's biological

---

[3] In its decision, the district court listed facts that "the Court from a careful review of the parties' submissions believe[d] . . . to be undisputed, and [did] not by th[e] factual recitation intend to resolve disputed factual issues, if any." We mirror the district court in this regard, reciting facts from the record that appear largely undisputed.

father, relinquishing his rights to the Child, consenting to the adoption, and representing that he was neither an enrolled member of nor eligible for membership in a Native American tribe.

¶ 7    On September 8, 2014, ten days from the Child's birth, Birth Mother executed a Voluntary Relinquishment of Parental Rights, Consent to Adoption, and Consent to Entry of Order Terminating Parental Rights in open court, again naming her brother-in-law as the Child's biological father. On September 25, 2014, the district court issued an order terminating Birth Mother's parental rights and determining the biological father's rights. Birth Mother had expressly objected to any Indian tribe receiving notice of the proceedings, and the district court determined that the proceedings were voluntary and that therefore no Indian tribe was entitled to notice. The court held that "the unwed biological father[], whether he be [Birth Mother's brother-in-law] or any other man," had "forfeited, surrendered, or waived" his parental rights and that his consent to the adoption was not required. The court also determined that the unmarried biological father had not acknowledged or established paternity to the Child and was therefore not a "parent" under ICWA. *See* 25 U.S.C. § 1903(9). The court then transferred custody of the Child to the adoption agency and authorized it to delegate custody to the prospective adoptive parents.

¶ 8    Birth Mother returned to South Dakota at the end of September 2014. On or about September 27, 2014, she saw Birth Father and told him that she had given birth to the Child and placed him for adoption. According to Birth Father, she told him that she listed no father on the birth certificate and that she later misrepresented the identity of the father. According to his affidavit, Birth Father "was completely shocked and devastated because [he] did not know that [their] son had been born, and [he] never knew [Birth Mother] had even considered placing him for adoption." Birth Father also stated that he "immediately sought assistance to establish paternity and intervene in this matter," although it is unclear from the record what his immediate action was.

¶ 9    According to Birth Father, he and Birth Mother "contacted the Utah vital records office to add [Birth Father's] name to [their] son's birth certificate, but [were] advised by counsel not to[,] due to [Birth Mother's] rights being terminated." Both Birth Father and Birth Mother informed the tribe of the situation. Over a period of a couple of months, Birth Father consulted with Dakota Plains Legal Services. On or before October 30, 2014, Dakota Plains Legal Services contacted counsel for the

prospective adoptive parents and left a message regarding Birth Mother, apparently communicating Birth Mother's desire to withdraw her consent and requesting that the Child be returned to her. In November 2014, Birth Mother contacted the adoption agency to correct her misrepresentation, informing the adoption agency that Birth Father was the true biological parent.[4] In late November or December 2014, according to Birth Father, Dakota Plains Legal Services referred him to Utah Legal Services, Inc., and on December 31, 2014, Birth Father filed a motion to intervene in the proceedings "in order to establish paternity, and thereafter file a petition to have his parental rights determined."[5] The case had been inactive from the entry of the termination order on September 25, 2014, until the filing of the motion to intervene on December 31, 2014.

¶ 10   Birth Father's motion to intervene was mistakenly granted on January 5, 2015, before the prospective adoptive parents' time to respond to or oppose the motion had run. Birth Father then filed a

---

[4] Birth Mother claims that "within one week of th[e] court entering its order to relinquish [her] rights, [she] contacted [the adoption agency] and informed them that [she] wanted to withdraw [her] consent" and was told that it was too late. But the exhibit she cites in support of that claim is a December 11, 2014 letter from the adoption agency that references a letter received from Birth Mother "last month" (i.e., November 2014). She cites that same letter in her affidavit, in support of her assertion that she "tried to revoke [her] consent and correct the misrepresentations that [she] had made to [the adoption agency]." And Birth Father cites that same letter in support of his claim that

> [i]n December 2014, when the child was just a little over three months old, [Birth Mother] contacted [the adoption agency] to inform them that she had misrepresented the identity of the true father, and she made efforts to rescind the relinquishment of her parental rights, but was informed by the director that they 'no longer have [any] power in that matter' and that she 'would need to work with the judge.'

[5] Birth Father stated that his intervention was "pursuant to Rule 24(a) of the Utah Rules of Civil Procedure and 25 U.S.C. 1911(c)."

Motion for Paternity Test, and the prospective adoptive parents filed a motion requesting that the district court reconsider its decision to grant Birth Father's motion to intervene and objecting to his motion for paternity testing. A few days later, Birth Father filed a Paternity Affidavit. Subsequently, Birth Mother filed an affidavit with the court stating that Birth Father was the biological parent and a member of the Cheyenne River Sioux Tribe. Birth Father then filed an Answer, Objection, and Verified Counterpetition to the Verified Petition for Adoption, objecting to the petition for adoption. He also filed a Notice of Commencement of Paternity Proceeding with the Utah Department of Health Office of Vital Records and Statistics. On January 27, 2015, the Cheyenne River Sioux Tribe filed a motion to intervene in the proceedings.

¶ 11 The district court held a hearing on the pending motions (not including the tribe's motion to intervene) on February 24, 2015. On the day of the hearing, the Bureau of Indian Affairs (BIA) released new ICWA guidelines. Birth Father filed the guidelines with the district court that very day, requesting that the court review them and drawing the court's attention to the guidelines regarding notice requirements, placement preferences, consent requirements, and the relationship between ICWA and state law. The prospective adoptive parents filed a motion objecting to Birth Father's submission of that supplemental memorandum. On March 12, 2015, Birth Mother filed a Verified Withdrawal of Consent to Adoption and Motion for Return of Custody with the court. On March 26, 2015, the court made a minute entry, granting Birth Father's motion for review based on the new ICWA guidelines and denying the prospective adoptive parents' motion to strike those guidelines.

¶ 12 The next day, the district court signed an order denying the Cheyenne River Sioux Tribe's motion to intervene on the bases (1) "that an Indian tribe . . . cannot appear in court without the assistance of a licensed attorney" and (2) "that, under ICWA, a tribe has a right to intervene only in *involuntary* proceedings, and not in voluntary proceedings like this one." On April 21, 2015, the court issued another order, denying Birth Father's motion to intervene on the basis that he was "not a 'parent' under either ICWA or . . . Utah's adoption statutes." Because Birth Father was not permitted to intervene, his motion for paternity testing was mooted. The April 21, 2015 order also denied Birth Mother's motion to withdraw her consent to the termination of her parental rights on the basis "that once a birth mother's parental

rights have been terminated by order of a court, that birth mother no longer has the right under ICWA to withdraw her consent, even if an adoption decree has not yet been entered."

¶ 13 Birth Father filed a motion for a new trial, and on May 20, 2015, he filed a notice of appeal. The district court denied the motion for a new trial on June 4, 2015. The appeal was then certified for immediate transfer to us. Neither the tribe nor Birth Mother appealed the denial of their motions. Birth Father also filed a Motion for Stay Pending Appeal, which the court granted, and pursuant to which "[t]he finalization of [the Child's] adoption will wait until the conclusion of the appeal." After the stay, Birth Father's parents filed a motion to intervene and a counter-petition for adoption based on ICWA's placement preferences, but their motion was also denied, and they did not appeal the denial. Thus, only Birth Father's claims are before us on appeal.

¶ 14 After oral argument, we asked for supplemental briefing on three issues: (1) whether Birth Mother's consent complied with ICWA's timing requirement, and if not, what effect that had on the validity of her consent; (2) if Birth Mother's consent was invalid, whether that would affect the district court's jurisdiction to enter or finalize an adoption decree; and (3) what, if any, other effect an invalid consent would have on the proceedings below.

¶ 15 We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(b).

## STANDARDS OF REVIEW

¶ 16 Whether Birth Mother's consent was valid under ICWA is a question of statutory interpretation, which we review "for correctness, affording no deference to the district court's legal conclusions." *State v. Gallegos*, 2007 UT 81, ¶ 8, 171 P.3d 426. And whether a district court has subject matter jurisdiction over a proceeding is a matter of law, which we review for correctness. *Canfield v. Layton City*, 2005 UT 60, ¶ 10, 122 P.3d 622.

¶ 17 Whether Birth Father has acknowledged or established paternity under ICWA is a question of statutory interpretation, which we also review for correctness. *Gallegos*, 2007 UT 81, ¶ 8. "As a general matter, the factual findings underpinning [a ruling on a motion to intervene] are subject to a clearly erroneous standard, and the district court's interpretation of rule 24(a) is reviewed for correctness." *Gardiner*

*v. Taufer*, 2014 UT 56, ¶ 16, 342 P.3d 269 (internal quotation marks omitted). "[W]hether a particular statute affords a particular class of persons an unconditional intervention right . . . is a pure question of law because it involves abstract statutory construction." *In re United Effort Plan Tr.*, 2013 UT 5, ¶ 21, 296 P.3d 742. Thus, "[a] district court would not be entitled to any deference to the extent it misinterpreted an intervention statute in the abstract." *Id.*

## ANALYSIS

¶ 18 The first question I address is whether Birth Mother's lack of valid consent, and the resultant invalid order terminating all parental rights, deprived the district court of subject matter jurisdiction to move forward with the adoption. Based on controlling Utah law and in keeping with the overwhelming majority of the courts of this country, I answer that question in the affirmative. Because the jurisdictional issue is properly before us only if Birth Father could have raised it on appeal, I then turn to a determination of whether Birth Father had the ability to challenge the validity of Birth Mother's consent and to put the jurisdictional issue before us. I conclude that Birth Father was empowered to do so under our traditional approach to standing and 25 U.S.C. section 1914. Finally, a majority of the court concludes that apart from the foregoing, Birth Father is a parent under ICWA and eligible to intervene in this matter and that to hold otherwise would subvert ICWA's core policies.

## I. BIRTH MOTHER'S INVALID CONSENT DEPRIVED THE DISTRICT COURT OF SUBJECT MATTER JURISDICTION

¶ 19 Although neither party originally raised the issue, we have an independent obligation to address the existence of subject matter jurisdiction. *See Nevares v. Adoptive Couple*, 2016 UT 39, ¶ 23, 384 P.3d 213 ("[S]ubject matter jurisdiction is an issue that can and should be addressed sua sponte when jurisdiction is questionable." (alteration in original) (citation omitted)); *People ex rel. J.G.C.*, 318 P.3d 576, 578 (Colo. App. 2013) (after requesting supplemental briefing on "the district court's jurisdiction to determine the nonpaternity of [the] presumptive father," concluding that "the district court lacked subject matter jurisdiction to make a paternity determination"); *see also In re Adoption of L.D.S.*, 155 P.3d 1, 8 (Okla. 2006), *as supplemented on reh'g*, No. 250 (Mar. 6, 2007). I would hold that invalid consent in adoption proceedings is a subject matter jurisdictional issue.

### A. Valid Consent Is a Jurisdictional Prerequisite to an Adoption

¶ 20 Without valid parental consent to an adoption, there is no justiciable matter and therefore nothing for the district court to exercise jurisdiction over.[6] This is because the subject of an adoption proceeding is a child and a court cannot proceed with the adoption unless the child has been validly placed within its purview. And absent consent, that placement has not happened, leaving a court without authorization to interfere with the fundamental right that is the parent-child relationship. *In re Adoption of Strauser*, 196 P.2d 862, 867 (Wyo. 1948) ("The first duty of the judge is to see that the necessary consents are given. If they are not, the proceeding is at an end. There is nothing for the judge to approve."); *cf. Atwood v. Cox*, 55 P.2d 377, 381 (Utah 1936) ("Jurisdiction is the power to decide a justiciable controversy . . . ." (citation omitted)).

¶ 21 The principle that invalid consent deprives the district court of subject matter jurisdiction in adoption proceedings has been a part of Utah law for more than six decades. In *Deveraux' Adoption v. Brown*, two children were placed in foster care but their mother's parental rights were never permanently terminated. 268 P.2d 995, 998 (Utah 1954). When the children were placed for adoption, the mother objected that her consent was never validly given. *Id.* at 996. We held that it was unnecessary to even look at other issues in the adoption proceeding because "the court never obtained jurisdiction to exercise the power to grant the adoptions and therefore any questions pertaining to the welfare or custody of the children [were] not before it in such a proceeding." *Id.* at 998. We therefore remanded, instructing the district

---

[6] There are exceptions to the requirement of parental consent where, for example, abuse, neglect, or other "parental unfitness" is at issue. *See Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 202–03 (Utah 1984), *abrogated on other grounds by* In re Adoption of J.S., 2014 UT 51, 358 P.3d 1009 ("Constitutionally protected parental rights can be . . . [voluntarily] surrendered pursuant to statute. . . . Parental rights can also be terminated through parental unfitness or substantial neglect."); *In re J.P.*, 648 P.2d 1364, 1375 (Utah 1982) ("[A]ll unwed mothers are entitled to a showing of unfitness before being involuntarily deprived of their parental rights."). Neither party argues that those exceptions apply in this case, so I focus only on the lack of consent.

court to set aside as void the orders granting the adoptions. *Id.* In doing so, we did not consider consent, as the majority on this point urges, to be "just one of many statutory prerequisites to the issuance of a valid adoption decree." *Infra* ¶ 124. Rather, we meant what we said: because of the mother's lack of consent, the district court "*never obtained jurisdiction.*" *Deveraux' Adoption*, 268 P.2d at 998 (emphasis added); *see also In re Adoption of Walton*, 259 P.2d 881, 883 (Utah 1953) ("So jealously guarded is the parent-child relation[ship] that uniformly it is held that the abandonment or desertion firmly must be established [as a statutory exception to obtaining parental consent] . . . before any question as to the best interests or welfare of the child can be the subject of inquiry.").

¶ 22 The majority argues that *Deveraux' Adoption* has been implicitly overruled by our cases that adopt a jurisdictional clear statement rule, according to which we construe a statute as jurisdictional only if it is "clearly denominated as such." *See infra* ¶ 143. This is wrong. It is true that *Labelle v. McKay Dee Hospital Center* outlines a presumption "that our district courts retain their grant of constitutional jurisdiction in the absence of a clearly expressed statutory intention to limit jurisdiction." 2004 UT 15, ¶ 8, 89 P.3d 113. But this presumption does not require the statutory provision to explicitly state that it is jurisdictional. Instead, a statute clearly expresses the "intention to limit jurisdiction" when the statute imposes a prerequisite to an action that is "of the essence of the thing to be done," and not "given with a view merely to the proper, orderly and prompt conduct of . . . business, and by the failure to obey no prejudice will occur to those whose rights are protected by the statute." *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2010 UT 65, ¶¶ 14, 19, 245 P.3d 184 (alteration in original) (citation omitted).[7] In contrast,

---

[7] We have also consistently regarded our appellate deadlines as jurisdictional, even though our rules of appellate procedure do not explicitly contain a jurisdictional statement. *See, e.g., Union Pac. R.R. Co. v. Utah State Tax Comm'n*, 2000 UT 40, ¶ 25, 999 P.2d 17 ("UPRR's petitions for judicial review in both this court and the district court were filed late, thus depriving both courts of jurisdiction."); *Johnson v. Office of Prof'l Conduct*, 2017 UT 7, ¶ 10, 391 P.3d 208 (holding that "we lack jurisdiction to hear the merits of [the] appeal" where appellant's petition was outside of the Utah Rules of Appellate Procedure's thirty-

(cont.)

statutory provisions are "merely directory in nature rather than mandatory and jurisdictional" when disregarding them does not "compromise the purpose" of the statute but is simply a failure to adhere to "one of numerous procedural hurdles." *Sill v. Hart*, 2007 UT 45, ¶ 19, 162 P.3d 1099 (internal quotation marks omitted).

¶ 23 The statutory requirement of consent is mandatory and jurisdictional because it goes to the soul of the adoption. *See Brown v. Baby Girl Harper*, 766 S.E.2d 375, 378 (S.C. 2014) ("Consent lies at the foundation of the adoption process[.]" (citation omitted)); *In re Adoption of Keith M.W.*, 79 P.3d 623, 629 (Alaska 2003) ("Parental consent lies at the foundation of the adoption process." (internal quotation marks omitted)); *see also In re Adoption of Walton*, 259 P.2d at 883 (noting that although it is not the law in Utah that adoption statutes "are to be construed strictly in favor of the parent," courts "have not hesitated to build a strong fortress around the parent-child relation[ship], . . . . [which] has been considered a bundle of human rights of such fundamental importance as to lead courts frequently to say that consent is at the foundation of adoption statutes"). In fact, although some states have based their jurisdictional holdings on statutory filing requirements that differ from Utah's, *see infra* ¶ 136 & n.21, none of those statutes contains a clear statement that the required filings relate to subject matter jurisdiction—but the courts still widely recognize consent as a jurisdictional requirement.

---

day deadline). And these deadlines are properly characterized as subject matter jurisdictional. *See, e.g.*, *Flannigan v. Jordan*, 871 So. 2d 767, 770 (Ala. 2003) (untimely appeal deprives court of "subject-matter jurisdiction to review the case"); *Ark. State Univ. v. Prof'l Credit Mgmt., Inc.*, 299 S.W.3d 535, 537 (Ark. 2009) ("The appeal from district court to circuit court was . . . untimely, and the circuit court was without jurisdiction to accept the appeal. We are likewise without jurisdiction to hear this appeal, and we therefore dismiss it for lack of subject-matter jurisdiction."); *Holley v. Davey*, No. CV115015458S, 2012 WL 1510966, at *1 (Conn. Super. Ct. Apr. 4, 2012); *In re Marriage of Welp*, 596 N.W.2d 569, 571 (Iowa 1999); *Gore v. Tenn. Dep't of Corr.*, 132 S.W.3d 369, 378–79 (Tenn. Ct. App. 2003); *Turbeville v. Dailey*, No. 03-11-00679-CV, 2011 WL 6351850, at *3 (Tex. App. Dec. 14, 2011).

¶ 24 In addition to the "clear statement" rule, Utah law also applies a "class of cases" rule, in which "the concept of subject matter jurisdiction [is limited] to those cases in which the court lacks authority to hear a class of cases, rather than when it simply lacks authority to grant relief in an individual case." *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 31, 266 P.3d 702. The prospective adoptive parents argue that this limitation means that whether a court has subject matter jurisdiction over a case cannot turn on any case-specific procedural facts. Instead, they argue that it is a limited inquiry into whether the case, considered in the abstract, is fairly characterized as a general type of case over which the court has jurisdiction.

¶ 25 But the "class of cases" paradigm begs the question, as defining the class of cases over which courts have subject matter jurisdiction is not as simple as looking at the general topic. By this logic, courts, by way of example, would have jurisdiction over anything with the rough shape and form of a "tort case" or "landlord-tenant case." The prospective adoptive parents' approach creates an unworkable standard—it is often impossible to determine whether a case falls within a "class of cases" without considering some concrete aspects about it. There are often prerequisites individual litigants must meet to show that they have satisfied the requirements of subject matter jurisdiction even when we unquestionably have subject matter jurisdiction over the topic. Consider the tort and landlord-tenant case categories noted above. District courts have jurisdiction over negligence cases, a species of tort, but parties must still comply with the Governmental Immunity Act's notice requirements, because "[c]ompliance with the Immunity Act is a prerequisite to vesting a district court with subject matter jurisdiction over claims against governmental entities." *Wheeler v. McPherson*, 2002 UT 16, ¶ 9, 40 P.3d 632; *see also Buckner v. Kennard*, 2004 UT 78, ¶ 35, 99 P.3d 842 ("Compliance with the notice requirements, where applicable, is a prerequisite for subject matter jurisdiction."). Similarly, although district courts certainly have jurisdiction over landlord-tenant cases in general, we have held that the court lacks subject matter jurisdiction where one party failed to exhaust its administrative remedies. *Hous. Auth. of Salt Lake v. Snyder*, 2002 UT 28, ¶ 11, 44 P.3d 724. This logic applies with equal force to other statutory claims. *Ramsay v. Kane Cty. Human Res. Special Serv. Dist.*, 2014 UT 5, ¶ 17, 322 P.3d 1163 (failure to

exhaust administrative remedies deprived the court of subject matter jurisdiction over plaintiff's Retirement Act claims).[8]

¶ 26   As the above cases demonstrate, an overly generalized take on the "category of cases" ignores the fact that courts cannot decide cases when they lack the authority necessary to do so, as is the case here. Furthermore, neither *In re Adoption of Baby E.Z.* nor its predecessor case, *Johnson v. Johnson*, 2010 UT 28, 234 P.3d 1100, purported to overrule *Deveraux' Adoption*'s holding that a court lacks subject matter jurisdiction over an adoption where valid consent has not been obtained. The standard put forth by the prospective adoptive parents, however, would essentially have us overrule *Deveraux' Adoption*—but they have not briefed this argument and, in any case, I see no reason to do so.

¶ 27   The rationale behind the jurisdictional necessity of parental consent in adoption proceedings is based not, as the majority asserts, in "the availability of a particular form of judicial relief," *infra* ¶ 130, but in justiciability, because, in the eyes of the law, no child has been made available for adoption. Put another way, the lack of parental consent to an adoption makes the case unripe. *See Mendive v. Third Judicial Dist. Court in & for Lander Cty.*, 253 P.2d 884, 890 (Nev. 1953) (stating that before district court accepts guardian's consent, "it would definitely appear that the further jurisdiction of the . . . district court over the . . . adoption proceeding would be futile and unavailing; that its present provisional jurisdiction could never ripen into a jurisdiction to make a final order permitting the adoption, dependent as such order would be upon the consent of the guardian"); *In re St. Vincent's Servs., Inc.*, 841 N.Y.S.2d 834, 844 (Fam. Ct. 2007) (holding that "the issue of adoption ripens into a justiciable issue" only after parents' rights have been validly terminated); *In re Adoption of G.V.*, No. 11AP-617, 2011 WL 4921672, at *1 (Ohio Ct. App. Oct. 18, 2011) (stating that adoption

---

[8] The majority is correct that Governmental Immunity Act cases and administrative exhaustion cases involve ripeness, which "fits comfortably within the traditional notion of justiciability." *Infra* ¶ 145. I agree that ripeness is an appropriate jurisdictional issue, and it applies directly to this case because until parental consent is obtained, the adoption case is unripe. *See infra* ¶ 27.

petition had been dismissed as unripe where father's consent was not obtained).

¶ 28 Furthermore, by stating that there is no child available for adoption, I do not mean, as the majority suggests, that the Child is not "a real child with a real interest in these proceedings." *Infra* ¶ 152. The delicate and difficult nature of undoing error in an adoption proceeding is not lost on anyone. But the existence of a real child before the court does not mean the adoption case is ripe any more than the existence of a real tort before the court necessarily means that a case under the Governmental Immunity Act is ripe. Both require a prerequisite before the court is authorized to hear the case. In the adoption context, that prerequisite is parental consent, a traditional limit on justiciability. *See infra* ¶ 30 n.10. In short, district courts have no authority to place a child for adoption without the consent of the biological parents, and the prospective adoptive parents' reliance on the district court's error does not change the state of our law.

¶ 29 In the majority's view, this application of justiciability principles will lead to a number of outcomes that will chip away at our longstanding law of jurisdiction. The majority's concerns have no basis. Consent as a jurisdictional prerequisite to adoption is well established in this country, and none of the evils the majority predicts have befallen the courts that have recognized as much. *See infra* ¶ 130 & n.14 (listing cases in which courts around the country have been successful in "rebuff[ing] attempts by litigants to recast merits arguments as issues of subject-matter jurisdiction"). To the contrary, courts have easily made distinctions between the jurisdictional implications of consent and general statutory requirements. *See, e.g., In re Bullock*, 146 S.W.3d 783, 788 (Tex. App. 2004) (holding that despite the fact that a valid termination order is a jurisdictional prerequisite, "not all statutory prerequisites to filing suit are jurisdictional"); *In re Harshey*, 318 N.E.2d 544, 548–49 (Ohio Ct. App. 1974) (holding that despite statutory language requiring both parental and agency consent for child's adoption, lack of parental consent deprives a court of jurisdiction but lack of agency consent does not). Despite its language about "opening the door" and "sow[ing] the seeds," *infra* ¶ 122, the majority points to no situation in which a party would be able to use my opinion to ask a court to improperly expand subject matter jurisdiction to any statutory requirement. The majority may fear that litigants will attempt to stretch precedent to win cases—as often happens, in any matter—but it has offered no explanation for why it thinks Utah courts, unlike all the

other courts that have not been persuaded by those efforts, will be lured into inappropriately extending our subject matter jurisdiction law. The majority raises several hyperbolic "slippery slope" arguments—e.g., warning of "chaos and unpredictability for years to come," *infra* ¶ 100, and that "[a]ny and all 'case-specific procedural facts' would be eligible for classification as subject-matter jurisdictional," making the possibilities "endless" for courts to misinterpret our holding, *infra* ¶ 150. In doing so, rather than taking on the actual parameters of our opinion, the majority "tilts at a windmill of its own invention." *Lee v. Kemna*, 534 U.S. 362, 385 n.15 (2002). In the majority's view, the principles of ripeness and the case law of our court and the majority of other jurisdictions "rest[] on no settled legal principle," dooming our lower courts to hopeless confusion. *Infra* ¶ 150 n.28. But I have faith in our lower courts' ability to apply justiciability principles and our precedent, thereby preventing a situation in which "whenever . . . a defect [in a statutory prerequisite] was found, the subject-matter jurisdiction of the adoption court would be in jeopardy." *Infra* ¶ 149. Because I unambiguously limit my opinion to the jurisdictional implications of parental consent in adoption proceedings, I am confident that we can avoid a Pandora's box of subject matter jurisdictional evils.[9]

---

[9] The majority also laments that recognizing the subject matter jurisdictional nature of consent in an adoption proceeding will mean that district courts will be forced to carefully review adoption proceedings to ensure that they are error-free. *Infra* ¶ 149. I cannot conceive of how this is a problem. We have encouraged, and continue to encourage, district courts to tread carefully "in this highly sensitive area of child adoption." *In re Adoption of W.A.T.*, 808 P.2d 1083, 1085 (Utah 1991). This is particularly important in the ICWA context, where state courts' being too quick to remove Indian children from their families "is precisely one of the evils at which the ICWA was aimed." *In re Adoption of Halloway*, 732 P.2d 962, 969 (Utah 1986); *see also* 25 U.S.C. § 1901(4)–(5) ("Congress finds . . . that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and . . . that the States, exercising their recognized jurisdiction over Indian child

(cont.)

¶ 30 And as noted above, our holding in *Deveraux' Adoption* that invalid consent deprives the district court of subject matter jurisdiction is consistent with the great majority of states' views on the issue; the majority's assertion that consent is "a mere legal prerequisite to the issuance of an [adoption] order," *infra* ¶ 121, flies in the face of holding after holding.[10]

---

custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.").

[10] *See, e.g., L.T. v. W.L.*, 159 So. 3d 1289, 1291 (Ala. Civ. App. 2014) ("When a required valid consent is not obtained, the probate court lacks jurisdiction to enter an adoption judgment."); *Westerlund v. Croaff*, 198 P.2d 842, 845 (Ariz. 1948) ("[C]onsent in writing of the living natural parents, or its statutory equivalent, is a jurisdictional prerequisite to a valid adoption."); *Arnold v. Howell*, 219 P.2d 854, 858 (Cal. Dist. Ct. App. 1950) ("Consent lies at the foundation of statutes of adoption . . . . With certain statutory exceptions, consent to an adoption is considered a jurisdictional prerequisite." (citation omitted)); *In re I.H.H-L.*, 251 P.3d 651, 657 (Kan. Ct. App. 2011) ("[Where] there is no consent from any statutorily authorized person . . . . the district court did not have jurisdiction over the petition for adoption and should have dismissed the case." (citation omitted)); *G.M.D. v. M.D.*, 610 S.W.2d 305, 307 (Mo. Ct. App. 1980) ("[I]n the absence of consent the court lacks jurisdiction to proceed."); *In re Jackson*, 28 P.2d 125, 129 (Nev. 1934) (Because "consent lies at the foundation of adoption statutes . . . . [t]he order of adoption in this case was void because [it was] made without the consent of [the father]."); *In re Ralph*, 710 N.Y.S.2d 500, 503 (App. Div. 2000) ("The court lacks jurisdiction to act upon incomplete adoption applications[.]"); *In re Holder*, 10 S.E.2d 620, 622 (N.C. 1940) ("[N]either parent . . . gave consent to the adoption in the manner contemplated by the statute . . . . This . . . is held to be essential to jurisdiction of the subject matter." (citation omitted)); *McGinty v. Jewish Children's Bureau*, 545 N.E.2d 1272, 1274 (Ohio 1989) (per curiam) ("[P]arental consent to an adoption order is the jurisdictional prerequisite which, if absent, allows the order to be attacked as void . . . ."); *Adoption of Robin*, 571 P.2d 850, 856 (Okla. 1977) ("It is fundamental that notice and parental consent are jurisdictional

(cont.)

17

¶ 31   For example, in a case with similar facts to this one, a mother lied to an adoption agency about the identity of the father of the two children she wanted to place for adoption and the county court thus never obtained consent from the biological father. *In re Adoption of Kassandra B.*, 540 N.W.2d 554, 556 (Neb. 1995). The Nebraska Supreme Court, noting that "[c]hildren are not legally free for adoption unless both biological parents consent or one of the statutory exceptions to the need for their consent has been met," held that the lower court lacked subject matter jurisdiction because the father's consent was never obtained. *Id.* at 560. The order terminating parental rights was therefore void. *Id.*

¶ 32   And where a technical defect arose involving the witnesses to the birth mother's signing of a consent form for adoption, the South Carolina Supreme Court rejected the notion that substantial compliance with the statutory requirements was sufficient. *Brown*, 766 S.E.2d at 379. The court noted that "statutory formalities [regarding consent or relinquishment forms] have heightened relevance and importance" because they "are the only clear line separating a biological parent's rights with respect to the child prior to the adoption, from the finality and irrevocability resulting from the execution of the formalities." *Id.* at 380. And because "[c]onsent lies at the foundation of the adoption process," the lack of valid consent from the birth mother meant any adoption decree would be invalid. *Id.* at 378 (citation omitted).[11]

---

prerequisites to the adoption of a legitimate child. . . . [and] [a]n adoption granted without parental consent is void . . . ." (citations omitted)); *Hughes v. Aetna Cas. & Sur. Co.*, 383 P.2d 55, 60 (Or. 1963) ("Consent to an adoption by parents or guardian or other person *in loco parentis* is jurisdictional, except where the statute does not require it."); *In re Adoption of List*, 211 A.2d 870, 873 (Pa. 1965) ("[N]otice to a natural parent of the adoption proceedings and the consent of a natural parent, where necessary, are jurisdictional prerequisites in an adoption proceeding . . . ."); *In re JWT*, 104 P.3d 93, 94 (Wyo. 2005) ("But here, the appropriate documentation never having been filed, the district court did not obtain jurisdiction to hear the adoption.").

[11] A handful of cases have suggested that the rule is different. For example, the Nevada Supreme Court held in a conclusory footnote that lack of consent made adoption proceedings merely voidable under 25

(cont.)

¶ 33   The majority attacks these cases on several grounds, none of which is persuasive. First, the majority argues that because these cases involve challenges to the validity of consent made by the birth parent, "they tell us nothing useful about . . . whether a failure of consent is a

---

U.S.C. section 1914, based entirely on the fear that "a challenge made years after the adoption was finalized and untimely under state law might result in a holding that was detrimental to the best interests of the Native American child that the ICWA was designed to protect." *In re Petition of Phillip A.C.*, 149 P.3d 51, 60 n.44 (Nev. 2006). Similarly, the Alaska Supreme Court held that federal law did not force the conclusion that "invalid consents under § 1913 are void as a matter of law," reasoning that otherwise decrees stemming from invalid consents would not be subject to state statutes of limitations. *In re Adoption of T.N.F.*, 781 P.2d 973, 979 (Alaska 1989).

But we need not reach the issue of how this court would decide a case where the adoption had already been finalized. Utah law provides a limitation on the time period in which to contest an adoption. UTAH CODE § 78B-6-133(7)(b) ("No person may contest an adoption after one year from the day on which the final decree of adoption is entered."). Because the court has not entered a final adoption decree, we do not need to decide whether this statute would bar a parent from contesting an adoption more than one year after the final adoption decree where the underlying proceeding was void for want of jurisdiction. *Cf. In re Estate of Willey*, 2016 UT 53, ¶ 16, 391 P.3d 171 (declining to reach issue of "whether all claims that judgments are void under rule 60(b)(4) [of the Utah Rules of Civil Procedure] are subject to the reasonable time limit imposed by rule 60(c)" because "the parties do not adequately brief this issue, because other jurisdictions are split on this issue, and because resolution of this issue is not necessary to the disposition of this case"). However, I note that other courts have, under certain circumstances, applied similar statutes in such a manner. *See Hogue v. Olympic Bank*, 708 P.2d 605, 608, 611 (Or. Ct. App. 1985) (en banc) (holding that one-year statute of limitations barred challenge to void adoption judgment where mother knew of adoption within statutory time period but did not act). *But see Hughes*, 383 P.2d at 66 (holding that statute did not bar challenge to void adoption judgment where applying statute of limitations would interfere with vested property rights).

*subject-matter jurisdictional* defect that can be raised by the court *sua sponte.*" *Infra* ¶ 134. Of course, there are cases in which the court has raised the issue *sua sponte. See, e.g.*, *In re I.H.H-L.*, 251 P.3d 651, 653 (Kan. Ct. App. 2011) ("Neither party questioned the district court's jurisdiction to conduct the [termination of parental rights] proceedings that led to this appeal. On its own motion, however, this court questioned that jurisdiction and sought additional briefing from the parties addressing the jurisdictional questions. An appellate court has a duty to question jurisdiction on its own initiative."); *In re Adoption of L.D.S.*, 155 P.3d at 8 ("The jurisdictional issue [of whether the child was eligible for adoption without the valid consent of the biological parents] was raised *sua sponte* by this Court."). And in any case, no court has relied on the dissent's distinction, as parties are also free to raise subject matter jurisdiction concerns. *See Johnson*, 2010 UT 28, ¶ 10 (stating that "parties can raise subject matter jurisdiction at any time during a proceeding"). We are obligated to raise subject matter jurisdictional issues when they appear in a case before us, and there is no authority for the assertion that we may not do so if the facts of other cases did not require other courts to do the same.

¶ 34 The majority also points out that some adoption cases have personal jurisdiction defects due to lack of notice to the biological father. *See infra* ¶ 135 & n.18. But the fact that lack of notice often is intertwined with lack of consent does not mean that the issue is one solely of personal jurisdiction. A court may lack both personal jurisdiction and subject matter jurisdiction, and the dissent's attempt to distinguish cases in which a lack of consent stemmed from failure to give notice is unavailing.

¶ 35 Additionally, the majority harbors "suspicion" of the cases we cite for the proposition that consent is a jurisdictional prerequisite because it thinks that many of them are from a "bygone era"—a time before courts focused on the best interests of the child. *Infra* ¶¶ 138–39. But courts across the country have continually and recently restated this proposition. Requiring parents to validly consent to termination of their parental rights before the court may assert jurisdiction over their children is not at all inconsistent with the current recognition in Utah and many other states that "the best interests of the child are paramount." *Infra* ¶ 139. Indeed, numerous courts with statutory

schemes that, like ours,[12] recognize the importance of the best interests of the child hold that consent is a jurisdictional requirement for adoption. *See C.T. v. J.S.*, 951 P.2d 1199, 1200 (Alaska 1998) ("The only question is whether the trial court permissibly circumvented the consent requirement . . . . If not, then the adoption decree is void for lack of subject matter jurisdiction[.]");[13] *Brown*, 766 S.E.2d at 378 ("Consent lies at the foundation of the adoption process[.]" (citation omitted));[14] *In re Adoption of L.D.S.*, 155 P.3d at 8 ("[T]he best interests of the child can be served in no legitimate manner except in obedience to the policies and procedures mandated by law.").[15] In any case, the best interests of a child are not furthered by placing the child for adoption without parental consent. *See In re S.L.G.*, 110 A.3d 1275, 1285 (D.C. 2015) ("Although 'the paramount consideration' in determining whether to terminate parental rights is the best interest of the child, our case law recognizes that the [termination of parental rights] factors must be applied in accordance with 'the presumption that the child's best interest will be served by placing the child with his natural parent, provided the parent has not been proven unfit.'" (citation omitted)); *In re Adoption of N.L.B.*, 212 S.W.3d 123, 128 (Mo. 2007) (en banc) (stating that statutorily required consideration of "the welfare of the person sought to be adopted . . . is informed by the fundamental proposition and presumption that maintaining the natural parent-child relationship is in the best interests of the child"); *In re Adoption of L.D.S.*, 155 P.3d at 9 ("The lesson of this matter is that the interests of the child and ultimately all concerned in matters regarding parental rights can be

---

[12] UTAH CODE § 78B-6-102(1) ("It is the intent and desire of the Legislature that in every adoption the best interest of the child should govern and be of foremost concern in the court's determination.").

[13] ALASKA STAT. § 25.23.005 (The adoption "chapter shall be liberally construed to the end that the best interests of adopted children are promoted.").

[14] S.C. CODE § 63-9-20 ("[W]hen the interests of a child and an adult are in conflict, the conflict must be resolved in favor of the child.").

[15] OKLA. STAT. tit. 10, § 7501-1.2(A)(1) (stating that one purpose of the Oklahoma Adoption Code is to "[e]nsure and promote the best interests of the child in adoptions").

adequately served only through scrupulous adherence to the statutory scheme found in the Adoption Code.").

¶ 36 Having explained why valid consent is a subject matter jurisdictional prerequisite for an adoption proceeding, I now turn to whether Birth Mother consented to the termination of her parental rights. I would hold that her consent was not timely under ICWA and therefore invalid.

### B. Birth Mother's Consent Was Invalid

¶ 37  ICWA lays out a series of requirements for the termination of parental rights, including that "[a]ny consent given prior to, or within ten days after, birth of the Indian child shall not be valid." 25 U.S.C. § 1913(a). Because the Child is an Indian child and therefore ICWA applies to these proceedings, the question is whether Birth Mother's consent was timely given under this section.

¶ 38  That Birth Mother's consent did not comply with ICWA's timing requirements is undeniable, as both times she attempted to consent were "within ten days after[] birth of the Indian child." *Id.* The Child was born at 12:14 p.m. on August 29, 2014, and Birth Mother attempted to consent for the first time on August 30, 2014. Both parties agree that this consent was invalid. Birth Mother again attempted to consent at 1:29 p.m. on September 8, 2014, and the prospective adoptive parents argue that this attempt was valid—even though it did not occur more than ten days after the Child's birth—because it occurred more than ten twenty-four-hour periods after the Child's birth. This argument is flat wrong.

¶ 39  When interpreting a statute, "our primary goal is to evince the true intent and purpose" of the legislative body. *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (citation omitted). The best evidence of legislative intent is "the plain and ordinary meaning of the statute's terms." *Rent-A-Center W., Inc. v. Utah State Tax Comm'n*, 2016 UT 1, ¶ 13, 367 P.3d 989. We often look to dictionary definitions as a "starting point" to determine the plain and ordinary meaning. *Nichols v. Jacobsen Constr. Co.*, 2016 UT 19, ¶ 17, 374 P.3d 3 (citation omitted); *State v. Canton*, 2013 UT 44, ¶ 13, 308 P.3d 517 ("In determining the ordinary meaning of nontechnical terms of a statute, our 'starting point' is the dictionary." (citation omitted)).

¶ 40  The prospective adoptive parents purport to apply a plain language analysis by looking to *Black's Law Dictionary*, which, around

the time ICWA was passed, defined "day" as "[a] period of time consisting of twenty-four hours and including the solar day and the night." *Day*, BLACK'S LAW DICTIONARY (5th ed. 1979). Under the prospective adoptive parents' approach, ICWA's timing requirement would be satisfied if consent was given any time after 240 hours of the child's birth.

¶ 41 But the prospective adoptive parents may not cherry-pick a dictionary definition and call it a plain language analysis. I note that most definitions refer to a twenty-four-hour period with respect to the time from midnight to midnight. *E.g.*, *Day*, WEBSTER'S NEW COLLEGIATE DICTIONARY (1973) ("the mean solar day of 24 hours beginning at mean midnight"); *Day*, RANDOM HOUSE COLLEGE DICTIONARY (revised ed. 1984) ("Also called *civil day.* a division of time equal to 24 hours but reckoned from one midnight to the next"); *Day*, AMERICAN HERITAGE DICTIONARY (5th ed. 2011) ("The 24-hour period during which the earth completes one rotation on its axis, traditionally measured from midnight to midnight."). This definition is compatible with the notion that we do not begin counting the days since the Child's birth based on the hour and minute he was born, but rather by the midnight-to-midnight metric generally used. *See, e.g.*, *Reisbeck v. HCA Health Servs. of Utah, Inc.*, 2000 UT 48, ¶ 16 n.4, 2 P.3d 447 (noting that rule 22 of the Utah Rules of Appellate Procedure's deadline of days was meant to be calculated according to calendar days); *see also State v. Sheets*, 338 N.W.2d 886, 886–87 (Iowa 1983) ("The general rule is that when the word 'day' is used it means calendar day which includes the entire day from midnight to midnight . . . . We find no language in the [45-day statutory requirement] that indicates an intention to measure the time twenty-four hours from a given event." (citations omitted)); *In re Janklow*, 589 N.W.2d 624, 626 (S.D. 1999) ("A 'day,' in this sense, begins at 12 o'clock midnight, and extends through 24 hours to the next 12 o'clock midnight." (citation omitted)); *Troxell v. Rainier Pub. Sch. Dist. No. 307*, 111 P.3d 1173, 1176–77 (Wash. 2005) (citing *Webster's Dictionary* in holding that the plain language of a statute required defining day as a twenty-four-hour period beginning at midnight). The prospective adoptive parents' formalism has no place in this area of the law, as their method of tracking time would require district courts to track unique filing deadlines for each individual litigant—3:24 p.m. for litigant A, 5 p.m. for litigant B, and so on. *See Troxell*, 111 P.3d at 1177 n.4 (noting "absurd consequences" of "computation based on the precise timing of an act" including that "parties would have to attend to the precise

hour, minute, and second of the filing" at issue (citation omitted)). I cannot see how Congress could have intended this result for counting time periods for purposes of ICWA.

¶ 42  This plain language interpretation of "day" as the time from midnight to midnight also meshes with the method for computing time outlined in the Federal Rules of Civil Procedure and its Utah counterpart, which also count in terms of days, not hours. FED. R. CIV. P. 6(a) (count in days "[w]hen the period is stated in days" and count in hours only "[w]hen the period is stated in hours"); UTAH R. CIV. P. 6(a) (same). This method of counting days applies in a variety of settings. FED. R. CIV. P. 6(a) (This rule applies "in computing any time period . . . in any statute that does not specify a method of computing time."); UTAH R. CIV. P. 6(a) (same); *see Gilroy v. Lowe*, 626 P.2d 469, 471 (Utah 1981) (stating that the "method of computing time periods relating to acts provided for by law is set out in Rule 6(a) [of the] Utah Rules of Civil Procedure" and requires counting by calendar days); *see also LeGras v. AETNA Life Ins. Co.*, 786 F.3d 1233, 1237–38 (9th Cir. 2015) ("We have consistently applied Rule 6 [of the Federal Rules of Civil Procedure] when interpreting time periods in various statutory contexts."); *Edwards v. Bay State Milling Co.*, 519 F. App'x 746, 748 n.3 (3d Cir. 2013) (noting that rule 6 of the Federal Rules of Civil Procedure "applies to any statute that does not specify a method of computing time" (internal quotation marks omitted)). Indeed, we have applied rule 6 of the Utah Rules of Civil Procedure to extend the waiting period for a putative father to file a paternity petition if the birth of the child falls on a holiday or weekend. *Thurnwald v. A.E.*, 2007 UT 38, ¶ 4, 163 P.3d 623, *abrogated on other grounds by* In re Adoption of J.S., 2014 UT 51, 358 P.3d 1009.

¶ 43  The prospective adoptive parents' interpretation contorts the plain language of ICWA—had Congress intended to count by hours, it would have done so, as many state legislatures have done. *See* UTAH CODE § 78B-6-125(1) ("A birth mother may not consent to the adoption of her child or relinquish control or custody of her child until at least 24 hours after the birth of her child."); *see also* IOWA CODE § 600A.4(2)(g), (4) (requiring a release of custody to be signed "not less than seventy-two hours after the birth of the child" and revocation of consent "within ninety-six hours of the time such parent signed a release of custody"); NEV. REV. STAT. § 127.070(1) ("All releases for and consents to adoption executed in this state by the mother before the birth of a child or within 72 hours after the birth of a child are

invalid."). But ICWA's language is unambiguous in requiring a waiting period in terms of days, and the argument that the waiting period is really 240 hours is demonstrably wrong.

¶ 44 Because Birth Mother gave consent before midnight on the tenth day after the Child's birth, she gave consent "within ten days after" the Child's birth and her consent is therefore invalid.[16] 25 U.S.C. § 1913(a); *see In re Adoption of C.D.K.*, 629 F. Supp. 2d 1258, 1261, 1263 (D. Utah 2009) (invalidating a mother's consent to termination of her parental rights because the relinquishment hearing happened within ten days of the child's birth). This, in my view, deprived the district court of subject matter jurisdiction, and I now turn to whether Birth Father had the right to raise the issue of the underlying subject matter jurisdictional defect.

## II. BIRTH FATHER HAS THE LEGAL RIGHT TO CHALLENGE THE VALIDITY OF BIRTH MOTHER'S CONSENT AND THE DISTRICT COURT'S SUBJECT MATTER JURISDICTION

¶ 45 Following Birth Mother's invalid consent, Birth Father appealed the district court's denial of his motion to intervene. The district court denied Birth Father's motion to intervene because it held that he had not established paternity before Birth Mother gave her consent, as required by Utah Code section 78B-6-121(3). Although I believe Birth Mother's consent was invalid and the district court lacked subject matter jurisdiction to proceed with the adoption, these issues are before us only if Birth Father can properly challenge them. I would hold that Birth Father can do so, as he enjoys both traditional standing

---

[16] The majority takes the position that the action is merely voidable because the phrase "may petition" in section 1914 "suggests that unless a party affirmatively challenges a proceeding's compliance with ICWA section 1913, the consent and resulting termination order are valid." *Infra* ¶ 117. I reject this attempt to pit sections 1914 and 1913's protections against each other. Section 1914 is a mechanism for bringing voidness to the attention of a court; it does not negate section 1913's language about untimely consent "not be[ing] valid." The majority's contrary interpretation contravenes our principle of interpreting statutes "in harmony with other provisions in the same statute and with other statutes under the same and related chapters." *Sill v. Hart*, 2007 UT 45, ¶ 7, 162 P.3d 1099 (citation omitted).

under Utah standing law and a statutory right as a parent under 25 U.S.C. section 1914 to raise Birth Mother's invalid consent and the district court's lack of subject matter jurisdiction to go forward with the adoption.

*A. Birth Father Has Standing Under Our Traditional Test*

¶ 46 Before a court may make a child available for adoption, it must terminate the parental rights of the biological parents. The order terminating Birth Mother's parental rights is, as Justice Lee correctly notes, an appealable order. *Infra* ¶ 98. But as a prerequisite to the adoption order—which has not been finalized in this case—it is an appealable order within an existing case in which Birth Father's rights are still very much at issue.[17] In the unique context of adoption

---

[17] The majority chides me for "cit[ing] no authority for the power to revisit a final order in a collateral termination proceeding not challenged by any of the parties at any stage of these proceedings." *Infra* ¶ 104. But the order here was not actually collateral, as both the termination and consent orders all took place within the same adoption proceeding, which is among the rare cases in which a final, appealable order affects remaining rights in such a way that we do not view it as collateral. *Cf. State v. Mooers & Becker*, 2017 UT 36, ¶ 17, __ P.3d __ (noting that "orders of complete restitution, though technically entered on the civil docket, flow entirely from the criminal cases that give rise to them; they are not separate civil cases with a life outside of the criminal case"); *id.* ¶ 19 n.4 (noting that where a district court alters the amount of complete restitution on appeal, that may form the basis for the district court on remand to also alter the amount of court-ordered restitution, even where the order of court-ordered restitution was not appealed). To call Birth Father's action "collateral" similarly ignores the reality of how adoption orders are intertwined. And because Birth Father's rights were directly affected by an order within the existing adoption case, his appeal properly falls within the time period of "the pendency of an action," during which we have a responsibility to *sua sponte* raise subject matter jurisdictional issues. *See infra* ¶ 104.

The majority also cites two cases in support of its assertion that state timelines bar Birth Father from challenging the order terminating Mother's rights because "[w]here, as here, a district court expressly holds that its order complies with ICWA requirements, the courts have held that the time to challenge that determination under section 1914

(cont.)

proceedings, Birth Father's rights are inextricably tied to the order terminating Birth Mother's rights, as that order purported to terminate his rights as a biological parent.[18] Consequently, I conclude that Birth Father has standing to raise the defect in Birth Mother's consent and the resultant failure of subject matter jurisdiction.

---

expires upon the running of the time for an appeal." *Infra* ¶ 119. But our holding in the first case, *In re Adoption of A.B.*, 2010 UT 55, 245 P.3d 711, applies only to individuals who have the ability to file an appeal. *See id.* ¶ 13. But in this case, Birth Father was not a party at the time of Birth Mother's untimely consent and therefore had no ability to appeal the relevant order. And the second case involves a question of res judicata and the Full Faith and Credit Clause, neither of which is applicable here. *See Kiowa Tribe of Okla. v. Lewis*, 777 F.2d 587, 592 (10th Cir. 1985).

[18] The majority posits that Birth Father "accepted the validity of the consent order" until this court raised the issue, and concludes that he thus waived the issue. *Infra* ¶ 98 n.1. But whether Birth Father, the prospective adoptive parents, or the district court miscounted the days from the Child's birth does not change the fact that the issue goes to subject matter jurisdiction and is properly raised by the court. *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 25, 266 P.3d 702 ("Because subject matter jurisdiction goes to the heart of a court's authority to hear a case, it is not subject to waiver and may be raised at any time, even if first raised on appeal." (citation omitted)); *Barnard v. Wassermann*, 855 P.2d 243, 248 (Utah 1993) ("This court has made clear that challenges to subject matter jurisdiction may be raised at any time and cannot be waived by the parties."). And I reject the majority's assertion that applying our *sua sponte* duties to this case "smacks of paternalism." *Infra* ¶ 120. That charge essentially boils down to an attack on ICWA's special protections for Indian children, parents, and tribes. If anything, the majority's suggestion that state courts should turn their back to these problems at the risk of being paternalistic smacks of the kind of disregard of Indian welfare that caused Congress to enact ICWA in the first place. *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 44–45 (1989) ("It is clear from the very text of the ICWA, not to mention its legislative history and the hearings that led to its enactment, that Congress was concerned with the rights of Indian families and Indian communities vis-à-vis state authorities.").

¶ 47  Courts of this state employ a three-step inquiry in assessing traditional standing: (1) "the party must assert that it has been or will be adversely affected by the [challenged] actions"; (2) "the party must allege a causal relationship between the injury to the party, the [challenged] actions and the relief requested"; and (3) "the relief requested must be substantially likely to redress the injury claimed." *Utah Chapter of the Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 19, 148 P.3d 960 (alterations in original) (internal quotation marks omitted). Birth Father easily satisfies all three parts of this test.

¶ 48  First, Birth Father is undeniably adversely affected by Birth Mother's invalid consent and the dependent order terminating her rights. Indeed, absent the termination order, Birth Father would be a "parent" under ICWA and entitled to intervene in this action even under the most grudging of standards. But as it now stands, Birth Mother's invalid consent cut off Birth Father's rights to his own child. That this state of affairs adversely affected Birth Father is beyond peradventure. *See In re J.P.*, 648 P.2d 1364, 1373 (Utah 1982) ("The rights inherent in family relationships—husband-wife, parent-child, and sibling—are the most obvious examples of rights retained by the people. They are 'natural,' 'intrinsic,' or 'prior' in the sense that our Constitutions presuppose them. . . . Blackstone deemed 'the most universal relation in nature . . . (to be) that between parent and child.'" (citations omitted)). Second, Birth Father can establish a causal relationship between the challenged action and the adverse effect: Birth Mother's invalid consent and the subsequent order terminating her rights led directly to the district court placing the Child for adoption. And finally, the relief requested—Birth Father's opportunity to intervene and assert his parental rights—will be a direct consequence of recognizing the invalidity of Birth Mother's rights.

### B. Birth Father Is a Parent Under ICWA

¶ 49  Section 1914 of ICWA allows a parent to petition a court to invalidate an action terminating parental rights that violated any provision of sections 1911, 1912, and 1913 of ICWA.[19] We hold that

---

[19] Section 1914 reads in full:

> Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from

(cont.)

Birth Father meets ICWA's definition of a "parent" because he has acknowledged paternity.

¶ 50 "Pursuant to general principles of statutory interpretation, [w]e . . . look first to the . . . plain language [of ICWA], recognizing that our primary goal is to give effect to [congressional] intent in light of the purpose the statute was meant to achieve." *In re Kunz*, 2004 UT 71, ¶ 8, 99 P.3d 793 (first three alterations in original) (internal quotation marks omitted). We consider it obvious that the plain language does not fully answer the question of what is required for an unmarried biological father to be considered a parent for purposes of ICWA.[20] ICWA defines "parent" as "any biological parent or parents of an Indian child" but specifically excludes "the unwed father where paternity has not been acknowledged or established." 25 U.S.C. § 1903(9). ICWA does not,

------

whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title.

25 U.S.C. § 1914. We address the language about removal from custody below. *Infra* ¶¶ 78–84.

[20] The dissent misinterprets this sentence, stating that we "find[] it 'obvious that the plain language' of ICWA does not dictate the application of state law standards of paternity." *Infra* ¶ 178. The dissent goes further to claim that we "base[] that conclusion on [our] sense of Congress's 'purpose' in enacting ICWA, and on analysis in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989), that [we] view[] as supportive of [our] holding." *Infra* ¶ 178. However, our conclusion that the plain language does not fully answer the question of what is required for an unmarried biological father to be considered a parent under ICWA is not so narrowly moored. Our conclusion is further supported by the language of, among other provisions, 25 U.S.C. section 1903(9), where "parent" is defined, providing that an unmarried biological father is a parent only if he has "acknowledged or established" paternity, but with no indication of what actions are required to acknowledge or establish paternity and no specification regarding timing.

however, define what actions the unmarried father has to take to acknowledge or establish paternity and also does not specify the timing. Because of the lack of a definition, we look instead to the plain meaning of the terms "acknowledge" and "establish." We conclude that the plain meaning of the terms is so broad that it offers little guidance, so we then address the question of whether the procedures and timing for acknowledging or establishing paternity are defined by state law or are subject to a tribal or federal standard.

¶ 51 The district court determined that "Congress intended for ICWA to defer to state and/or tribal law standards for establishing paternity" and that Birth Father failed to comply with Utah or South Dakota requirements for establishing paternity. We disagree. Instead, we hold that Congress intended that a federal standard apply. We also hold that Birth Father's actions were timely and sufficient to acknowledge paternity under ICWA.

1. Interpreting "Acknowledge" and "Establish" Requires a Plain Meaning Approach

¶ 52 Because the terms "acknowledge" and "establish" are not defined in the statute, we turn first to dictionary definitions for guidance. The first definition for "acknowledge" in *Black's Law Dictionary* is "[t]o recognize (something) as being factual or valid." *Acknowledge*, BLACK'S LAW DICTIONARY (10th ed. 2014). The second definition for "acknowledge" specifically gives "acknowledge paternity of the child" as an example; it reads, "[t]o show that one accepts responsibility for." *Id.* The legal definition of "acknowledge" in *Merriam-Webster*'s online dictionary includes a variant with a similar example ("will *acknowledge* the child as his") and defines "acknowledge" as "to admit paternity of." *Acknowledge*, MERRIAM-WEBSTER, *available at* https://perma.cc/HMQ9-MHP8. Other definitions of "acknowledge" in *Merriam-Webster*'s online dictionary include "to recognize as genuine or valid." *Id.* Clearly, "acknowledge" is a broad term and little guidance is found in its meaning as to how to apply it. For example, while acknowledging paternity of a child can mean "show[ing] that one accepts responsibility for" the child, no specific actions are suggested by that term or its definition. *Acknowledge*, BLACK'S LAW DICTIONARY (10th ed. 2014). Incidentally, *Black's Law Dictionary* defines a "formal acknowledgment" as "[a] father's recognition of a child as his own by a formal, written declaration that meets a state's requirements for execution, typically by

signing in the presence of two witnesses." *Acknowledgement*, BLACK'S LAW DICTIONARY (10th ed. 2014). An "informal acknowledgment," on the other hand, is "[a] father's recognition of a child as his own not by a written declaration but by receiving the child into his family or supporting the child and otherwise treating the child as his own offspring." *Id.* The dictionary definitions thus provide for acknowledgment under both state rules and other means not tied to state standards, and ICWA does not specify whether it requires formal or informal acknowledgment of paternity. Thus, the dictionary definition alone of "acknowledge" does not answer the question of what ICWA requires of a parent.

¶ 53 "Establish" likewise has a broad meaning under a plain language analysis. *Black's Law Dictionary* has three definitions of "establish," only one of which makes sense in the context of establishing paternity: "To prove; to convince." *Establish*, BLACK'S LAW DICTIONARY (10th ed. 2014). And the most logical definition for this context in *Merriam-Webster*'s online dictionary is "to put beyond doubt." *Establish*, MERRIAM-WEBSTER, *available at* https://perma.cc/9RB2-33WP. From these definitions, it is obvious that it requires more to "establish" paternity than to "acknowledge" paternity. But what actions are required in order to "prove" paternity or "put [paternity] beyond doubt" is not apparent from the plain meaning of the word. Furthermore, neither the plain meaning of "acknowledge" nor the plain meaning of "establish" suggests anything about the timing of the actions. Theoretically, if we were to rely on a plain meaning of the terms for the actions and timing required, a father could acknowledge or establish paternity many years after the completion of the adoption. Because the terms are so broad and vague and because of the lack of a timing element, dictionary definitions alone are inadequate for determining who is a parent under ICWA.

¶ 54 In light of this roadblock in the plain language analysis, the dissent argues that we should view "acknowledge" and "establish" as terms of art defined by the states. But the dissent belies its own conclusion by asserting, on one hand, that "acknowledge" and "establish" are well-defined terms of art, and on the other, that there are fifty variants of the terms. *Infra* ¶ 170. These are contradictory ideas, and the dissent's attempt to reconcile them is unavailing.

¶ 55 The dissent's position takes an erroneous view of the definition of a term of art. A term of art has one established meaning, not fifty. *Term of art*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A word

or phrase having *a* specific, precise meaning in a given specialty, apart from its general meaning in ordinary contexts." (emphasis added)); *see McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991) ("[W]e assume that when a statute uses such a term [of art], Congress intended it to have its established meaning."); *Dubois v. Madison Paper Co.*, 795 A.2d 696, 699 (Me. 2002) ("The phrase 'clear and convincing evidence' is a legal term of art with *a* well-established meaning." (emphasis added)). The dissent's insistence that "acknowledge" and "establish" have distinctly defined meanings contradicts the notion that the "long-established" definitions last only as far as the state line.

¶ 56   A term of art may of course have nuanced differences from state to state, but the core meaning must be the same.[21] Contrary to the dissent's assertion, different states' interpretations of "acknowledge" and "establish" do not share a common core. As the dissent itself notes, "standards vary widely across the fifty states," *infra* ¶ 170 n.35, including whether a writing must be signed by the mother for the father to acknowledge paternity. The standard for acknowledging or establishing paternity in Utah is so different from the standard in, for example, New Jersey, that we could not say they share the same common core. *See Bruce L. v. W.E.*, 247 P.3d 966, 978–79 (Alaska 2011) ("Under New Jersey law, 'fil[ing] a written acknowledgement of paternity . . . or initiat[ing] a lawsuit claiming paternity or any other parental rights prior to the final judgment of adoption' would make an unwed father a parent for ICWA purposes." (alterations in original) (quoting *In re Adoption of a Child of Indian Heritage*, 543 A.2d 925, 936 (N.J. 1988))).

¶ 57   The contradiction inherent in the dissent's argument is exposed in its analysis of *Holyfield*. The dissent states that *Holyfield's* rejection of state-law definitions is "easily distinguishable, as it

---

[21] This underscores why acknowledgement or establishment of paternity is not, as the dissent contends, like a declaration of bankruptcy. *Infra* ¶ 191 n.49. Declaring bankruptcy — as a legal term of art — certainly has different effects than "just say[ing] the word bankruptcy." *Infra* ¶ 191 n.49. But the dissent ignores that the steps one must take to declare bankruptcy and the legal effects it has are the same in all fifty states. But that is far from the case for acknowledging and establishing paternity.

involved a statutory term (*domicile*) of 'generally uncontroverted meaning.'" *Infra* ¶ 165 (quoting *Holyfield*, 490 U.S. at 48). This is similar to how—at times—the dissent describes "acknowledge" and "establish" as well. *See infra* ¶ 170 ("First, the words *acknowledgement* and *establishment* of *paternity* are long-established terms of art in state family law."); *infra* ¶ 170 ("Congress utilized terms with accepted meaning in state family law."); *infra* ¶ 170 n.35 ("[W]hen ICWA was enacted, 'acknowledge' was a term of art that indicated a specific process under state law—*though varying from state to state*." (emphasis added)). The dissent is attempting to have its cake and eat it too by stating that "acknowledge" and "establish" are both accepted terms of art and have fifty different meanings.

¶ 58 Rather, "acknowledge" and "establish" are properly construed as plain language terms. *Carpenter v. Hawley*, 281 S.E.2d 783, 786 (N.C. Ct. App. 1981) ("Contrary to plaintiff's assertions, the word 'acknowledged' is not a term of art . . . requiring a formal declaration before an authorized official."); *see also Estate of Griswold*, 24 P.3d 1191, 1197–98 (Cal. 2001) (applying plain language analysis to "acknowledge" in paternity suit); *Blythe v. Ayres*, 31 P. 915, 922 (Cal. 1892) (stating that "[t]he word 'acknowledge' has no technical meaning" in the context of paternity proceedings); *State v. Wolfe*, 239 A.2d 509, 512–13 (Conn. 1968) (stating that "acknowledge" in paternity statute "can only be taken in its usual and common meaning which is '(t)o own, avow, or admit; to confess; to recognize one's acts, and assume the responsibility therefor'" (citing editions of *Black's Law Dictionary* and *Webster's Dictionary*)). A plain language interpretation of "acknowledge" and "establish" furthers ICWA's purpose by allowing reasonable methods of acknowledging or establishing paternity, and Birth Father's actions fall plainly within that scope.

2. Federal Law Applies to Give Context to the Plain Meaning of the Terms

¶ 59 Having found that a plain language analysis of the terms requires more than the dictionary definitions provide, we now turn to the question of whether the procedures and timing for acknowledging or establishing paternity are defined by state law. We reject the notion that courts should rely on state law to determine whether an unmarried biological father has acknowledged or established paternity under ICWA. Instead, we adopt the reasoning in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989). In *Holyfield*, the Supreme Court stated that

> the purpose of the ICWA gives no reason to believe that Congress intended to rely on state law for the definition of a critical term; quite the contrary. It is clear from the very text of the ICWA, not to mention its legislative history and the hearings that led to its enactment, that Congress was concerned with the rights of Indian families and Indian communities vis-à-vis state authorities.

*Id.* at 44–45. "Parent" is a critical term under ICWA. Whether an individual qualifies as a "parent" determines whether he or she may benefit from the heightened protections for parental rights available under ICWA. There is "no reason to believe that Congress intended to rely on state law for the definition of [this] critical term." *Id.* at 44. Indeed, we must begin "with the general assumption that in the absence of a plain indication to the contrary, . . . Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Id.* at 43 (alteration in original) (internal quotation marks omitted). And although "Congress sometimes intends that a statutory term be given content by the application of state law," this applies only in the context of fleshing out the federal standard—it does not mean the federal standard is replaced with fifty state standards. *Id.*

¶ 60 Additionally, *Holyfield* notes that Congress can and does expressly state when it wants a state or tribal law definition to apply. *Id.* at 47 n.22 ("Where Congress . . . intend[s] that ICWA terms be defined by reference to other than federal law, it state[s] this explicitly."). For example, Congress explicitly stated that "extended family member" and "Indian custodian" are defined by reference to tribal law or custom or state law. 25 U.S.C. § 1903(2), (6). This, the *Holyfield* Court stated, is evidence that if Congress "did intend that ICWA terms be defined by reference to other than federal law," "it would have said so." 490 U.S. at 47 n.22. And this is not merely "another way of saying that the legislature could have spoken more clearly." *Craig v. Provo City*, 2016 UT 40, ¶ 38, 389 P.3d 423. Rather, the explicit use of state or tribal law for "extended family member" and "Indian custodian" but not for other terms such as "acknowledge" and "establish" indicates that Congress "rejected the formulation embodied in the neighboring provision"—i.e., that it declined to incorporate state or tribal standards for acknowledging and establishing paternity. *Id.* ¶ 38 n.9. Because Congress did not mandate a state or tribal law definition for

"acknowledge" or "establish," we can and should rely instead on a federal definition.

¶ 61 In determining how to define the procedures for acknowledging and establishing paternity, we have a duty to "harmonize [a statute's] provisions in accordance with the legislative intent and purpose." *Osuala v. Aetna Life & Cas.*, 608 P.2d 242, 243 (Utah 1980); *see also Jensen v. Intermountain Health Care, Inc.*, 679 P.2d 903, 906–07 (Utah 1984) (stating that the meaning of a statute's sections could not be determined without taking into account "the purposes they were designed to effectuate"); *B.L. Key, Inc. v. Utah State Tax Comm'n*, 934 P.2d 1164, 1168 n.2 (Utah Ct. App. 1997) ("[T]he overarching principle, applicable to all statutes, [is] that [statutes] should be construed and applied in accordance with the intent of the Legislature and the purpose sought to be accomplished." (third alteration in original) (citation omitted)). At times, it may be necessary to delve into legislative history to determine what and how many purposes the legislature intended. *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 15, 267 P.3d 863 ("[W]hen statutory language is ambiguous . . . we generally resort to other modes of statutory construction and 'seek guidance from legislative history' and other accepted sources." (citation omitted)). But that is not the case here, where we have a clear directive in the statute itself that drives at a purpose:

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

25 U.S.C. § 1902.

¶ 62 The dissent provides no support for its assertion that 25 U.S.C. section 1901(5) states that a "key countervailing purpose at stake under ICWA is the protection of the traditional jurisdiction of state courts over adoption proceedings." *Infra* ¶ 159. And that is an odd statement given that, in context, section 1901(5) states that "the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to

recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." That is, ICWA represents an extraordinary act of federal intervention into family law precisely in response to Congress's concern about state courts' "alarming[]" tendency to disregard the interests of Indian parents and tribes. 25 U.S.C. § 1901(4). So, far from being "recognize[d] . . . to a large degree" as a "countervailing purpose," *infra* ¶ 159, state courts' wielding of their traditional jurisdiction is what led to the need for ICWA in the first place.

¶ 63   Notably, nothing in the "Congressional declaration of policy," 25 U.S.C. § 1902, supports the assertion that protection of states' traditional jurisdiction is part of ICWA's purpose. And the fact that "ICWA does not oust the states of that traditional area of their authority," *infra* ¶ 159, is not a reason to read in another purpose—it is simply how federalism works. *See In re Adoption of Halloway*, 732 P.2d 962, 967 (Utah 1986) ("Under general supremacy principles, state law cannot be permitted to operate as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (internal quotation marks omitted)).

¶ 64   The dissent also ignores Congress's plenary powers in this arena by asserting that issues of paternity and other family matters have "never been a creature of federal law," *infra* ¶ 163, and that the use of the past tense in section 1903(9) is significant because it means that Congress intended "acknowledged" and "established" to be defined by existing standards—by which it means state standards. *Infra* ¶ 171. This is not correct. First, acknowledgement or establishment of paternity under a federal standard is consistent with the use of the past tense because any action a putative father takes after the enactment of ICWA necessarily looks back to the standard ICWA had—in the past— established. Second, to the extent the dissent is attempting to guard against a perceived intrusion, it ignores the fact that this "intrusion" is taking place within the context of Indian welfare, an area in which Congress has plenary authority. U.S. CONST. art. I, § 8(3) ("The Congress shall have Power . . . To regulate Commerce . . . with the Indian Tribes."); *see Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989) ("[T]he central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs."); *Halloway*, 732 P.2d at 967 ("The Supreme Court has made it clear that where Indian affairs are concerned, a broad test of preemption is to be applied.").

¶ 65 This authority encompasses family matters such as child-raising. *Wakefield v. Little Light,* 347 A.2d 228, 234 (Md. 1975) ("We think it plain that child-rearing is an essential tribal relation." (internal quotation marks omitted)); *see also* 25 U.S.C. § 1901(2)–(3) (stating that Congress has "assumed the responsibility for the protection and preservation of Indian tribes and their resources" and that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children"). Indeed, the very point of ICWA is to regulate family law issues. 25 U.S.C. § 1902 (stating that the statute's policy is to protect Indian children and families and establish standards for placing those children in foster or adoptive homes). By arguing that the definition of paternity in the context of Indian affairs is a state issue, the dissent's position largely ignores the federal government's plenary powers over Indian affairs, not to mention the purpose and text of ICWA as a whole. We are loath to pour state law back into ICWA when ICWA's whole reason for being is to drain what, in Congress's view, is an inequitable swamp—displacing state law on the matters on which ICWA speaks.

¶ 66 The danger that ICWA "would be impaired if state law were to control" presents an additional, compelling reason "for the presumption against the application of state law." *Holyfield*, 490 U.S. at 44 (citation omitted). And hewing closely to this presumption in the Indian affairs arena, in which Congress enjoys plenary power, strikes us as particularly appropriate where "the congressional findings that are a part of the statute demonstrate that Congress perceived the States and their courts as partly responsible for the problem it intended to correct." *Id.* at 45; s*ee also Halloway*, 732 P.2d at 969 (stating that Utah court's receptivity to placing Indian children in non-Indian homes "is precisely one of the evils at which the ICWA was aimed"); 25 U.S.C. § 1901(4) (indicating "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies"); *id.* § 1901(5) (expressing concern "that the States . . . have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families"). The U.S. Supreme Court praised our "scholarly and sensitive" decision in *Halloway* for its sensitivity to the risk that state law could "be used to frustrate the federal legislative judgment expressed in the ICWA." *Holyfield*, 490 U.S. at 52–53 (quoting *Halloway*, 732 P.2d at 970).

¶ 67   Furthermore, ICWA provides that "where State or Federal law applicable to a child custody proceeding under State or Federal law provides a higher standard of protection to the rights of the parent . . . of an Indian child than the rights provided under [ICWA], the State or Federal court shall apply the State or Federal standard," thus ensuring that parents of Indian children enjoy the highest level of protection of their parental rights available. 25 U.S.C. § 1921. Applying state law to determine who is a parent under ICWA would, in some cases, provide a lower level of protection of parental rights than ICWA intends. Utah law serves as the perfect example of this problem. Whereas ICWA provides that an unmarried biological father may "acknowledge[] *or* establish[]" paternity, *id.* § 1903(9) (emphasis added), Utah law provides no viable procedure for acknowledging paternity in cases where the mother wants to place the child for adoption at birth and does not consent to the acknowledgment. For a biological father to acknowledge paternity through a declaration of paternity, Utah law requires the birth mother's signature in addition to the unmarried biological father's signature. UTAH CODE § 78B-15-302(1)(c). Thus, in cases where the birth mother declines to sign the declaration, the unmarried biological father is precluded from acknowledging paternity under ICWA, if we look to Utah law for the definition of that term. *See In re Adoption of R.M.*, 2013 UT App 27, ¶ 8, 296 P.3d 757 ("If the birth mother declines to acknowledge the unmarried biological father's paternity and refuses to sign the declaration of paternity, he will have to comply with the paternity provisions in order for his consent to be required."). The result is that, when applying Utah law, the unmarried biological father's option to acknowledge paternity is essentially read out of ICWA. The district court's opinion illustrates this result, as it does not seriously analyze whether Birth Father acknowledged paternity under Utah law, instead focusing on whether he complied with the requirements for *establishing* paternity under Utah law.

¶ 68   Also, as the district court recognized, "Utah's requirements for establishment of paternity by unwed fathers are notoriously strict." *See In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 40, 266 P.3d 702 ("The Utah legislature has enacted strict requirements for unmarried birth fathers who seek to prevent adoption of their children.").[22] Applying state law

---

[22] This is not to say that Utah's standards for acknowledging paternity are unreasonable. Rather, we point out the strict nature of

(cont.)

to a term as critical as the definition of a parent under ICWA is not in keeping with ICWA's text and purpose. And applying Utah law specifically to eliminate the option of acknowledging paternity—and instead requiring an unmarried biological father of an Indian child to comply with some of the strictest requirements for establishing paternity in order to receive any protection of his parental rights under ICWA—"would, to a large extent, nullify the purpose the ICWA was intended to accomplish." *Holyfield*, 490 U.S. at 52.

¶ 69 We also conclude that "Congress could hardly have intended the lack of nationwide uniformity that would result from state-law definitions of" who is a parent under ICWA. *Id.* at 45.[23] In *Holyfield*, the U.S. Supreme Court concluded that ICWA did not incorporate state-law definitions of domicile in large part to avoid the anomaly of different results depending on which state the mother traveled to in order to give birth. *Id.* at 46. It would be similarly anomalous—not to mention unfair and an unwarranted intrusion by states into Indian customs and practices—to make an unmarried biological Indian father's status as a parent under ICWA depend on whether the mother gave birth in one state or another. "[A] statute under which different rules apply from time to time to the same" unmarried biological father, "simply as a result of" the mother's decision to give birth in "one State [or] another, cannot be what Congress had in mind." *Id.* Thus, we conclude that the interpretation of what is required to acknowledge or establish paternity under ICWA is not left up to state law.

¶ 70 We note that the dissent offers no persuasive reasoning for why we should presume that ICWA embraced state principles over those expressed in tribal law principles dealing with family issues. But, in any case, we likewise reject the notion that courts should look to tribal law to determine whether an unmarried biological father has acknowledged or established paternity under ICWA. As with state law, the application of tribal law to the definition of a parent under ICWA

---

Utah law to show that actions outside of Utah's paternity requirements are not per se unreasonable.

[23] A principal reason for the presumption that Congress does not make "the application of . . . federal act[s] dependent on state law. . . . is that federal statutes are generally intended to have uniform nationwide application." *Holyfield*, 490 U.S. at 43.

would result in a lack of nationwide uniformity. Based on *Holyfield*, we determine that Congress could hardly have intended that result.

3. A Federal Standard of Reasonableness Applies

¶ 71 Having rejected the application of state law to define the procedures and timing for acknowledging or establishing paternity under ICWA, we hold that a federal standard applies.[24] We acknowledge that ICWA does not explicitly define the procedures and timing required, but in light of the congressional findings and the purpose of ICWA as discussed above, as well as its protectiveness of parental rights pertaining to Indian children, we conclude that the requirements must be less exacting than those for establishing paternity under Utah law. Instead, we conclude that a reasonability standard applies to the time and manner in which an unwed father may acknowledge or establish his paternity. This comports with the canon of interpretation that where a statute is silent as to the time or manner of a subject, we presume a reasonability standard—an approach that is

---

[24] We concede that the courts in some cases we cite today did not look to a federal definition for acknowledging or establishing paternity, *see, e.g., In re Adoption of a Child of Indian Heritage*, 543 A.2d 925, 935 (N.J. 1988), but the dissent's criticism on that issue misses the point. *Infra* ¶ 166 n.33. The federal standard of reasonableness sets the floor for how states can define acknowledging or establishing paternity in the context of ICWA. The fact that some state standards may be more protective of parents' rights than the federal minimum does not mean they have rejected a reasonableness floor, and these standards are not inconsistent with our decision today. *See* 25 U.S.C. § 1921 ("In any case where State or Federal law applicable to a child custody proceeding under State or Federal law provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under this subchapter, the State or Federal court shall apply the State or Federal standard."); *see also Yavapai-Apache Tribe v. Mejia*, 906 S.W.2d 152, 173 (Tex. App. 1995) ("Congress intended to defer to state or tribal standards for establishing paternity, as long as [those] standards were within contemplation of Congress and provide [a] realistic opportunity for unwed father[s] to establish [the paternal] relationship with [the] child." (citation omitted)).

consistent with ICWA case law[25] and has been applied by many states over many years and many different topics of law.[26] ICWA is silent

---

[25] Other states have determined that an unmarried biological father of an Indian child can qualify as a parent under ICWA even if his actions were not sufficient to comply with state-law requirements for establishing paternity. For example, the Arizona Court of Appeals held that even though an unwed father had not complied with a state statute giving him thirty days after receiving notice of an adoption petition to serve the mother with notice that he had initiated a paternity proceeding—and therefore "the juvenile court would typically find he waived his right to further notification of any adoption hearing"—the record nonetheless reflected that he had taken adequate steps to acknowledge paternity for ICWA purposes. *Jared P. v. Glade T.*, 209 P.3d 157, 160, 162 (Ariz. Ct. App. 2009). And the Alaska Supreme Court concluded, based on its analysis of cases from other states, "that to qualify as an ICWA parent an unwed father does not need to comply perfectly with state laws for establishing paternity, so long as he has made reasonable efforts to acknowledge paternity." *Bruce L. v. W.E.*, 247 P.3d 966, 979 (Alaska 2011). This is consistent with our conclusion that the definition of a parent under ICWA is not controlled by state law.

[26] *Coulter & Smith, Ltd. v. Russell*, 966 P.2d 852, 858 (Utah 1998) ("[I]f a contract fails to specify a time of performance the law implies that it shall be done within a reasonable time under the circumstances."); *see Laurelle v. Bush*, 119 P. 953, 956 (Cal. Dist. Ct. App. 1911) ("It is a well-recognized rule of statutory construction that a general grant of power, unaccompanied by specific directions as to the manner in which the power is to be exercised, implies the right and duty to adopt and employ such means and methods as may be reasonably necessary to a proper exercise of the power" in the context of granting a permit for a license.); *Spiegelberg v. Gomez*, 379 N.E.2d 1135, 1136 (N.Y. 1978) (implying a reasonableness condition on time before city may raise the rent on property it acquires); *Lance Int'l, Inc. v. First Nat'l City Bank*, 927 N.Y.S.2d 56, 58 (App. Div. 2011) (implying a reasonable period of time for winding up a dissolved corporation's affairs when statute is silent on time periods); *Jonathan Neil Corp. v. State Liquor Auth.*, 491 N.Y.S.2d 632, 633 (App. Div. 1985) (using a "reasonable time" standard for how long a party should keep records on its premises "[i]n

(cont.)

both as to the manner in which an unwed father may acknowledge or establish paternity and as to the time in which he must do so. Applying a reasonability standard here creates obvious stop-gaps and prevents the slippery-slope concerns of the dissent, as it requires more than "any bare *acknowledgement* by a putative father," *infra* ¶ 198, and would not allow "a putative Indian father [to] come forward months or even years later and assert a right to disrupt even a finalized adoption." *Infra* ¶ 201.[27]

---

the absence of a fixed statutory period of time"); *Nw. Ohio Bldg. & Constr. Trades Council v. Conrad,* 750 N.E.2d 130, 135–36 (Ohio 2001) (noting requirement that absent specific language administrative agency actions be performed "in a reasonable manner"); *State v. Gaul*, 691 N.E.2d 760, 767 (Ohio Ct. App. 1997) (applying the "reasonable manner" standard to a statute that commanded a public official to invest public money but did not specify how it was to be done); *Commonwealth v. Bd. of Supervisors of Arlington Cty.*, No. 18747, 1976 WL 22828, at *2 (Va. Cir. Ct. Oct. 1, 1976) (county board must exercise its general powers in a reasonable manner); *see also Lora v. Shanahan*, 804 F.3d 601, 614 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2494 (2016) (analyzing "reasonable" time limit for immigration detention).

[27] The dissent's arguments about a standard of reasonableness seem to stem not from a belief that ICWA could not have intended a reasonableness standard but from discomfort with *any* reasonableness standard. *See infra* ¶ 172 (equating "reasonably" with "vaguely"). We find it hard to believe that a state court would be baffled by application of a reasonableness standard in the federal context and would feel the need to resort to legislative-like hearings, *see infra* ¶ 175, given that we frequently are called upon to apply a federal standard of reasonableness in other contexts, such as interpreting the Fourth Amendment of the U.S. Constitution. *State v. Maxwell*, 2011 UT 81, ¶ 14, 275 P.3d 220 (discussing "reasonableness" in Fourth Amendment context); *State v. Simons*, 2013 UT 3, ¶ 40, 296 P.3d 721 (Lee, J., concurring) (noting that "the touchstone under the Fourth Amendment is reasonableness, and that standard affords flexibility"). And although states may differ in their interpretation of "reasonableness," *see generally State v. Martinez*, 2017 UT 43, ¶ 18, __ P.3d __ (rejecting New Mexico Court of Appeals' holding on "reasonable Fourth Amendment privacy considerations of passengers" (citation omitted)), the country

(cont.)

¶ 72 This approach is consistent with ICWA's liberal administration. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,586 (Nov. 26, 1979) (stating that ICWA "shall be liberally construed"); *see also Brenda O. v. Ariz. Dep't of Econ. Sec.*, 244 P.3d 574, 577 (Ariz. Ct. App. 2010) ("ICWA is to be interpreted 'liberally in favor of the Indians' interest in preserving family units.'" (citation omitted)); *In re Esther V.*, 248 P.3d 863, 869 (N.M. 2011) (noting that ICWA is a remedial statute that must be interpreted "liberally to facilitate and accomplish [its] purposes and intent" (citation omitted)). The BIA guidelines also support a federal reasonableness standard.[28] Indeed, courts assessing paternity by unwed

---

has not devolved into "chaos and unpredictability" as "each court faced with the . . . question . . . offer[s] its own subjective assessment of what is . . . 'reasonable.'" *Infra* ¶ 200.

[28] The BIA considered including a federal standard for what constitutes acknowledgement or establishment of paternity. Some commenters for the BIA's proposed rule "recommended language requiring an unwed father to 'take reasonable steps to establish or acknowledge paternity'" and requested clarification on time limits for acknowledging or establishing paternity. Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,795–96 (June 14, 2016). The BIA responded by stating that "[t]he Supreme Court and subsequent case law has already articulated a constitutional standard regarding the rights of unwed fathers" and that many states have held that, under ICWA, an unwed father "must make reasonable efforts to establish paternity, but need not strictly comply with State laws." *Id.* (citing *Bruce L.*, 247 P.3d at 978–79). Based on these holdings that a reasonableness standard for acknowledging or establishing paternity applies under ICWA—a set of holdings we join today—the BIA "d[id] not see a need to establish an ICWA-specific Federal definition for this term." 81 Fed. Reg. at 38,796.

The U.S. Supreme Court relied on similar language from BIA guidelines in *Holyfield*. The guidelines declined to articulate a federal standard on the basis that "[t]here is no indication that these state law definitions [of "residence" and "domicile"] tend to undermine in any way the purposes of the Act." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,585 (Nov. 26, 1979). From this, the Supreme Court concluded that "[t]he clear implication is that

(cont.)

43

putative fathers under other federal statutes have also looked to "the history and tradition of liberal administration of benefits" in rejecting "[a]pplication of rigorous state law schemes for proof of paternity." *St. John Stevedoring Co. v. Wilfred*, 818 F.2d 397, 399 (5th Cir. 1987). Put another way, the BIA guidelines did not adopt a uniform standard of reasonableness because the BIA correctly presumed that state courts already understood that strict compliance with state law was not necessary.

¶ 73 By contrast, the dissent's proposed standard would lead to absurd situations where an unwed father who clearly has acknowledged or established paternity under ICWA would not qualify under Utah law. Take, for example, a situation where a biological mother abandons a child with the unmarried biological father. If the father acted as the sole caretaker for his child, that would surely be a clear-cut case of acknowledgement of paternity. But under Utah law, the father would not have acknowledged paternity if he did not have a written agreement that the mother had also signed. *Supra* ¶ 67. This would provide the father with fewer rights than a reasonability standard under ICWA. We believe a common-sense reading of ICWA prohibits the dissent's strict interpretation. *See In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 40; *In re J.S.*, 321 P.3d 103, 110 (Mont. 2014) (applying a "[c]ommon sense construction of the meaning of 'active efforts'" in ICWA (alteration in original)); *see also In re Adoption of Sara J.*, 123 P.3d 1017, 1036 (Alaska 2005) (applying "[c]ommon sense" to interpret ICWA's placement preferences); *In re T.S.W.*, 276 P.3d 133, 144 (Kan. 2012) (same).

¶ 74 Thus, we hold that Birth Father's actions satisfied the requirements for acknowledging paternity under ICWA using a reasonability standard. Birth Father and Birth Mother resided together at the time of conception and for the first six months of Birth Mother's pregnancy. During that time, Birth Father supported Birth Mother, paying for their rent, utilities, and groceries and Birth Mother's phone bill. When Birth Mother moved to Utah six months into the pregnancy, the plan was for Birth Father to join her later, once she was settled into their new apartment. Birth Father stayed in contact with Birth Mother

---

state law that *did* tend to undermine the ICWA's purposes could not be taken to express Congress' intent." *Holyfield*, 490 U.S. at 51 n.26.

over the phone for the first few weeks after her move, until Birth Mother cut off communication with him. Birth Father was then told by family friends that Birth Mother was fine and would return to South Dakota soon. Birth Father indicated that he believed Birth Mother needed some space and that she would either return to South Dakota to deliver their baby or that she would return with the baby after the delivery. Instead, Birth Mother placed their child for adoption. Upon learning of the proceedings shortly after the September 25, 2014 order terminating parental rights was issued, Birth Father informed the tribe of the situation and consulted with Dakota Plains Legal Services. After being referred to Utah Legal Services, Birth Father filed a motion to intervene, a motion for paternity testing, and a paternity affidavit expressly acknowledging that he was the Child's biological father. He also filed an Answer, Objection, and Verified Counterpetition to the Verified Petition for Adoption. When new ICWA guidelines were released on the day of the hearing on his motions, Birth Father acted immediately: the very same day, he submitted those guidelines to the court with a motion requesting the court to review them and drawing the court's attention to pertinent provisions in the guidelines. In the April 21, 2015 order denying Birth Father's motion to intervene on the basis that he was not a parent under ICWA, the district court itself stated that Birth Father

> has filed numerous documents with the Court in this case asserting paternity. In connection with this case, [Birth Father] has filed an affidavit setting forth his willingness and ability to parent the Child, his plans for care of the Child, and his willingness to pay child support and expenses related to the pregnancy and birth. He has filed a notice, with the Utah Department of Health, Office of Vital Records and Statistics, indicating that he has filed a paternity action regarding the Child (identifying this case as the paternity action). Thus, if one construes this action as a 'paternity action,' then [Birth Father] has now accomplished all of the tasks required by Utah's statute.

¶ 75 These actions, we hold, were both timely and sufficient for Birth Father to acknowledge paternity under ICWA, making Birth Father a "parent" for purposes of section 1914.[29]

*C. Birth Father Is a Parent Under Utah Law*

¶ 76 As an alternative basis, I would hold that Birth Father also timely acknowledged and established his paternity under Utah law. As the district court indicated, Birth Father "accomplished all of the tasks required" by Utah Code section 78B-6-121(3), which relates to the consent of an unmarried biological father. And Birth Father accomplished these tasks within the timeframe required by Utah law. *See* UTAH CODE § 78B-6-121(3) (requiring the unmarried biological father to accomplish those tasks "prior to the time the mother executes her consent for adoption or relinquishes the child for adoption"). The district court concluded that Birth Father's actions were untimely because he "completed these tasks no earlier than January 26, 2015," which the court determined was *after* "the time the mother execute[d] her consent for adoption or relinquishe[d] the child for adoption." *Id.* However, because Birth Mother never gave valid consent, *supra* ¶ 44, and because Birth Father has accomplished all the necessary actions, Birth Father timely established paternity even under Utah law. Thus, even if Utah law applied to define how to acknowledge or establish paternity under ICWA, Birth Father satisfies the statutory definition of a "parent."

¶ 77 The actions Birth Father took illustrate that this case is a poster child for application of ICWA. Against the backdrop of 25 U.S.C. section 1902's declaration of policy stating that ICWA is designed "to promote the stability and security of Indian tribes and families" and

---

[29] The dissent's skepticism that "the actions [Birth Father] took prior to the custody proceedings satisfied" a reasonability standard, *infra* ¶ 171 n.37, echoes socioeconomic and cultural assumptions that ICWA itself aims to uproot. *See* 25 U.S.C. § 1901(5) (stating "that the States . . . have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families"); H.R. REP. No. 95-1386, at 10 (1978) (discussing how "many social workers [are] ignorant of Indian cultural values and social norms" and therefore "make decisions that are wholly inappropriate in the context of Indian family life").

guard against state courts' unnecessary removals of Indian children from their families, the majority would hold that an Indian father who took every necessary action to acknowledge paternity of his Indian child did too little, too late. I disagree. Because Birth Father acknowledged his paternity under both a federal reasonableness standard and a stricter Utah standard, he is a "parent" for purposes of ICWA. This status as a parent gives him standing under section 1914 to challenge the order terminating Birth Mother's parental rights due to her invalid consent. 25 U.S.C. § 1914 ("[A]ny parent . . . may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title.").

### D. Birth Father's Status as a Parent, Along with His Custody of the Child, Gives Him the Right to Intervene

¶ 78  Because we conclude that Birth Father is a "parent" under ICWA, we now look to language in section 1914 that arguably requires not just that a person bringing a challenge to a termination action be a "parent" but also that he be a parent "from whose custody such child was removed." Birth Father may bring an action under this section because, as a parent, he had legal custody of the Child, and to the extent he did not have physical custody of the Child, it was because of Birth Mother's misrepresentations.

¶ 79  We first note that legal custody alone suffices for section 1914 purposes. To hold otherwise would exclude a large number of fathers who were unable to obtain physical custody through circumstances that are out of their control. We believe that result would be seriously troubling, especially given that ICWA should be "liberally construed." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. at 67,586.

¶ 80  Our approach is consistent with how courts have interpreted "custody" in other ICWA settings. For example, section 1912(f), which states that "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child," refers to either physical or legal custody. *D.J. v. P.C.*, 36 P.3d 663, 670 (Alaska 2001); *see also Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2562 (2013) (addressing whether unwed father had "legal *or* physical custody" of the child (emphasis added)).

¶ 81 In this case, Birth Father had legal custody of the Child by virtue of his paternity. "[A] parent possesses a fundamental liberty interest in the care, custody, and management of the parent's child." UTAH CODE § 78A-6-503(1).[30] This includes not just physical custody, but also legal custody, which is defined as a relationship including "the right to physical custody," *id.* § 78A-6-105(22)(a), "the right and duty to protect, train, and discipline" the child, *id.* § 105(22)(b), and "the right to determine where and with whom the minor shall live," *id.* § 105(22)(d). And Utah law appears to presume that a parent automatically enjoys legal custody, stating that the "fundamental liberty interest of a parent concerning the care, custody, and management of the parent's child is recognized, protected, and does not cease to exist simply because a parent may fail to be a model parent or because the parent's child is placed in the temporary custody of the state," *id.* § 78A-6-503(4), and that "a parent has the right, obligation, responsibility, and authority to raise, manage, train, educate, provide for, and reasonably discipline the parent's children," *id.* § 503(10)(a). Thus, as a parent under ICWA, Birth Father had legal custody of the Child.

¶ 82 Although Birth Father's legal custody of the Child is sufficient, we also note that his lack of physical custody was due to Birth Mother's misrepresentations, which we will not hold against him for section 1914 purposes. We believe there is a meaningful distinction between a father who, albeit unsuccessfully, attempts to obtain physical custody and one who makes no such efforts. *Compare In re Adoption of Baby Girl B.*, 67 P.3d 359, 366 (Okla. Civ. App. 2003) (stating that, in keeping with "the policies and purposes" of ICWA, where "a father has no reasonable notice of fatherhood, then [federal and state versions of ICWA] do not preclude him from asserting rights under those Acts simply because he had not been, through no fault of his own, a custodial parent"), *with In re J.S.*, 321 P.3d 103, 113 (Mont. 2014) (holding that father never had custody of child where he "was not

---

[30] Under ICWA, "legal custody" is defined by reference to tribal or state law. *See* 25 U.S.C. § 1903(6) (defining "Indian custodian" as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law"); Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38,792 (stating that a parent may have legal custody "under any applicable Tribal law or Tribal custom or State law").

involved in the child's life for the significant part of 15 years and only became interested in the action ten years after significant State involvement refocused his attention to the matter"); *see also Adoptive Couple*, 133 S. Ct. at 2571 (Breyer, J., concurring) (stating that majority's conclusion that father lacked physical and legal custody did not address situations where a father has paid "all of his child support obligations" or "was deceived about the existence of the child or . . . prevented from supporting his child"). In this case, Birth Father lacked physical custody of the Child only because Birth Mother left the state, refused to communicate with him, and did not tell him when or where the Child was born. Until Birth Mother left, however, Birth Father had taken significant steps to care for his unborn child, including providing financial support during Birth Mother's pregnancy. And after Birth Father found out about the Child's birth, he filed numerous documents with the district court stating his willingness to care for and support the Child. Where, as here, a father took every reasonable step to obtain physical custody but was thwarted by the mother's misrepresentations, we hold that he is not barred from challenging an action under section 1914.

¶ 83 We also note that the majority of courts, including our court of appeals, have adopted a similar view in rejecting the idea that ICWA's language about "the removal of Indian children from their families" requires an existing Indian family for the child to be removed from. *State ex rel. D.A.C.*, 933 P.2d 993, 999–1000 (Utah Ct. App. 1997) (stating that ICWA's policies support application of the Act even where there was no existing Indian family); *see also In re Baby Boy Doe*, 849 P.2d 925, 932 (Idaho 1993) (calling "existing Indian family" exception an inappropriate "judicially created exception" that "circumvent[s] the mandates of ICWA"); *In re A.J.S.*, 204 P.3d 543, 549 (Kan. 2009) (stating that the exception "appears to be at odds with the clear language of ICWA"); *In re Baby Boy C.*, 805 N.Y.S.2d 313, 323 (App. Div. 2005) (noting that "the word 'existing' is not found anywhere in ICWA's definitions sections and appears to have been supplied by judicial interpretation"). These courts have held that interpreting the "removal" language to mean that ICWA does not apply where there was no existing Indian family would frustrate the policies of ICWA.[31] *State ex*

---

[31] We see important parallels between the rise and fall of the "existing Indian family" doctrine and the case before us today. In the

(cont.)

*rel. D.A.C.*, 933 P.2d at 1000; *In re Baby Boy C.*, 805 N.Y.S.2d at 324 ("Since ICWA was passed, in part, to curtail state authorities from making child custody determinations based on misconceptions of Indian family life, the ["existing Indian family"] exception, which necessitates such an inquiry, clearly frustrates this purpose[.]"). To hold that a parent who has never had physical custody—through no fault of his own—could not bring an action under section 1914 would have the same baffling effect of barring the very people the Act is intended to benefit.

¶ 84    Thus, we hold that Birth Father was a parent who had custody of the Child. But we are split on the implications of this holding. A minority of the court would hold that he has statutory standing to raise the subject matter jurisdictional issues of Birth Mother's consent, and, because he has standing to place them before our court, we have a responsibility to reach them.[32] But, aside from the

"existing Indian family" context, several courts at first relied heavily on the plain language of "removal" in various sections of ICWA, thereby denying Indian children ICWA's heightened protections. But such a strangled view of ICWA was widely abandoned after the U.S. Supreme Court's decision in *Holyfield*, as state courts recognized the "existing Indian family" doctrine's "deviation from ICWA's core purpose of 'preserving and protecting the interests of Indian tribes in their children.'" *In re A.J.S.*, 204 P.3d 543, 550 (Kan. 2009) (citation omitted); *see also In re Adoption of Baade*, 462 N.W.2d 485, 489 (S.D. 1990) ("Such a practice fails to recognize the legitimate concerns of the tribe that are protected under the Act."). We therefore reject the dissent's idea that giving force to ICWA's stated purpose is a "purposivist approach" that will lead us on "an endless journey." *Infra* ¶ 197 n.51. Rather, our opinion today is a recognition that the plain language of ICWA is informed by its "core purpose of preserving and protecting the interests of Indian tribes in their children," *In re Baby Boy C.*, 805 N.Y.S.2d 313, 323 (App. Div. 2005), and that this purpose argues for an interpretation that embraces a minimum federal standard—reasonableness—for an Indian father's acknowledgement or establishment of paternity.

[32] Because I believe that Birth Mother's consent was invalid, I would hold that this should result in a remand for a lack of subject matter jurisdiction. I reject the majority's notion that a lack of subject matter jurisdiction would bind the court to an order of vacatur and dismissal.

(cont.)

subject matter jurisdictional implications of Birth Father's status as a parent, the majority holds that he was entitled to intervene in the adoption proceedings. We therefore remand on that basis.

¶ 85   In remanding for the district court to allow Birth Father to intervene, we are not blind to "the potential traumatic impact of a sudden, precipitous separation of a child from the only parents [he] has ever known." *In re Adoption of Baby Girl P.*, 242 P.3d 1168, 1176 (Kan. 2010). But "[w]hatever feelings we might have as to where [the Child] should live, . . . it is not for us to decide that question." *Holyfield*, 490 U.S. at 53. It is our task to decide whether the district court exercised proper jurisdiction, but we are not tasked with deciding "what the outcome of that determination should be." *Id.* And we hope that our guidance to district courts in adoption proceedings will prevent future heart-wrenching situations. *See id.* at 53–54 ("Had the mandate of the ICWA been followed [by the district court], much potential anguish might have been avoided, and in any case the law cannot be applied so as automatically to 'reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation.'" (quoting *In re Adoption of Halloway*, 732 P.2d 962, 972 (Utah 1986))).[33]

---

*See infra* ¶ 154. The district court lacked jurisdiction to proceed with the adoption, but it had proper jurisdiction to obtain consent from the birth parents and terminate their rights if appropriate. Therefore, I would hold that a remand to that stage of the court's proceedings is appropriate. *See In re Adoption of L.D.S.*, 155 P.3d 1, 8–9 (Okla. 2006), *as supplemented on reh'g*, No. 250 (Mar. 6, 2007) (finding decree of adoption void and directing the trial court on remand "to return the parties to the legal status they held before the erroneous declaration that the child was available for adoption without parental consent"). Among other outcomes, this could include Birth Mother's providing valid consent, in which event Birth Father may be able to timely petition to intervene, or Birth Father, Birth Mother, and the prospective adoptive parents may file petitions for custody.

[33] The majority notes possible procedural due process problems if Birth Mother does not receive notice. *Infra* ¶ 110. But Birth Mother had both notice and an opportunity to be heard on this appeal when her motion to withdraw her consent was denied. *See Nelson v. Jacobsen*, 669 P.2d 1207, 1211 (Utah 1983) ("Timely and adequate notice and an

(cont.)

## III. THE DISTRICT COURT ERRED IN HOLDING THAT THE ADOPTION PROCEEDINGS WERE VOLUNTARY AS TO BIRTH FATHER

¶ 86  Under ICWA, a parent has a right to receive notice of and to intervene in any proceeding involving the involuntary termination of his or her parental rights. 25 U.S.C. § 1912(a) ("In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the . . . termination of parental rights to[] an Indian child shall notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and of their right of intervention."). As we discussed above, Birth Father is a "parent" under ICWA. *Supra* ¶¶ 74–77. The district court held that the proceeding was voluntary as to Birth Father, which meant he was not entitled to notice and intervention. We reverse and hold that the proceeding was involuntary as to Birth Father.

¶ 87  Originally, these proceedings appeared to be voluntary on the part of both parents because Birth Mother misrepresented her brother-in-law as the biological father and had him sign a consent form for termination of parental rights in order to make the adoption go faster. Even after Birth Father filed a motion to intervene to establish paternity and after Birth Mother filed an affidavit informing the court that Birth Father was the biological parent and a member of the Cheyenne River Sioux Tribe, the court still believed the case to be "undoubtedly a voluntary proceeding" because it was "initiated not by the State but by Petitioners after the child's mother indicated her (at the time) voluntary desire to relinquish her parental rights and place the child for adoption." While we recognize that the proceedings were voluntary as to Birth Mother, it is clear that Birth Father never sought to

opportunity to be heard in a meaningful way are the very heart of procedural fairness."). I am also confident that were we to reinstate Birth Mother's rights, any due process concerns could be addressed by requiring Birth Father to provide Birth Mother with notice that her parental rights have been reinstated and that she possesses the ability to waive her parental rights in compliance with ICWA's timing requirements.

voluntarily terminate his parental rights. We disagree with the district court's characterization of "involuntary proceedings" as "state-sponsored proceedings" and "voluntary proceedings" as "proceedings initiated by an Indian parent seeking to terminate her parental rights." Rather, we hold that proceedings to terminate a parent's parental rights against his or her will are involuntary proceedings under ICWA.

¶ 88 ICWA does not define "involuntary proceeding" as used in 25 U.S.C. section 1912(a), so we look to the plain meaning of the term instead. The plain language in section 1912(a) refers to "any involuntary proceeding in a State court." *Black's Law Dictionary* defines "involuntary" as "[n]ot resulting from a free and unrestrained choice; not subject to control by the will." *Involuntary*, BLACK'S LAW DICTIONARY (10th ed. 2014). When a parent's rights are terminated against his or her will, the termination does not "result[] from a free and unrestrained choice" by that parent. *Id.* And if the proceedings are involuntary as to one parent, a plain language analysis leads to the conclusion that they are involuntary proceedings under ICWA, regardless of whether those proceedings are initiated by the state or by the other parent. Additionally, in light of ICWA's policy "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families," 25 U.S.C. § 1902, it would be inconsistent to deny a parent the right to receive notice and to intervene in proceedings for the termination of his or her parental rights just because the termination of the other parent's rights was voluntary. Thus, we conclude that the proceedings in this case are involuntary as they pertain to Birth Father.[34] Birth Father therefore was entitled to notice of the proceedings and the opportunity to intervene.

---

[34] Regardless of whether the proceedings are voluntary, because Birth Father is a parent for purposes of ICWA, *see supra* ¶¶ 74–77, he was "entitled to the protections under [25 U.S.C. sections] 1912(d) and (f) and other applicable provisions." *Bruce L. v. W.E.*, 247 P.3d 966, 979 (Alaska 2011). But nothing in the record indicates that Birth Father was provided with, for example, any "remedial services and rehabilitative programs designed to prevent the breakup of the Indian family[.]" 25 U.S.C. § 1912(d). And the district court has made no "determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by

(cont.)

## CONCLUSION

¶ 89  Because the proceedings in this case were involuntary as to Birth Father, and because he acknowledged paternity as required under ICWA, he had a right to receive notice of and to intervene in the adoption proceeding. Consequently, we reverse the district court's denial of Birth Father's motion to intervene and remand for further proceedings consistent with this opinion.

¶ 90  In addition, I would hold that (a) Birth Mother did not give valid consent to the termination of her parental rights, (b) the district court therefore lacked jurisdiction to proceed with the adoption of the Child, and (c) the issue is properly before us. I dissent from the majority's holding to the contrary on issues (b) and (c).

---

the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *Id.* § 1912(f).

    *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552 (2013), is not to the contrary. *Adoptive Couple* held that sections 1912(d) and (f) do not apply where "an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody," such that "the Indian parent *never* had custody of the Indian child." *Id.* at 2560, 2562. But, as the deciding vote in the case averred, it did not "involve special circumstances such as a father who was deceived about the existence of the child or a father who was prevented from supporting his child." *Id.* at 2571 (Breyer, J., concurring). There is thus no controlling precedent on the precise issue before this court. *Id.* (noting that *Adoptive Couple* "need not, and in my view does not, . . . decide whether or how [sections] 1912(d) and (f) apply where those [special] circumstances are present").

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court as to Part I, in which CHIEF JUSTICE DURRANT and JUSTICE PEARCE joined; and a dissenting opinion as to Part II, in which CHIEF JUSTICE DURRANT joined:

¶ 91 Contested adoption proceedings are difficult. They cut at the heart of the most sacred, essential institution of our society—the family. And the disposition of such a case has profound effects on the lives of many—on the child in question and on all who assert an interest in the child's parentage or upbringing.

¶ 92 The sensitivity of these issues is heightened when one or more of the interested parties hails from another state. And the difficulty is compounded further when, as here, a party claiming rights as a putative father is a member of an Indian tribe, protected by the Indian Child Welfare Act (ICWA).

¶ 93 For these and other reasons Justice Himonas is right to urge a course of caution. I could not agree more with the admonition that the "'best interests'" of children and others involved in adoption proceedings require careful "obedience to the policies and procedures mandated by law." *Supra* ¶ 1 (citation omitted).

¶ 94 That's about as far as my agreement with the lead opinion goes, however. The lead opinion claims to be following the "majority" approach on a range of the issues it addresses. *See supra* ¶ 30 (asserting that its jurisdictional analysis is consistent with "the great majority of states' views on the issue"); *supra* ¶ 71 (stating that the majority's federal "reasonableness" standard of establishing or acknowledging "paternity" under ICWA "is consistent with ICWA case law" in other states). But the cited cases are easily distinguishable. And Justice Himonas's approach is quite unique. No court that I am aware of (Justice Himonas cites none) has ever held that a timing defect in an earlier consent order is the sort of *subject-matter* jurisdictional defect that must be considered *sua sponte* by the court presiding over an adoption. And the court's analysis of the ICWA standard of establishing or acknowledging "paternity" is equally novel. No court that I am aware of (and again the lead opinion cites none) treats the notion of "paternity" in ICWA as a purely federal standard—a standard of "reasonableness" to be developed on a case-by-case basis by the courts, and not by reference to standards established as a matter of state law.

¶ 95 On these and other points the lead opinion stretches existing law beyond recognition. Justice Himonas claims fealty to existing precedent but his approach is a novel one. It threatens to unsettle this important field on numerous points of heretofore settled law.

¶ 96 The question presented in this case is a simple one. We are asked to decide whether the district court erred in denying a motion to intervene filed by E.T., a member of an Indian tribe who asserts an interest in B.B. as a putative father. The district court denied that motion on the ground that E.T. could not qualify as a "parent" under Utah law or under ICWA, which excludes an unwed father whose "paternity has not been acknowledged or established." 25 U.S.C. § 1903(9). The ICWA notion of acknowledgement or establishment of paternity, in the district court's view, was an invocation of state law principles of paternity. And the district court denied E.T.'s motion to intervene because E.T. had not acknowledged or established his paternity as a matter of state law.

¶ 97 I would affirm that decision, which is entirely in line with the terms of ICWA and with established case law in other jurisdictions. I would hold that E.T. does not qualify as a "parent" because he did not acknowledge or establish his paternity under Utah law. While a majority of the court disagrees with my analysis on this point, a majority nonetheless rejects the lead opinion's subject-matter jurisdiction analysis. Thus, the court concludes that there is no subject-matter jurisdiction defect in this case.

¶ 98 Justice Himonas's contrary conclusions are premised on a series of distortions of settled principles of law. First, the lead opinion distorts the law of appellate procedure and subject-matter jurisdiction. The root of its jurisdictional analysis is its decision to question a final order finding that the birth mother (C.C.) consented to the adoption more than ten days after the birth of the child as required by ICWA. That order was a final, appealable one when entered. But no one ever challenged it. Not C.C. And not even E.T.[1] And that should have

---

[1] Justice Himonas posits that E.T. lacked an opportunity to challenge C.C.'s consent because he was never a party to the proceedings. But E.T. had every opportunity when he moved to intervene. At that point he had a full and fair opportunity to identify any grounds for his intervention. Yet he never challenged the validity of the consent

(cont.)

rendered the merits of that decision final, foreclosing our prerogative of second-guessing it, under settled rules of finality and appellate procedure.

¶ 99 The lead opinion would unsettle our law of appellate procedure in reopening an order that no party ever sought to challenge. And it would distort the law of subject-matter jurisdiction by treating a purported defect in the consent order as a matter going to the adoption court's subject-matter jurisdiction.

¶ 100 Second, the court distorts the standard set forth in ICWA. It does so by interpreting the statute's reference to the acknowledgement or establishment of "paternity" to call for a wholly *federal* standard of paternity—a standard the court declines to define except to say that it calls for a case-by-case evaluation of "reasonableness." *Supra* ¶¶ 71–72. This unsettles the law in this important field. No court to date has interpreted ICWA to call for a wholly federal standard of establishing paternity. By declaring the existence of such a standard without ultimately defining it, the court ensures chaos and unpredictability for years to come.

¶ 101 I find all of the above untenable. And easily avoidable. All we have to do is follow settled rules of procedure and jurisdiction and the plain text of ICWA. I would do so here. While a majority of the court holds that there is no defect in the district court's subject-matter jurisdiction, I would also affirm the district court's denial of the motion to intervene because E.T. did not timely acknowledge or establish his paternity.

---

order—neither in the proceedings below nor on appeal. In resting on other grounds, E.T. accepted the validity of the consent order both before the district court and in his briefs on appeal. For this reason the court concludes that E.T. has waived any opportunity to challenge the consent and termination order. And the court's analysis of the procedural impropriety of the lead opinion's review of the consent and termination order is premised on the fact that E.T. failed to bring this issue within the scope of our review.

Adoption of B.B.

Lee, A.C.J., Opinion of the Court in part

## I. SUBJECT-MATTER JURISDICTION

¶ 102   We have no quarrel with Justice Himonas's assertion that our court has a duty to make a *sua sponte* assessment of our own subject-matter jurisdiction. *See supra* ¶ 19. But upon review of the supplemental briefing, we see no basis for the conclusion that the district court lacked jurisdiction to decide E.T.'s motion to intervene. We see at least four independent grounds for rejecting Justice Himonas's determination of a subject-matter jurisdiction defect.

### A. The Consent Order Is Not Properly Before Us

¶ 103   The heart of Justice Himonas's jurisdictional analysis is his determination that the district court erred in concluding that C.C.'s consent complied with ICWA's timing requirements. Because Justice Himonas would reverse the district court's conclusions on this issue, he would determine that the district court lacked jurisdiction to proceed with the adoption.

¶ 104 But Justice Himonas cites no authority for the power to revisit a final order in a collateral termination proceeding not challenged by any of the parties at any stage of these proceedings—below or on appeal. When a court enters a final order stating its findings of fact and conclusions of law, that order is binding unless and until a litigant successfully challenges the order's validity. *See Snell v. Cleveland, Inc.*, 316 F.3d 822, 825–28 (9th Cir. 2002) (reversing district court's *sua sponte* decision to vacate a final judgment in an earlier case on the basis of an alleged defect in diversity jurisdiction). This is true even in the context of subject-matter jurisdiction. *See id.* We have a *sua sponte* responsibility to raise issues of subject-matter jurisdiction during the *pendency of an action*. *See id.* at 826; UTAH R. CIV. P. 12(h)(2). But we do not have power to *sua sponte* reconsider the premises of jurisdiction of a final judgment that has not been collaterally attacked by a litigant. *See Snell*, 316 F.3d at 825–28; UTAH R. Civ. P. 60(b); *Yanow v. Weyerhaeuser S.S. Co.*, 274 F.2d 274, 279–80 & n.8 (9th Cir. 1958) (citing *Noble v. Union River Logging R. Co.*, 147 U.S. 165, 171–74 (1893)).

¶ 105   Granted, E.T. was unaware of the termination proceedings in which C.C. voluntarily relinquished her rights and consented to the adoption of B.B. Yet he had every opportunity to raise a rule 60(b) challenge to that final judgment in the context of his motion to intervene. And he failed to do so at any time prior to the court's final

58

adjudication of his motion to intervene. E.T.'s decision not to raise such a challenge constituted a waiver of the issue before the district court.

¶ 106 E.T.'s waiver is equally clear on appeal. His notice of appeal identifies only the order denying his motion to intervene and subsidiary orders. *See Amended Notice of Appeal* (June 8, 2015). It makes no mention of the consent order. And the consent order, as a distinct final judgment, was not a subsidiary order. That is fatal. An order not identified in the notice of appeal falls beyond our appellate jurisdiction. And the failure to identify an order is a non-waivable (jurisdictional) defect.[2]

¶ 107 "[T]he object of a notice of appeal is to advise the opposite party that an appeal has been taken from a specific judgment in a particular case. Respondent is entitled to know specifically which judgment is being appealed." *Jensen v. Intermountain Power Agency*, 1999 UT 10, ¶ 7, 977 P.2d 474 (quoting *Nunley v. Stan Katz Real Estate, Inc.*, 388 P.2d 798, 800 (Utah 1964)). We decline to disregard this rule of appellate procedure in this case. Accordingly, we do not review the order adjudicating C.C.'s consent under ICWA because E.T. did not raise a rule 60(b) challenge to this order below and likewise did not identify this order in his notice of appeal.

¶ 108 We see no basis for the notion of a free-ranging duty to search the record to "ensure" that an adoption case is "as free as possible" from any "defects" we deem "fatal." *Supra* ¶ 1. That premise runs counter to our settled rules of appellate procedure, which are rooted in the adversary system. Our law leaves it to the parties to identify legal deficiencies undermining the legality or finality of a judgment rendered in a collateral matter. Under our longstanding rules the appellant bears the burden of identifying any and all orders being challenged on appeal.

---

[2] *See Jensen v. Intermountain Power Agency*, 1999 UT 10, ¶¶ 6–9, 977 P.2d 474 (notice of appeal must identify orders for review, orders not identified are beyond the jurisdiction of the court to review); *Holbrook v. Hodson*, 466 P.2d 843, 845 (Utah 1970) (untimely notice of appeal is a defect in appeal requiring dismissal); *Utah Down Syndrome Found., Inc. v. Utah Down Syndrome Ass'n*, 2012 UT 86, ¶ 13, 293 P.3d 241 (non-parties have no appeal of right).

¶ 109 We follow that pattern here. We hold that the consent order in question is not properly presented for our review because it was not identified in the notice of appeal.

¶ 110 The effects of the lead opinion's contrary conclusion would be substantial. In proposing the reversal of an order not identified in the notice of appeal and the *sua sponte* reconsideration of factual and legal conclusions underpinning a final judgment, the lead opinion would undermine the rights of a party who has not been heard at any point in the proceedings on appeal (C.C.). To our knowledge, C.C. has not received any notice that the termination order is under review on appeal. And were the lead opinion's decision to control, we have no reason to believe that C.C. would receive formal notice that her rights had been reinstated by the lead opinion's proposed vacatur of the termination order. This would be deeply problematic—and an apparent violation of C.C.'s right to procedural due process.

¶ 111 The proposal to disregard our settled rules of appellate procedure would come at a cost to the legitimacy of our judicial system. It would also threaten the certainty and predictability that are essential to a well-functioning adoption system.

¶ 112 Justice Himonas's approach would inject uncertainty of an indefinite duration into the lives of those who place their children for adoption. This uncertainty is wide-ranging. A mother who consents to an adoption would never be certain that the child's placement would be final. She would be left with the risk that a court might peer down long after judgment has become final and identify an error missed by the district court, counsel, and all parties.

¶ 113 Under Justice Himonas's approach, such a mother need not even receive notice that the validity of her consent is being reviewed. Yet there would always be the possibility that lives might be turned upside down by a judicial decision vacating consent and re-imposing the obligations of parenthood. This would be more than unfair. It would be fundamentally at odds with our adoption statute. *See* UTAH CODE § 78B-6-102(5)(b) ("[A]n unmarried mother, faced with the responsibility of making crucial decisions about the future of a newborn child, is entitled to privacy, and has the right to make timely and appropriate decisions regarding her future and the future of the child, and is entitled to assurance regarding the permanence of an adoptive placement.").

¶ 114 Justice Himonas's approach would also jeopardize the security and reliance interests of adoptive children and adoptive parents.[3] We do not positively countenance C.C.'s conduct in this case. But the lead opinion's proposal to cast aside settled rules of law governing appellate procedure would impact more than this case. It would disrupt a system that, while imperfect, is carefully tailored to protect the interests in certainty and finality of all persons who come before our courts.

¶ 115 This would be deeply problematic. In the field of adoption, clear legal rules, finality, and certainty align with the best interests of children. *See* UTAH CODE § 78B-6-102(5)(a). And all of those principles are undermined by the lead opinion's proposal to *sua sponte* reconsider the validity of the order accepting C.C.'s consent and terminating her parental rights.

B. Invalid Consent Under ICWA Section 1913 Is Not Void *Ab Initio*

¶ 116 Justice Himonas seeks to avoid the finality of the consent and termination order by concluding that a violation of section 1913 renders an untimely consent void *ab initio. See supra* ¶¶ 31–32, 44. But that conclusion is inconsistent with the text of the statute and with settled case law.

¶ 117 Section 1913(a) states that "[a]ny consent given prior to, or within ten days after, birth of the Indian child shall not be valid." 25 U.S.C. § 1913(a). In isolation, this language does not answer the critical question—whether parties may waive an objection to a defect in

---

[3] *See, e.g.*, UTAH CODE § 78B-6-102(5)(a) (identifying the state's "compelling interest" in both "providing stable and permanent homes for adoptive children in a prompt manner" and "preventing the disruption of adoptive placements"); *id.* § 78B-6-102(5)(c) (finding that "adoptive children have a right to permanence and stability in adoptive placements"); *Wells v. Children's Aid Soc. of Utah*, 681 P.2d 199, 203 (Utah 1984) ("The state has a strong interest in speedily identifying those persons who will assume the parental role over [adoptive] children, not just to assure immediate and continued physical care but also to facilitate early and uninterrupted bonding of a child to its parents. . . . To serve its purpose for the welfare of the child, a determination that a child can be adopted must be final as well as immediate."), *abrogated on other grounds by In re Adoption of J.S.*, 2014 UT 51, 358 P.3d 1009.

the timing of consent by failing to timely challenge it. But section 1914 provides strong evidence that any defect in ICWA compliance is subject to waiver. It provides that "[a]ny Indian child . . . , any parent or Indian custodian . . . , and the Indian child's tribe *may petition* any court of competent jurisdiction to *invalidate* such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title." *Id.* § 1914. The permissive "may petition" clearly implies a choice—to petition or not. To give meaning to that choice, the statute cannot be interpreted to void orders that have not been challenged under section 1914. The term "invalidate" also carries a negative implication. It suggests that unless a party affirmatively challenges a proceeding's compliance with ICWA section 1913, the consent and resulting termination order are valid.

¶ 118 This conclusion is consistent with case law in other jurisdictions.[4] A few courts have held that section 1914 preempts rules governing preservation. But no court has ever raised an ICWA consent issue *sua sponte*.[5] Surely it is even more problematic to reconsider a consent order not identified in the notice of appeal.[6]

¶ 119 Where, as here, a district court expressly holds that its order complies with ICWA requirements, the courts have held that the time to challenge that determination under section 1914 expires upon the running of the time for an appeal. *See In re Adoption of A.B.*, 2010 UT 55, ¶¶ 22–25, 245 P.3d 711; *cf. Kiowa Tribe of Okla. v. Lewis*, 777 F.2d 587, 592 (10th Cir. 1985) ("We cannot read § 1914's reference to 'any court of competent jurisdiction' as the type of clear and manifest authorization

---

[4] *See, e.g.*, *In re of Petition of Phillip A.C.*, 149 P.3d 51, 60 n.44 (Nev. 2006) (noting that "a voluntary proceeding that violates § 1913(a) is merely voidable, not automatically void"); *In re Adoption of Erin G.*, 140 P.3d 886, 892–94 (Alaska 2006) (holding that section 1914 challenge was subject to state statute of limitations).

[5] *See generally In re Enrique P.*, 709 N.W.2d 676, 684–90 (Neb. Ct. App. 2006) (collecting ICWA cases raising challenges under section 1914).

[6] *Henry M. v. Ariz. Dep't of Econ. Sec.*, No. 2 CA-JV 2011-0146, 2012 WL 2859979, at *3–4 (Ariz. Ct. App. July 12, 2012) (declining to review an ICWA compliance issue under section 1914 where the order was not identified in the notice of appeal).

that federal courts need before they upset the ordinary principles of federal-state comity embodied in 28 U.S.C. § 1738 and the Full Faith and Credit Clause. It seems rather to state simply where such actions may initially be brought. Regardless of whether we agree with the Kansas Supreme Court's construction of the ICWA, here *we must honor the judgment it has rendered on the subject*." (emphasis added)).

¶ 120 Accordingly, we hold that violations of ICWA subject to challenge under section 1914 do not render those actions void *ab initio*. Justice Himonas's contrary conclusion is not just unprecedented; it would threaten the interests of the very population ICWA was intended to protect. By voiding an action not challenged by the Indian child, his mother, putative father, or his tribe, the lead opinion would slight the autonomy of the stakeholders Congress empowered by enacting section 1914. That smacks of paternalism. And it would disrupt finality and inject greater uncertainty into already complicated proceedings—at great cost to all involved. *See supra* ¶¶ 111–15.

## C. Consent to Adoption Is Not Jurisdictional

¶ 121 Even if a violation of section 1913 rendered consent void *ab initio*, we find no basis for the majority's conclusion that a defect in consent deprives a district court of subject-matter jurisdiction. The concept of subject-matter jurisdiction encompasses (a) statutory limits on the "authority of the court to adjudicate a class of cases," *Johnson v. Johnson*, 2010 UT 28, ¶ 10, 234 P.3d 1100; and (b) timing and other limits on the "justiciability" of the proceeding before the court (such as standing, ripeness, and mootness), *see Carlton v. Brown*, 2014 UT 6, ¶¶ 29–30, 323 P.3d 571. In extending the principle of subject-matter jurisdiction to include a mere legal prerequisite to the issuance of an order granting the relief sought by the plaintiff, the lead opinion would unsettle our law and open the door to any of a wide range of issues being injected *sua sponte* by the court—or by a party long after a case is otherwise finally decided.

¶ 122 In opening the door to reconsider the legal basis for an order that our law deems final and jurisdictionally insulated from review, the lead opinion would threaten the principles of efficiency and finality at the heart of our adoption system. And its novel conception of subject-matter jurisdiction would sow the seeds of uncertainty that would threaten the finality of cases in other fields as well.

¶ 123 The adoption cases cited by Justice Himonas are all distinguishable on grounds mentioned above. *Supra* ¶ 121. None of

them supports the lead opinion's novel theory. The cited Utah cases, *see supra* ¶ 25, are also distinguishable. Those cases go to a principle of justiciability and the propriety of a case being heard in a particular forum at a particular time (before a governmental entity has a chance to rule on a notice of claim, or before a party exhausts administrative avenues for relief). That is not at all what is at issue here. So the lead opinion's view does not follow from existing cases. The lead opinion would open up a broad new category of subject-matter jurisdictional issues that would undermine the efficient operation of our justice system and the finality of our judgments for years to come.

¶ 124  We accordingly reject the notion that any defect in the timing of the mother's consent deprived the district court of subject-matter jurisdiction. The timeliness of the entry of consent under ICWA has nothing to do with subject-matter jurisdiction as that term is understood in our law. Valid consent is just one of many statutory prerequisites to the issuance of a valid adoption decree. *See* UTAH CODE §§ 78B-6-101 *et seq.* (identifying a host of statutory requirements for the issuance of an adoption in varying circumstances). And a deficiency in this or any other prerequisite falls outside the traditional scope of subject-matter jurisdiction.

### 1. Theory

¶ 125  The notion of "jurisdiction" is a slippery one.[7] This is a word that means different things in different circumstances. Sometimes it is used to characterize the scope of a court's power to issue a certain form of relief.[8] In that sense we may speak of a court lacking "jurisdiction" to

---

[7] *See, e.g., Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (quoting *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996) ("'Jurisdiction,' it has been observed, 'is a word of many, too many, meanings . . . .'")); *Chen v. Stewart*, 2004 UT 82, ¶ 35, 100 P.3d 1177 ("Jurisdiction is 'a many-hued term.'"), *abrogated on other grounds by State v. Nielsen*, 2014 UT 10, 326 P.3d 645.

[8] *See, e.g., Bank of Am., N.A. v. Kuchta*, 21 N.E.3d 1040, 1046 (Ohio 2014) ("A court's jurisdiction over a particular case refers to the court's authority to proceed or rule on a case that is within the court's subject-matter jurisdiction. This latter jurisdictional category involves consideration of the rights of the parties. If a court possesses subject-matter jurisdiction, any error in the invocation or exercise of

(cont.)

award relief that is precluded by the substantive law under the facts of a particular case. And we may identify legal preconditions to the availability of such relief as bars on the exercise of a court's "jurisdiction."[9]

¶ 126 Another conception of "jurisdiction" goes to the territorial authority of the court that issues a decision. This is the notion of *personal jurisdiction*. It may be invoked in a case in which a judgment is entered against a party lacking in a sufficient connection to the state in which the court sits.[10] This is another instance in which we may speak

_____

jurisdiction over a particular case causes a judgment to be voidable rather than void." (citation omitted)).

[9] *See, e.g.*, *Commonwealth v. Steadman*, 411 S.W.3d 717, 724 (Ky. 2013) ("[T]he questions Steadman has raised do not go to subject-matter jurisdiction and instead concern only whether the trial court had particular-case jurisdiction. Or, more precisely, as 'challenges to [the trial court's] subsequent rulings and judgment,' they 'are questions incident to the exercise of jurisdiction rather than to the *existence* of jurisdiction.' In other words, they are allegations of pure legal error and not of a failure of the court's power to act at all. And *particular-case* jurisdiction is subject to waiver." (alterations in original) (citation omitted)); *In re Adoption of M.A.*, 930 A.2d 1088, 1091 (Me. 2007) (reversing a district court's dismissal of an adoption case for lack of subject-matter jurisdiction and distinguishing authority to issue an adoption under the governing statute from subject-matter jurisdiction which is determined solely on the basis of whether the case is within the class of cases over which a court has authority); *Heath v. W.C.A.B. (Pa. Bd. of Prob. & Parole)*, 860 A.2d 25, 29 (Pa. 2004) ("[W]e have no quarrel with the Commonwealth Court's asking *sua sponte* whether the 'personal animus' exception implicated its subject matter jurisdiction. Rather, we disagree with the Commonwealth Court's ultimate conclusion that the exception is indeed jurisdictional. . . . [W]e determine whether the court had power to enter upon the inquiry, not whether it might ultimately decide that it was unable to grant the relief sought in the particular case." (citation omitted) (internal quotation marks omitted)).

[10] *E.g.*, *Fenn v. Mleads Enters., Inc.*, 2006 UT 8, ¶ 10, 137 P.3d 706 ("[A] Utah state court may assert specific personal jurisdiction over a foreign defendant only if (1) the defendant has minimum contacts with Utah

(cont.)

of a court lacking "jurisdiction" to enter an award against a particular party.

¶ 127 Yet neither of these notions of jurisdiction goes to a court's *subject-matter* jurisdiction. Both of these forms of jurisdiction, moreover, are subject to the rules of preservation and waiver. A failure to raise them at the appropriate time results in a forfeiture of the issue.[11] It is accordingly improper for a court to raise these "jurisdictional" matters *sua sponte*.

¶ 128 Subject-matter jurisdiction is special. It is distinct from other notions of jurisdiction in that we require our courts to consider such issues *sua sponte*, or in other words we do not allow the parties to waive or forfeit them from consideration.[12] The distinction is crucial, as it cuts

---

and (2) the assertion of jurisdiction would not offend the traditional notions of fair play and substantial justice.").

[11] *See, e.g.*, *State v. All Real Prop., Residence & Appurtenances*, 2005 UT 90, ¶¶ 8–11, 127 P.3d 693 (holding that a failure to raise an objection to personal jurisdiction or defective notice at first opportunity in a proceeding results in waiver or forfeiture of the claim); *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346 ("As a general rule, claims not raised before the trial court may not be raised on appeal.").

[12] *See, e.g.*, *Petersen v. Utah Bd. of Pardons*, 907 P.2d 1148, 1151 (Utah 1995) ("[S]ubject matter jurisdiction is an issue that can and should be addressed sua sponte when jurisdiction is questionable."); *see also Steadman*, 411 S.W.3d at 722 (recognizing that subject-matter jurisdiction cannot be waived or forfeited); *Heath*, 860 A.2d at 29 ("We begin with the well-established principle that subject matter jurisdiction is a question that is not waivable and may be raised by a court on its own motion."); *Estate of Brown*, 402 S.W.3d 193, 198–99 (Tenn. 2013) (distinguishing subject-matter jurisdiction, which cannot be waived, from other statutory prerequisites to relief like a statute of limitations, which may be waived or forfeited); *Bd. of Supervisors of Fairfax Cty. v. Bd. of Zoning Appeals of Fairfax Cty.*, 626 S.E.2d 374, 379 (Va. 2006) (identifying the "fundamental distinction between the element of subject matter jurisdiction and the other jurisdictional elements" as the inability of this issue to be waived or forfeited and a court's obligation to raise it *sua sponte* (citation omitted) (internal quotation marks omitted)); *CSC Grp. Holdings, LLC v. Automation & Elecs., Inc.*, 368 P.3d

(cont.)

at the heart of our adversary system. If an issue is subject-matter jurisdictional, the general rules of finality and preservation are off the table. So for each such issue we undermine the premises of efficiency, speedy resolution, and finality that generally undergird our justice system.

¶ 129 That is why our law has been careful to cabin the notion of subject-matter jurisdiction.[13] We limit this concept carefully because an

---

302, 307 (Wyo. 2016) ("[Subject-matter jurisdiction] cannot be created or destroyed by procedural irregularities, such as, for example, a defect in the process by which intervention effectively adds a new party to a case. The rules of civil procedure cannot extend or limit subject matter jurisdiction, even though such rules may establish the proper method of invoking the jurisdiction of the court in particular cases. A court's subject matter jurisdiction lies dormant until it is called upon to exercise it by some sort of initiating procedural mechanism, such as a pleading, complaint, or information. At that point, the court 'acquires jurisdiction' in the limited sense of procedurally having the authority to proceed and exercise its subject matter jurisdiction in a particular case. Consequently, a failure to adhere to the requirements governing the proper nature and filing of such case-initiating documents, even to the extent they may be characterized as substantive requirements, will not necessarily deprive a court of subject matter jurisdiction." (citation omitted)).

[13] *See In re Adoption of Baby E.Z.*, 2011 UT 38, ¶¶ 31–34, 266 P.3d 702; *Johnson*, 2010 UT 28, ¶¶ 9–10; *In re Estate of McLaughlin*, 754 P.2d 679, 681–82 (Utah Ct. App. 1988). This is by no means a unique feature of Utah law. Courts far and wide have long cabined the concept of subject-matter jurisdiction in this way. *See, e.g.*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160–61 (2010) ("'Jurisdiction' refers to a court's adjudicatory authority. Accordingly, the term 'jurisdictional' properly applies only to prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) implicating that authority." (citation omitted) (internal quotation marks omitted)); *Amodio v. Amodio*, 724 A.2d 1084, 1086 (Conn. 1999) ("Answering this certified question requires us to review the distinction between a trial court's 'jurisdiction' and its 'authority to act' under a particular statute. Subject matter jurisdiction involves the authority of a court to adjudicate the type of controversy presented by the action before it."

(cont.)

(citation omitted) (internal quotation marks omitted)); *Cunningham v. Standard Guar. Ins. Co.*, 630 So. 2d 179, 181 (Fla. 1994) ("[S]ubject-matter jurisdiction concerns the power of the trial court to deal with a class of cases to which a particular case belongs. Stated differently: 'Jurisdiction,' in the strict meaning of the term, as applied to judicial officers and tribunals, means no more than the power lawfully existing to hear and determine a cause. It is the power lawfully conferred to deal with the general subject involved in the action. It does not depend upon the ultimate existence of a good cause of action in the plaintiff, in the particular case before the court. It is the power to adjudge concerning the general question involved, and is not dependent upon the state of facts which may appear in a particular case.") (citation omitted) (internal quotation marks omitted)); *Troupis v. Summer*, 218 P.3d 1138, 1140–41 (Idaho 2009) ("Jurisdiction over the subject matter is the right of the court to exercise judicial power over that class of cases; not the particular case before it, but rather the abstract power to try a case of the kind or character of the one pending; and not whether the particular case is one that presents a cause of action, or under the particular facts is triable before the court in which it is pending, because of some of the inherent facts that exist and may be developed during trial." (citation omitted) (internal quotation marks omitted)); *McCormick v. Robertson*, 28 N.E.3d 795, 802 (Ill. 2015) ("So long as a claim meets the requirements for justiciability, it will be sufficient to invoke the court's subject matter jurisdiction, even if the claim is defectively stated. The *only* consideration is whether it falls within the general class of cases that the court has the inherent power to hear and determine. If it does, then subject matter jurisdiction is present." (emphasis in original) (citation omitted)); *Holding v. Franklin Cty. Zoning Bd. of Adjustment*, 565 N.W.2d 318, 319 (Iowa 1997) ("For several years we have sought to correct a formerly widespread misimpression that often confused a court's lack of subject matter jurisdiction with a court's lack of authority to act in a particular matter. . . . We hope the distinction is now clear as it is important: the term subject matter jurisdiction refers to the power of a court to hear and determine the class of cases to which the proceedings in question belong. Where subject matter jurisdiction exists, it does not necessarily follow that a court has authority to act in a specific case included within that general class."); *Duvall v. Duvall*, 80 So. 2d 752, 754 ("Jurisdiction of the subject matter is the power of the court to hear and determine cases of the general class to which the

(cont.)

expansive notion of subject-matter jurisdiction will undermine the basic premises of our justice system. And that is why the law has long defined the concept of subject-matter jurisdiction to consist of the two categories noted above—statutory limits on the class of cases assigned to the authority of a certain court, and other limits that go to the concept of justiciability.

¶ 130  These principles are well-embedded in our law. And cases in Utah and elsewhere have long warned of the perils of expanding these categories to encompass mere preconditions to the availability of a particular form of judicial relief.[14] We heed that warning here. We do

_____

particular case belongs. . . . But if a court has jurisdiction of the subject matter, it has the power to decide the case according to its own view of the law and the facts; the test of jurisdiction is whether the court has the right to enter on the inquiry, and not whether its methods were regular, its findings right, or its conclusions according to law."), *overruled on other grounds*, 81 So. 2d 695 (Miss. 1955); *In re Expungement of Arrest Records Related to Brown v. State*, 226 S.W.3d 147, 150 (Mo. 2007) ("Subject matter jurisdiction is a tribunal's statutory authority to hear a particular kind of claim. The court must have cognizance of the class of cases to which the one to be adjudged belongs. The failure to distinguish between the erroneous exercise of jurisdiction and the want of jurisdiction is a fruitful source of confusion and errancy of decision." (citation omitted) (internal quotation marks omitted)).

[14] We have routinely rebuffed attempts by litigants to recast merits arguments as issues of subject-matter jurisdiction. *See, e.g.*, *Johnson*, 2010 UT 28, ¶ 10 (warning that "[b]ecause parties can raise subject matter jurisdiction at any time during a proceeding, it makes sense to cabin the issues that fall under the category" and rejecting just such an attempt in the divorce context); *Chen*, 2004 UT 82, ¶ 36 (concluding that the parties had mischaracterized a merits claim as an issue of subject-matter jurisdiction in an effort to avoid waiver). The same is true in other jurisdictions. *See, e.g.*, *In re Adoption of D.P.P.*, 158 So. 3d 633, 636–37 (Fla. Dist. Ct. App. 2014) ("We disagree with the lower court's determination concerning subject matter jurisdiction in the adoption proceeding. A court has subject matter jurisdiction when it has the authority to hear and decide the case. . . . Because the finality of judgments is favored, it is well established that errors, irregularities and even wrongdoing in the proceeding do not render a judgment void

(cont.)

not treat a defect in a birth mother's consent as a defect in an adoption court's subject-matter jurisdiction.

¶ 131 Clearly our district courts have the statutory authority to issue an adoption decree. UTAH CODE § 78A-5-102(1); *id.* § 78B-6-105; *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 34, 266 P.3d 702 ("Utah district courts clearly have subject matter jurisdiction over adoption proceedings as a class of cases."). Because there are no grounds for questioning the justiciability of this proceeding (no standing, ripeness, or mootness problem),[15] moreover, we find that there is no subject-matter jurisdictional issue presented by this case.

---

when the court has jurisdiction and the parties had an opportunity to be heard."); *Troupis*, 218 P.3d at 1140 ("Subject matter jurisdiction is a key requirement for the justiciability of a claim and cannot be waived by consent of the parties. Because of the serious ramifications of a court acting without subject matter jurisdiction, namely that the judgments of that court are void, the concept must be clearly defined." (citation omitted)); *Najera v. Chesapeake Div. of Soc. Servs.*, 629 S.E.2d 721, 723 (Va. Ct. App. 2006) ("Whether a judicial order can be attacked as void turns on the subtle, but crucial, difference between the power of a court to adjudicate a specified class of cases, commonly known as 'subject matter jurisdiction,' and the authority of a court to exercise that power in a particular case. This distinction guards against the *faux* elevation of a court's failure to comply with the requirements for exercising its authority to the same level of gravity as a lack of subject matter jurisdiction. In making that distinction, we focus on the statutory language delegating power to the courts to decide the issue and the legislative design it reveals." (citation omitted) (internal quotation marks omitted)).

[15] Justice Himonas disagrees. He asserts that without valid consent "there is no justiciable matter and therefore nothing for the district court to exercise jurisdiction over." *Supra* ¶ 20. But this is just a restatement of the lead opinion's proposed holding. Justice Himonas offers no support for the proposition that a failure of consent—the failure of a mere precondition to the issuance of certain relief—is a matter that goes to "justiciability." And it certainly does not. Or, more properly, if it does then the exception has swallowed the rule, and any

(cont.)

2. Cases on Adoption and Jurisdiction

¶ 132 Justice Himonas claims to find support for his contrary conclusion in a line of adoption cases in other states. Those cases, in his view, establish the well-settled general rule that courts lack subject-matter jurisdiction over adoption proceedings predicated on invalid consent. *See supra* ¶ 30 n.10. Justice Himonas also proffers support for his analysis in Utah precedent—in this court's decision in *Deveraux' Adoption v. Brown*, 268 P.2d 995 (Utah 1954), and in cases requiring a notice of claim under the Governmental Immunity Act and the exhaustion of administrative remedies as prerequisites to jurisdiction. *See supra* ¶ 25. Yet none of the cited cases supports the lead opinion's framework. Here, a court rendered a final judgment that C.C.'s consent was valid and complied with ICWA. And no one has challenged that final judgment—either via direct appeal or collateral attack. No court that we are aware of—and Justice Himonas cites none—has ever revisited the factual or legal underpinnings of a mother's consent *sua sponte* in a subsequent proceeding.

¶ 133  All of the cases cited by Justice Himonas are distinguishable. First, nearly all of them fit within the two categories of subject-matter jurisdiction identified above. And the few that do not fit this paradigm bear no resemblance to the facts of this case, as they involve statutory prerequisites to jurisdiction that are not present in our code.

¶ 134  Justice Himonas's cases generally fall into three categories. In one category the courts are simply stating that a defect in a mother's consent is a legal barrier to the issuance of an adoption order.[16] No one

---

legal defect in a court's decision goes to "justiciability" (and must be raised *sua sponte* and may be considered at any time).

[16] *See, e.g., L.T. v. W.L.*, 159 So. 3d 1289, 1291 (Ala. Civ. App. 2014) (vacating adoption on biological mother's petition to set aside judgment because Alabama statute requires that minors be represented by a guardian ad litem prior to giving consent; finding lack of jurisdiction to issue the adoption decree because mother, a minor at the time, was not represented by a guardian ad litem at any point in the proceedings); *Westerlund v. Croaff*, 198 P.2d 842, 845 (Ariz. 1948) (noting that district court had concluded that father was unwilling to consent and that his consent was required; concluding that writ of prohibition was appropriate to enjoin further adoption proceedings); *Arnold v.*
(cont.)

doubts that conclusion. A birth mother's consent is undeniably a prerequisite to the issuance of an adoption decree. And in that sense it can certainly be said that the court lacks "jurisdiction" to issue an adoption decree. Yet these holdings appear in cases in which *the birth parent* appears and challenges the validity of the consent. So they tell us nothing useful about the question presented here—which is whether a failure of consent is a *subject-matter jurisdictional* defect that can be raised by the court *sua sponte*.[17]

¶ 135 Other cases cited in the lead opinion rest on principles of *personal jurisdiction*. In these cases courts have allowed a collateral

---

*Howell*, 219 P.2d 854, 858 (Cal. Dist. Ct. App. 1950) (setting aside adoption on the ground that consent was obtained by fraud, noting that consent is a jurisdictional prerequisite in the sense that it is a basis for setting aside an adoption where the issue is raised by a party); *In re Adoption of List*, 211 A.2d 870, 873–74 (Pa. 1965) (using the term "jurisdiction" and "jurisdictional" to identify statutory requirements for adoption and identifying a "presumption of [the adoption decree's] validity and regularity and an implication . . . that the court did find the necessary facts and did perform all the steps essential to the jurisdiction of the court" and placing the "burden . . . on the person attacking an adoption decree to establish its invalidity by clear and convincing evidence").

[17] *See In re JWT*, 104 P.3d 93, 94 (Wyo. 2005) (distinguishing a failure to file all of the statutorily required documents with the adoption petition—a Wyoming statutory precondition to suit that if not followed will void the proceedings "*ab initio*"—from "a case where mother file[s] a false affidavit" which [on its face meets the statutory requirements], concluding that where the necessary documents are filed—albeit falsely—"the district court might have . . . jurisdiction to proceed with the adoption"); *McGinty v. Jewish Children's Bureau*, 545 N.E.2d 1272, 1275 (Ohio 1989) (per curiam) (rejecting a habeas petition challenging the court's subject-matter jurisdiction to issue an adoption where there was an alleged defect in consent; concluding that "once a final determination has been made that the parents validly consented to the adoption, that determination removes the basis for a habeas corpus attack on the ground that the court ordering the adoption lacked subject matter jurisdiction").

attack on a final order by a birth parent whose connection to or notice from the forum state was constitutionally defective.[18] Occasionally the courts have offhandedly referred to such a defect as going to *subject-matter jurisdiction*.[19] But, confusing terminology aside, this is decidedly

---

[18] *G.M.D. v. M.D.*, 610 S.W.2d 305, 307 (Mo. Ct. App. 1980) (vacating adoption on petition of parent whose consent was required and who had not been given adequate notice of the proceedings); *In re Jackson*, 28 P.2d 125, 129 (Nev. 1934) (same); *In re Holder*, 10 S.E.2d 620, 622 (N.C. 1940) (vacating adoption on petition from brother and legal heir of deceased biological mother on several grounds, including that the biological mother's consent was required and she had not been given notice of the adoption proceedings and that the adoption order was never signed by the court); *Adoption of Robin*, 571 P.2d 850, 856 (Okla. 1977) (setting aside an adoption on petition of a biological father whose consent was required for the issuance of an adoption and who was deprived of due process by the adoptive parents' fraud on the court and finding that birth mother's consent was obtained by fraud and duress); *Hughes v. Aetna Cas. & Sur. Co.*, 383 P.2d 55, 60 (Or. 1963) (granting biological child's petition declaring him the legal heir of his deceased mother where the biological mother was not given notice of the adoption proceedings nor was her consent obtained and no exception to such requirement was satisfied).

[19] *C.T. v. J.S.*, 951 P.2d 1199, 1200 (Alaska 1998) (using the term subject-matter jurisdiction but reasoning only that the lower court ruling that mother was estopped from refusing consent was in error and reversing adoption on that basis); *G.M.D.*, 610 S.W.2d at 307 (mentioning the term subject-matter jurisdiction in stating the rule 60(b) standard but making no reference to it thereafter in assessing the validity of a challenge raised by biological mother—not by the court *sua sponte*); *In re Holder*, 10 S.E.2d at 622 (using the terminology of subject-matter jurisdiction in reference to the fact that "neither parent was made a party" to the adoption proceeding); *In re Adoption of L.D.S.*, 155 P.3d 1, 8 (Okla. 2006), *as supplemented on reh'g*, No. 250 (Mar. 6, 2007) (holding district court was divested of jurisdiction during pendency of appeal and voiding adoption issued during the time when the district court lacked jurisdiction on account of a pending appeal); *Hughes*, 383 P.2d at 60–63 (using the term subject-matter jurisdiction in

(cont.)

not a matter of *subject-matter jurisdiction*. The lack of notice or connection to the forum goes to *personal* or *territorial jurisdiction*. And that sort of jurisdiction has long been understood as subject to the law of preservation and waiver—in that a failure to raise a personal jurisdiction defense at the first opportunity results in a forfeiture, and the matter is not the court's to raise.[20]

¶ 136 Justice Himonas also cites a few cases where the states' adoption statutes require that specific documents be filed simultaneously with the petition for adoption as a precondition to the court's acquisition of subject matter jurisdiction over the case.[21] Even under this third category of cases, jurisdiction is determined as of the

---

the context of a case that turned on the failure of the adoption court to give notice to the biological mother of the adoption proceeding).

[20] *See, e.g.*, *All Real Prop., Residence & Appurtenances*, 2005 UT 90, ¶ 10 (holding that a failure to raise an objection to personal jurisdiction or defective notice at first opportunity in a proceeding results in waiver or forfeiture of the claim).

[21] *In re I.H.H-L.*, 251 P.3d 651, 656–57 (Kan. Ct. App. 2011) (interpreting the Kansas adoption statute to require attachment of consent to the petition as a precondition to a court's jurisdiction to hear an adoption petition and concluding failure to do so precluded the district court from acquiring subject-matter jurisdiction over the adoption but also rejecting a rule where "subject matter jurisdiction could fluctuate moment to moment" and embracing the federal rule that subject-matter jurisdiction is determined at the time of filing of the complaint); *In re Adoption of Kassandra B.*, 540 N.W.2d 554, 559 (Neb. 1995) ("The fact that the statute is phrased in the past tense indicates that the requisite consents should be obtained prior to filing the petition."); *In re Ralph*, 710 N.Y.S.2d 500, 502–03 (App. Div. 2000) (concluding that failure to file complete adoption applications precluded the court's exercise of jurisdiction and dismissing the action); *In re JWT*, 104 P.3d at 94 (identifying Wyoming statutory requirements that required particular documents to be filed "with the petition to adopt" and concluding that their absence at the time of filing rendered the adoption "invalid *ab initio*," but noting that had the documents been filed—even if their content were false—jurisdiction might properly be found).

filing of the action. It is not divested by any subsequent interpretive error that may arise in the case.

¶ 137 Here Justice Himonas does not assert that there was any defect in jurisdiction at the time the case was initiated. He couldn't. By statute, our Utah courts are expressly authorized to assume jurisdiction over adoption petitions and determine parental rights and consent at any time during the proceeding—prior to the issuance of the adoption.[22] And there is no dispute that the district court did in fact terminate C.C.'s rights and determine that no father had established rights in the child prior to proceeding on the petition for adoption. *See Order Allowing Relinquishment of Parental Rights, Terminating Birth Mother's Parental Rights, and Determining Birth Father's Rights* at 2 (Sept. 25, 2014).

¶ 138 The cases cited by Justice Himonas should also be viewed in historical perspective. Many of the cited cases are from a bygone era— in which adoption was disfavored and the rights of biological parents were elevated above the best interests of the child and the interests of adoptive parents.[23]

---

[22] *See* UTAH CODE § 78B-6-109(1)–(2) (allowing determination of parental rights to occur at any point in an adoption proceeding prior to issuance of the adoption); *id.* § 78B-6-105 (identifying the filing of an adoption petition as the only thing required to initiate an adoption proceeding); *id.* § 78B-6-112(2)(a) (authorizing a court to terminate parental rights in the adoption proceeding).

[23] *See, e.g., Westerlund*, 198 P.2d at 843–44 ("As adoption is in derogation of the common law, generally speaking it may be said that adoptive statutes should receive a strict construction, particularly with respect to the jurisdiction of the court or where the effect of the adoption would be to deprive a natural parent of the possession of his child."); *In re Jackson*, 28 P.2d at 127 ("The act of adoption takes a child away from its parent by destroying the legal and natural relation between them and creating in its stead an artificial relation deemed by law to be for the best interests of the child. It is in derogation of the common law which regards the natural rights of the parents to be of a sacred and enduring character. As the statute confers a special power of this kind which may be exerted in opposition to the wishes, or without the consent of the parents, it should be strictly construed in their favor.

(cont.)

¶ 139 But these principles have no application to Utah adoption law today. Our Utah Adoption Act was enacted in 2008. And in enacting this law our legislature made express findings rejecting the notion that adoption is disfavored because it disrupts biological family ties. *See* UTAH CODE § 78B-6-102. Our legislature has thus rejected the premises underlying many of the cases cited by Justice Himonas. In Utah the best interests of the child are paramount. *Id.* § 78B-6-102(1). We also have recognized the fundamental interests of adoptive parents. *Id.* § 78B-6-102(5)(d). These are other grounds for suspicion of Justice Himonas's reliance on the cited cases.

¶ 140 The issue presented in this case, moreover, is quite distinct from that presented in the cases cited by the majority. Here we are squarely presented with a question regarding *subject-matter jurisdiction*—whether we may consider a potential objection that no party has raised and that goes to an order that was rendered final and unappealable many months back. The lead opinion's theory on this point is unprecedented. It has cited no authority for the proposal to review a final order that determined that valid consent was given and that was never challenged by the mother who gave the consent. Indeed, the district court's order was not even challenged by the putative father—either below or on appeal. The lead opinion's view that we have authority, indeed an obligation, to review the mother's consent is without support in the cited cases.

---

The courts are quite uniform in applying the rule of strict construction in favor of the parents' natural rights in adoption proceedings."); *Adoption of Robin*, 571 P.2d at 855 ("Adoption statutes are to be strictly construed in favor of the natural parents where the controversy is between the natural parents and persons seeking to destroy that status."); *Hughes*, 383 P.2d at 59 ("[T]he right of adoption being in derogation of the common law, is a special power conferred by statute, and the rule is that such statutes must be strictly construed. . . . [T]he court in adoption proceedings is exercising a special statutory power not according to the course of the common law, and when its decree is called in question, even collaterally, no presumptions in favor of jurisdiction are indulged, but the facts necessary for jurisdiction must appear affirmatively, on the face of the record." (citation omitted) (internal quotation marks omitted)).

¶ 141 Utah law is likewise unhelpful to the lead opinion. The *Deveraux' Adoption* case is similar to the line of adoption cases cited by Justice Himonas.[24] *Deveraux* speaks of a court "never obtain[ing] jurisdiction to exercise the power to grant" an adoption in a case in which there was a defect in a birth mother's consent. *Deveraux' Adoption v. Brown*, 268 P.2d at 998. But the *Deveraux* court's notion of "jurisdiction" goes only to the legal authority of the court to award certain relief (to issue an adoption decree). *Deveraux* had no occasion to consider whether a defect in the birth mother's consent deprived the court of subject-matter jurisdiction because the birth mother herself intervened in the adoption and "objected that her consent was never validly given." *Supra* ¶ 21 (citing *Deveraux*, 268 P.2d at 996). So *Deveraux* likewise tells us nothing of relevance to the matter before us.

3. Governmental Immunity Act and Administrative Exhaustion

¶ 142 That leaves only the governmental immunity and administrative exhaustion cases cited by Justice Himonas. The lead opinion cites those cases to support its view that "[t]here are often prerequisites individual litigants must meet to show that they have satisfied the requirements of subject matter jurisdiction even when we unquestionably have subject matter jurisdiction over" a general category of cases. *Supra* ¶ 25. We have no quarrel with that general proposition. The "categories" of cases over which our courts have subject-matter jurisdiction certainly have boundaries to them. And litigants must make a case-by-case showing as to whether they fall within the relevant boundaries. But that unobjectionable proposition is hardly a license for us to treat mere preconditions to the issuance of a given type of order as a bar to the exercise of subject-matter jurisdiction.

---

[24] *Deveraux* likewise suffers from the background principles problem. It long predates Utah's current adoption act. And it identifies adoptions as disfavored and fails to mention principles of the best interests of the child or the rights of adoptive parents—elevating the rights of biological parents above all else. *See Deveraux' Adoption v. Brown*, 268 P.2d 995, 997 (Utah 1954).

¶ 143 Conditions that go to subject-matter jurisdiction are clearly denominated as such.[25] And they are, by necessity, conditions that can be established fairly easily at the outset of the litigation. Familiar examples in federal court are the existence of a federal question or the diversity of citizenship of the parties (and a sufficient amount in controversy). *See* 28 U.S.C. §§ 1331–32. But in Utah our district courts are courts of general jurisdiction. They have general power to hear "all matters civil and criminal" so long as they are "not excepted in the Utah Constitution and not prohibited by law." Utah Code § 78A-5-102(1). The code, admittedly, places certain restrictions on the jurisdiction of our district courts. But they are expressly denominated as such—as jurisdictional limits.[26] And they are matters that may be easily assessed at the outset of the litigation, unlike legal preconditions to the issuance of a given form of judicial relief.

¶ 144 It is true that the governmental immunity and administrative exhaustion cases identify "case-specific procedural facts" that have been deemed to go to subject-matter jurisdiction. *Supra* ¶ 24. But these cases provide no authority to treat any legal precondition to the issuance of a form of judicial relief as subject-matter jurisdictional. Instead these cases fit comfortably within the settled paradigm.

---

[25] *See, e.g.*, *Labelle v. McKay Dee Hosp. Ctr.*, 2004 UT 15, ¶ 8, 89 P.3d 113 ("Article VIII, section 5 of the Utah Constitution vests in the district court 'original jurisdiction in all matters except as limited by this constitution or by statute.' We presume that our district courts retain their grant of constitutional jurisdiction in the absence of a clearly expressed statutory intention to limit jurisdiction."); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–16 (2006) ("If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." (footnote omitted) (citation omitted)).

[26] *See, e.g.*, Utah Code § 34A-2-407(12)(a)–(b) (identifying claims within the "exclusive jurisdiction" of the Labor Commission "[s]ubject to appellate review"); *id.* § 78A-6-103(2) (identifying "exclusive jurisdiction" of juvenile courts over certain matters).

¶ 145  It is also true that we have held that the filing of a notice of claim with the government is a statutory "prerequisite to vesting a district court with subject matter jurisdiction over claims against governmental entities." *Wheeler v. McPherson*, 2002 UT 16, ¶ 9, 40 P.3d 632. But that does not at all mean that any statutory prerequisite to a successful tort claim is subject-matter jurisdictional. It means that our law treats the failure to file a notice of claim as a matter rendering the judicial proceeding *unripe*. This fits comfortably within the traditional notion of justiciability. A failure to file a claim with a non-judicial department of government can be understood to deem the judicial filing premature. And a premature filing can easily be viewed as a categorical defect that goes to subject-matter jurisdiction; it is subject-matter jurisdictional in that it deems the non-judicial department the appropriate body to resolve the matter, and accordingly holds that the filing in court is premature. That is ultimately what our cases say. *See Rushton v. Salt Lake Cty.*, 1999 UT 36, ¶¶ 18–21, 977 P.2d 1201 ("A notice of claim provides the entity being sued with the factual details of the incident that led to the plaintiff's claim. Moreover, it 'provide[s] the governmental entity an opportunity to correct the condition that caused the injury, evaluate the claim, and perhaps settle the matter without the expense of litigation.'" (alteration in original) (quoting *Larson v. Park City Mun. Corp.*, 955 P.2d 343, 345–46 (Utah 1998)). We leave it at that, as doing so avoids the slippery slope introduced by the lead opinion.

¶ 146  The exhaustion cases are similar. They hold that a court lacks subject-matter jurisdiction where a plaintiff has failed to exhaust its avenues for relief in an administrative agency. *See Hous. Auth. of Salt Lake v. Snyder*, 2002 UT 28, ¶ 11, 44 P.3d 724. But again this is no broad conclusion that all legal preconditions to a successful claim are subject-matter jurisdictional. It goes to traditional justiciability in the sense of ripeness. So our exhaustion cases similarly identify a categorical defect that goes to subject-matter jurisdiction. They conclude that a non-judicial entity is the appropriate body to resolve the matter, and that a court lacks jurisdiction because the case belongs in an administrative proceeding and not in court.[27]

---

[27] Our courts have not always framed this jurisdictional problem in these precise terms. But that is the conceptual essence of our cases. *See Salt Lake City Mission v. Salt Lake City*, 2008 UT 31, ¶ 14, 184 P.3d 599 (equating ripeness requirements in federal law with the requirement of

(cont.)

¶ 147 We follow these precedents but do not extend them in the manner devised by the lead opinion. Doing so would expand on traditional conceptions of subject-matter jurisdiction in a manner that jeopardizes some central tenets of our justice system.

### 4. Systemic Costs and Slippery Slope

¶ 148 The lead opinion's framework may appear to protect the interests of a sympathetic party. *See supra* ¶ 1 (expressing concerns about the "septic" nature of this case, infected by a birth mother who "perpetrated a fraud" and deprived a birth father of his chance to intervene to protect his interests). But it would do so at a substantial cost to the coherence of our law and to basic tenets of our judicial system—to the law of subject-matter jurisdiction, to rules of waiver and preservation, and to principles of finality and efficiency embedded deeply in our jurisprudence. Such costs are immediately apparent in

---

administrative exhaustion); *Tolman v. Logan City*, 2007 UT App 260, ¶ 9, 167 P.3d 489 ("However, an as applied challenge does not become ripe until the challenging party has exhausted its administrative remedies and received a final decision from the relevant administrative agency."). Our approach, moreover, is consistent with parallel case law in other jurisdictions. *See Crow v. Penrose-St. Francis Healthcare Sys.*, 169 P.3d 158, 161 (Colo. 2007) ("Because the Hospital's governing board has not rendered a final decision in his matter, Crow has not exhausted his available administrative remedies, and his case is not ripe for judicial review."); *Molo Oil Co. v. City of Dubuque*, 692 N.W.2d 686, 693 (Iowa 2005) ("Exhaustion of one's administrative remedies is a condition precedent to ripeness.").

We do not mean to suggest that administrative exhaustion is on all fours with the doctrine of ripeness. There are certainly conceptual differences between the two sets of principles. *See Ticor Title Ins. Co. v. F.T.C.*, 814 F.2d 731, 734–35 (D.C. Cir. 1987) (identifying the overlap as well as differences between administrative exhaustion requirements and the doctrine of ripeness). But this is a coherent way to understand administrative exhaustion as subject-matter jurisdictional. And the lead opinion's contrary view—treating exhaustion as jurisdictional because it is a legal prerequisite to the issuance of relief—would open a perilous slippery slope.

the adoption setting; but the decision proposed in the lead opinion would also reverberate in other fields.

¶ 149 If Justice Himonas's view prevailed, it would be the judge's duty (both in the district court and on appeal) to search the record for statutory prerequisites to an adoption that may not have been fulfilled. And whenever such a defect was found, the subject-matter jurisdiction of the adoption court would be in jeopardy. Such jeopardy would last for at least a year beyond the entry of the adoption decree. *See supra* ¶ 32 n.11. And throughout such proceedings, both in the district court and during any appeal, the parties could expect a more sluggish and less efficient disposition—as judges would be required to make ongoing assessments on issues heretofore left to the adversary system. All interested parties would suffer as a result.

¶ 150 The lead opinion purports to limit its rule to a specific prerequisite to the issuance of an adoption decree—to the validity of the birth mother's consent. But the logic of its analysis sweeps more broadly. Any and all "case-specific procedural facts" would be eligible for classification as subject-matter jurisdictional. *See supra* ¶ 24. All that matters under the lead opinion is that the matter in question be an important precondition to the availability of the relief sought by the plaintiff. The possibilities for inclusion are endless.[28] And the timeframe for upsetting a final adoption is potentially unlimited.[29]

---

[28] Justice Himonas responds by insisting that we have identified "no situation in which a party would be able to use [his] opinion to ask a court to improperly expand subject matter jurisdiction to any statutory requirement." *Supra* ¶ 29. But this misses our point—that *the logic* of the lead opinion sweeps broadly to encompass any "case-specific procedural fact[]" affecting the validity of the adoption decree. That premise forms the basis for the legal standard the lead opinion would apply in future cases. And lower courts would have to take the opinion seriously as long as it remained in place. So it's possible that this court would hold the line—refusing to extend the standard Justice Himonas would announce today to other "case-specific procedural facts" affecting the validity of an adoption decree. But the lower courts would still be left to field any of a series of challenges to adoption decrees as long as the lead opinion's theory remained.

The lead opinion, after all, rests on no settled legal principle. It is based only on the insistence that consent is historically and logically

(cont.)

¶ 151 Justice Himonas says that a defect in the mother's consent deprives the district court of subject-matter jurisdiction because "absent consent," the court is "without authorization to interfere with the fundamental right that is the parent-child relationship." *Supra* ¶ 20. The lead opinion even goes so far as to say that without valid consent "no child has been made available for adoption." *Supra* ¶ 27.

¶ 152 But that is an unvarnished judicial fiction. Of course there is a child to be adopted. We call him "B.B." here to protect his anonymity. But he is a real child with a real interest in these proceedings. And he has been living with his would-be adoptive parents since just after his birth in 2014. Since that time all of these individuals have proceeded in

---

important. And that would leave lower courts without any basis for discerning what other statutory requirements might properly be deemed a matter of equal importance.

The slippery slope problem would remain, moreover, even assuming that "consent" problems are the only "case-specific procedural facts" that would be deemed to go to subject-matter jurisdiction. ICWA prescribes a range of requirements affecting a parent's consent: that consent be given before a judge, 25 U.S.C. § 1913(a); that the judge engage in an adequate colloquy regarding the parent's rights, *id.*; that the colloquy be fully understood, *id.*; that the judge certify that the colloquy was understood, *id.*; that the colloquy be interpreted where it might not be understood in English, *id.*; and that the consent not be improperly prohibited from being withdrawn, *id.* § 1913(c). And state law of course also regulates consent—by mothers and fathers. *See, e.g.*, UTAH CODE § 78B-6-120; *id.* § 78B-6-120.1; *id.* § 78B-6-121; *id.* § 78B-6-125. These and other elements of valid consent would seem to be "case-specific procedural facts" implicating subject-matter jurisdiction under the lead opinion's theory. The lead opinion would thus invite litigation—and uncertainty and delay—on the question of whether these and other elements of "consent" may be questioned in a manner reopening an adoption that is otherwise final.

[29] *See supra* ¶ 32 n.11 (acknowledging the possibility that the one-year limitation on challenges to an adoption decree in Utah law, Utah Code section 78B-6-133(7)(b), may not apply in the face of a jurisdictional defect stemming from ICWA, and citing at least one case that supports that conclusion—*Hughes v. Aetna Cas. & Sur. Co.*, 383 P.2d 55, 66 (Or. 1963)).

reliance on the finality of the order terminating the birth mother's parental rights. They may not yet have an adoption decree. But they have rested easily on the conclusion that the birth mother no longer has a right to interfere with the adoption because her consent was deemed valid, her rights were terminated, and the time for questioning the basis for those decisions has long passed. So the lead opinion may say there is no child to be adopted, but all those who had anything to do with B.B. have long thought otherwise.

¶ 153 What the lead opinion is really saying is that it thinks the validity of a mother's consent is particularly important. It says as much in asserting that the "requirement of consent is mandatory and jurisdictional because it goes to the soul of the adoption." *Supra* ¶ 23. Fair enough. We don't doubt that a mother's consent is a crucial step in the proceedings. But subject-matter jurisdiction is different. Our law has long assessed subject-matter jurisdiction at the categorical level—encompassing only statutory limits on the classes of cases to be decided by the court and traditional limits on justiciability. A defect in consent fits in neither category. So if a consent problem is a jurisdictional problem then so are many other legal grounds for challenging the propriety of a district court's decision. That cannot be—unless we are prepared to abandon the central tenets of finality and adversariness at the heart of our justice system. We are not. And we reject the lead opinion's view that a defect in consent might deprive our courts of subject-matter jurisdiction over an adoption proceeding.

D. Jurisdiction Is Proper Under the Lead Opinion's Theory

¶ 154 If a defect in a birth mother's consent really deprived the district court of subject-matter jurisdiction, then the proper course would be an order of vacatur and dismissal.[30] Yet the lead opinion

---

[30] *See, e.g., Ramsay v. Kane Cty. Human Res. Special Serv. Dist.*, 2014 UT 5, ¶ 17, 322 P.3d 1163 ("[W]hen a court determines it lacks subject matter jurisdiction, it 'retains only the authority to dismiss the action.'" (quoting *Varian–Eimac, Inc. v. Lamoreaux*, 767 P.2d 569, 570 (Utah Ct. App. 1989)); *Salt Lake Cty. v. Bangerter*, 928 P.2d 384, 386 (Utah 1996) ("When it is ascertained that there is no jurisdiction in the court because of the absence of a justiciable controversy, then the court can go no further, and its immediate duty is to dismiss the action. . . ." (internal quotation marks omitted) (quoting *Baird v. State*, 574 P.2d 713, 716 (Utah 1978)).

would not dismiss the case. It would remand to allow the mother to decide whether to enter a valid consent. *See supra* ¶ 84 n.32.

¶ 155 That is telling. What it tells us is that even the lead opinion would not ultimately conclude that the district court lacks subject-matter jurisdiction over any of the issues it undertakes to review—namely the adjudication of C.C.'s consent and the denial of the E.T.'s motion to intervene. Even taking the lead opinion's view of the cases at face value, there isn't a single case for the proposition that a district court lacks jurisdiction to decide whether consent was validly given or to determine whether a party claiming an interest in the child may properly intervene in the proceedings. These are pre-adoption issues that, under any view, a district court has power to decide.

¶ 156 The lead opinion tries to split the baby. It concludes that the court has jurisdiction to take "valid consent" but lacks jurisdiction to take "invalid consent." *See supra* ¶ 84 n.32. But there is no such thing as a defect in subject-matter jurisdiction that arises only if the court decides an issue one way. What the lead opinion is really trying to do is reopen the merits of the termination order. But the merits of the termination order are foreclosed from our consideration here for all of the reasons set forth in Part I.A above.

¶ 157 We leave the matter there. The contrary path articulated in the lead opinion would upend the settled law of subject-matter jurisdiction in troubling ways. We decline to take that path.

## II. MOTION TO INTERVENE AND FEDERAL PATERNITY STANDARD

¶ 158 The lead opinion's decision on the merits of E.T.'s motion to intervene is likewise problematic. Here a majority of the court expands the reach of ICWA in a manner that its plain language cannot bear—and that ignores a countervailing purpose that Congress was also balancing in enacting ICWA. I respectfully dissent.

¶ 159 ICWA, like most statutes, is not "aimed at advancing a single objective at the expense of all others." *Myers v. Myers*, 2011 UT 65, ¶ 27, 266 P.3d 806. It is a "result of a legislative give-and-take that balances multiple concerns." *Id*. A key countervailing purpose at stake under ICWA is the protection of the traditional jurisdiction of state courts over adoption proceedings. *See* 25 U.S.C. § 1901(5) (noting that states

possess "recognized jurisdiction over Indian child custody proceedings").[31] ICWA does not oust the states of that traditional area of their authority. *Id.* It recognizes it to a large degree—balancing against the interests of the integrity of Indian families the rights of the states to vindicate the important interests protected by their laws of adoption and parental rights.

¶ 160 In other words, ICWA does not create an independent federal adoption regime. Its substantive provisions function only within the context of a state or tribal adoption proceeding. *See id.* §§ 1911–13. And Congress did not override the traditional jurisdiction inherent in adoption cases. It simply mandated some minimum standards that state adoption schemes must satisfy. *See id.* § 1902.

¶ 161 This confirms that Congress understood the importance of state law in this field. And it recognized the fundamental nature of the interests protected by such law—including the welfare and best interests of children, which are implicated whenever an adoption

---

[31] ICWA admittedly provides for a degree of federal "intervention" into state sovereignty in this field. *See supra* ¶ 62. But the Act also preserves "traditional" state sovereignty to some degree. That is reflected not only in the text of section 1901(5) but also in other statutory sections that make reference to mechanisms and terms of state law. *See* 25 U.S.C. § 1912(a) (identifying additional federal standards to apply to "any involuntary proceeding in a State court"); *id.* § 1913(b) (identifying a right to "withdraw consent to a foster care placement under State law"); *id.* § 1919(a) (authorizing the establishment of jurisdiction agreements between states and tribes); *id.* § 1922 (authorizing "emergency removal . . . under applicable State law"). To that extent there is no mistaking the fact that ICWA balances the protection of "the essential tribal relations of Indian people," *see supra* ¶ 62, against the "traditional" sovereignty of the states.

I am not advocating that we ignore the former, as the majority suggests. I am just urging that we keep both sets of interests in mind—and that we look to the text of the statute in deciding where Congress has intervened and where it has preserved traditional state sovereignty. Thus, I would give full effect to ICWA's text where the statute identifies unique federal standards. But I would not go beyond the text of the statute to displace state law where Congress has not spoken.

proceeding is underway. Thus, ICWA does not guarantee an unfettered right of members of Indian tribes to intervene in or object to an adoption in any circumstance or at any time. It sets forth specific, limited rights of tribal members.

¶ 162 The provision at issue here is along these lines. It does not guarantee a right to notice and intervention to any tribal member with a claimed interest in a child in an adoption proceeding. It limits that right to a "parent." 25 U.S.C. § 1912(a). And ICWA defines "parent" in a careful, limited way. It states that a "parent" is "any biological parent or parents of an Indian child," *not including* "the unwed father where paternity has not been acknowledged or established." *Id*. § 1903(9).

¶ 163 To me this is an obvious invocation of state law. I say *obvious* because paternity has never been a creature of federal law. It has always been a matter within the exclusive sovereignty of the states. The longstanding rule in Utah and elsewhere is that an unwed father's legal rights as a father—his "paternity"—is established by the law of the state in which his putative child's adoption goes forward. *See generally In re Adoption of Baby B.*, 2012 UT 35, 308 P.3d 382; *see also* HOMER H. CLARK, JR., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES, 309 (2d ed. 1972). Admittedly, there are constitutional limitations on this general rule—circumstances in which the state law of paternity must give way to federal constitutional limitations (such as due process). *See, e.g., Stanley v. Illinois*, 405 U.S. 645, 649–58 (1972) (holding that "a presumption that distinguishes and burdens [only] all unwed fathers" was unconstitutional). But no one has suggested that any such limitation would apply here. So the obvious place to look to decide whether E.T. has "acknowledged" or "established" his "paternity" is Utah law.

¶ 164 I would decide this case on that basis. I would conclude, as have other courts confronting this question,[32] that an Indian parent has

---

[32] *See Jared P. v. Glade T.*, 209 P.3d 157, 161 (Ariz. Ct. App. 2009) ("ICWA does not, however, define how paternity can be acknowledged or otherwise detail any procedure to establish paternity. Consequently, we look to state law to determine whether paternity has been acknowledged or established."); *In re Daniel M.*, 708, 1 Cal. Rptr. 3d 897, 900 (Cal. Ct. App. 2003) ("Moreover, because the ICWA does not provide a standard for the acknowledgment or establishment of
(cont.)

a right to notice and intervention under 25 U.S.C. section 1912(a) only if his paternity has been "acknowledged or established" as a matter of state law (or perhaps tribal law). And I would affirm the district court's decision here because it was properly based on the Utah standard.

¶ 165 The majority's contrary conclusions cannot stand. The statutory text undermines the majority's approach. And Congress's legislative purpose, as interpreted in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989), cannot properly be construed to support the court's conclusions. *Holyfield* is easily distinguishable, as it involved a statutory term (*domicile*) of "generally uncontroverted" meaning. *Id*. at 48.

¶ 166 That cannot be said of the notion of the *acknowledgement* or *establishment* of *paternity*. These are terms that impose varying standards throughout the fifty states (and the laws of Indian nations). We cannot possibly interpret this language of ICWA to prescribe a uniform federal standard. The only way to achieve uniformity would be to legislate a specific, binding federal standard. Yet even the majority declines to do that. It just says it thinks that a reasonability standard would work the best.[33] And it provides no analysis under that standard

paternity, courts have resolved the issue under state law."); *In re Adoption of a Child of Indian Heritage*, 543 A.2d 925, 935 (N.J. 1988) ("We conclude, therefore, that Congress intended to defer to state or tribal law standards for establishing paternity, so long as these approaches are permissible variations on the methods of acknowledging and establishing paternity within the general contemplation of Congress when it passed the ICWA. . . ."); *In re Adoption of Baby Girl B.*, 67 P.3d 359, 367 (Okla. Civ. App. 2003) (relying on state law but warning that its application cannot frustrate the purpose of ICWA).

[33] The majority seeks support for its approach in a supposed "canon of interpretation" presuming a "reasonability" standard in the face of statutory silence "as to the time or manner of a subject." *Supra* ¶ 71. And it claims that such a canon is "consistent with ICWA case law." *Supra* ¶ 71. I'm unsure of the basis or applicability of this supposed "canon" as a general matter. But whatever its merits in other settings, it is not consistent with the ICWA cases cited by the majority. Neither the Arizona Court of Appeals nor the Alaska Supreme Court adopted a federal reasonability standard for *acknowledging* or *establishing* paternity. To the contrary, both courts held that the undefined terms

(cont.)

other than to say that E.T. has acknowledged or established paternity under any possible standard.

¶ 167 To me that suggests that we are not really interpreting the terms of the governing federal statute. If we are unable to state a meaningful legal standard, we are not really judging in accordance with a rule of law. We are only picking a winner in litigation. I cannot agree with this decision. And I respectfully disagree with the majority's analysis for these reasons, which I explain in more detail below.

## A. ICWA Invokes State Law

¶ 168 The starting place for our analysis should be the statutory text. And that text strongly signals the congressional adoption of a state standard of paternity. It does so by employing legal terms of art with settled meaning in family law.

¶ 169 A person cannot qualify as a *parent* under ICWA if he is an "unwed father" whose "paternity has not been acknowledged or established." 25 U.S.C. § 1903(9). Four elements of this phrasing cut against the majority's conclusion that ICWA directs state courts to establish a uniform *federal* standard of paternity.

¶ 170 First, the words *acknowledgement* and *establishment* of *paternity* are long-established terms of art in state family law. All fifty states prescribe their own standards and procedures for *acknowledging* or *establishing paternity*.[34] But the phrases employed in ICWA encompass

---

invoked state law. *Jared P.*, 209 P.3d at 161 ("ICWA does not, however, define how paternity can be acknowledged or otherwise detail any procedure to establish paternity. *Consequently, we look to state law to determine whether paternity has been acknowledged or established*." (emphasis added)); *Bruce L. v. W.E.*, 247 P.3d 966, 978 (Alaska 2011) (following courts that "have looked to state law . . . to determine whether paternity has been acknowledged or established under ICWA.").

Granted, both the Arizona and Alaska courts concluded that the putative father did not have to *perfectly* comply with applicable state law in some circumstances. But that is a far cry from the adoption of a uniform federal reasonability standard.

[34] "All states have programs under which birthing hospitals give unmarried parents of a newborn the opportunity to *acknowledge* the

(cont.)

concepts that most all states share in common: (a) the notion of an *acknowledgement* of paternity, which generally refers to a writing by a father (with or without a requirement of consent by the mother), where the writing itself has the legal effect of sustaining a father's parental rights to some degree;[35] and (b) the concept of an *establishment* of

---

father's paternity of the child. States must also help parents *acknowledge* paternity up until the child's eighteenth birthday through vital records offices or other offices designated by the state. Paternity can also be *established* at a court or administrative hearing or by default if the man was served notice of a paternity hearing but did not appear." DEPARTMENT OF HEALTH AND HUMAN SERVICES ADMINISTRATION FOR CHILDREN AND FAMILIES OFFICE OF CHILD SUPPORT ENFORCEMENT, HANDBOOK ON CHILD SUPPORT ENFORCEMENT 14 (2008) (emphasis added).

[35] Even in 1978, when ICWA was enacted, "acknowledge" was a term of art that indicated a specific process under state law—though varying from state to state. No later than 1921, there was already debate about what steps an unwed father should be required to take to legally "acknowledge" paternity. WALTER C. TIFFANY, HANDBOOK ON THE LAW OF PERSONS AND DOMESTIC RELATIONS 302–03 (Roger W. Cooley ed., 3d ed. 1921) ("The courts are not in agreement as to what constitutes a sufficient acknowledgment of the child to legitimate it. In a few instances it has been held that the acknowledgment must be by an instrument executed for the express purpose, but the better rule seems to be that the writing need not be made for the express purpose of acknowledging the child, but that the acknowledgment is sufficient if made in any written instrument, collateral or otherwise."). In the 1970s there was still "great variety in the methods prescribed [by the states] for making the acknowledgment." HOMER H. CLARK, JR., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES 173 (1987). "In some states," the acknowledgement had to be "in writing and witnessed, in others it [had to] be executed before a notary or other officer, in others it [had to] be merely in writing, in others it [had to] be 'general and notorious' and in still others no formalities whatever [were] required." *Id.* In an effort to eliminate the inconsistency that stemmed from states' exclusive jurisdiction to prescribe the acknowledgement process, the National Conference of Commissioners on Uniform State Laws published the Uniform Parentage Act of 1973. Pursuant to the Act, an unwed father

(cont.)

paternity, which is initiated by a court filing and culminates in the issuance of a judicial order (sometimes contested but not necessarily) establishing the father's parental rights and obligations.[36] Surely it was no accident that Congress utilized terms with accepted meaning in state family law. And because it did, we should presume that ICWA embraced the principles embedded in these state law terms.

¶ 171  Second, the statute speaks in the past tense. It forecloses the right to notice and intervention for unwed fathers whose paternity "*has not been* acknowledged or established." 25 U.S.C. § 1903(9). This backward-looking phrasing further underscores the state term-of-art premise of the ICWA definition. Congress made the putative father's right to notice and intervention dependent on what *had been* acknowledged or established—past tense. And there is not and never has been any way for a father to "acknowledge" or "establish" his parental rights as a matter of *federal law*. There is no such thing as federal family law (see more on that below). And for that reason it would be very odd for Congress to be speaking of a *federal*

---

could acknowledge paternity "in a writing filed with the appropriate court or Vital Statistics Bureau" if the mother "does not dispute the acknowledgment within a reasonable time after being informed thereof." UNIF. ACT ON PARENTAGE § 4 (NAT'L CONFERENCE OF COMM'RS ON UNIF. STATE LAWS 1973). As of 2000, nineteen states had enacted the Uniform Parentage Act in its entirety and many others had enacted "significant portions of it." Prefatory Note to UNIF. PARENTAGE ACT (NAT'L CONFERENCE OF COMM'RS ON UNIF. STATE LAWS 2002). But there is still no national, uniform standard. This is purely a matter of state law, and the standards vary widely across the fifty states.

[36] Even prior to ICWA, "statutes ha[d] been enacted in most if not all jurisdictions creating judicial proceedings to *establish* the paternity of an illegitimate child. . . ." 59 A.L.R. 3d 685 (1974) (emphasis added); *see also* 14 C.J.S. *Children Out-of-Wedlock* § 111 (describing the different burdens of proof in suits to establish paternity); UNIF. ACT ON PARENTAGE §§ 3, 6 (NAT'L CONFERENCE OF COMM'RS ON UNIF. STATE LAWS 1973) (authorizing a "natural father" to establish his paternity through court action).

acknowledgement or establishment of paternity as a prerequisite to a right to notice and intervention.[37]

¶ 172 Third, the statutory duty to provide notice to those whose paternity has been *acknowledged* or *established* indicates that these are established, formal mechanisms. A family who wishes to adopt a child of Indian heritage has a statutory duty to provide notice to any *parent*. But if *parent* includes anyone who has vaguely *acknowledged* paternity in some informal way, the adopting family will have no way to know how to fulfill its obligations under ICWA. And an Indian mother would have no way of assuring that her child will actually be given to the adoptive couple, even after her own parental rights have been terminated. That is a further strike against the majority's construction. Surely Congress didn't mean to require biological mothers and

---

[37] The majority appears to ignore this point in its reasonableness analysis. Rather than focusing exclusively on E.T.'s actions prior to the termination order, it spends significant time on the actions E.T. took after the termination order. But E.T. could not possibly have been entitled to notice and intervention at the time the proceeding began—or even at the time of his motion to intervene—based on actions he took after that time.

I am also skeptical that the actions he took prior to the custody proceedings satisfied even the majority's reasonability standard for acknowledging paternity. My skepticism stems not from any "socioeconomic [or] cultural assumptions," *supra* ¶ 75 n.29, but from the inherent difficulty of administering a "reasonability" standard that credits purely private conduct. The relevant "actions" boil down to E.T. providing for C.C. for the first six months of pregnancy and believing that C.C. would come back to South Dakota or that he would join C.C. in Utah after the baby was born. If this amounts to a reasonable acknowledgment of paternity, almost anything will. After all, E.T. appears to have provided for C.C. even before the child was conceived, and he does not assert that he articulated or documented his beliefs regarding future plans before the custody proceedings were initiated. Under those circumstances I cannot see how the adoptive parents or the district court would have any way of knowing that E.T. had an interest in the child—or of providing E.T. notice at the time the adoption petition was filed. And this only exacerbates the practical problems of the majority's standard.

adoptive families to give notice to persons whose *acknowledgement* of paternity was so vague and informal that they cannot reasonably be identified. And the majority's decision to require this only enhances the practical concerns identified above. *See supra* ¶¶ 111–15.

¶ 173 A fourth and related point builds on a series of established canons or norms of statutory construction in this field. When Congress passed ICWA, it was surely aware that (a) "[t]he whole subject of the domestic relations of husband and wife, parent and child" has long been understood to "belong[] to the laws of the states, and not to the laws of the United States," *Ex parte Burrus*, 136 U.S. 586, 593–94 (1890);[38] (b) state courts have "virtually exclusive primacy" in the area of family law, while "federal courts, as a general rule, do not adjudicate issues of" family law "even when there might otherwise be a basis for federal jurisdiction," *United States v. Windsor*, 133 S. Ct. 2675, 2691 (2013); and (c) for these and other reasons, family law terms in federal statutes are ordinarily deemed to be "determined by state, rather than federal law," *De Sylva v. Ballentine*, 351 U.S. 570, 580 (1956).

¶ 174 These principles lend a heavy dose of skepticism to the view that Congress intended to delegate to *state courts* the power to prescribe a set of uniform *federal standards* of paternity. That would be an extraordinary delegation of federal policymaking power. To me it's unimaginable that Congress would have meant to delegate that power to a judicial branch of another sovereign—fifty sovereigns, really—in a field traditionally left to that sovereign's sole authority.[39]

---

[38] *See also Haddock v. Haddock*, 201 U.S. 562, 575 (1906) ("No one denies that the states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce."), *overruled in part on other grounds by Williams v. North Carolina*, 317 U.S. 287 (1942); *United States v. Windsor*, 133 S. Ct. 2675, 2689–90 (2013) ("By history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States.").

[39] My point is not to state a general objection to an inquiry into "reasonableness"—or even to "subjective standards generally." *See Oliver v. Utah Labor Comm'n*, 2017 UT 39, ¶ 84 n.18, __ P.3d __ (Lee, A.C.J., concurring). It is to emphasize the need to tie our legal standards "to the statutory text," and to urge caution for "fuzzy" legal inquiries

(cont.)

¶ 175 The exercise of this power is a matter of legislative policymaking. There is no "right" answer to the question of what it takes for an unwed father to acknowledge or establish paternity. So to make law on the appropriate standards, we would have to step into the role long held by our legislature. I have no idea how to do that. (Should we hold legislative hearings the way the legislature does when it adopts or amends laws in this field?) And I am certain Congress didn't mean for the Utah Supreme Court to have the final say on the matter. We are one of fifty state courts of last resort. So to interpret ICWA to give this body the power to decide on an ideal standard for the acknowledgement or establishment of paternity is to assure a lack of a uniform standard. That cannot be what Congress had in mind—even under the majority's strong purposivist view of ICWA. *See supra* ¶ 69 (concluding that Congress's purpose of assuring uniformity sustains the conclusion that this court should prescribe a federal standard of acknowledging or establishing paternity).

¶ 176 This is a strong indication that we are treading into a domain not meant for us under the terms of the governing statute. "When presented with alternative interpretations of a statutory scheme, we should choose the one that involves the judiciary least in the enterprise of legislative policymaking." *State v. Parduhn*, 2011 UT 55, ¶ 72, 283 P.3d 488 (Lee, J., dissenting). Courts should not go looking for opportunities to "become a policymaker instead of an interpreter." *Id.* "We should presume that the legislature intended to preserve the respective legislative and judicial roles, with the legislature making policy and the courts construing and applying that policy to cases that come before them." *Id.* "If one of two interpretations of a statute

---

that "bear no relation" to the governing terms of the law. *Id.* For that reason the majority's Fourth Amendment example is beside the point. *See supra* ¶ 71 n.27. The text of the Fourth Amendment is framed in terms of "unreasonable searches and seizures." U.S. CONST. amend. IV. So of course the Fourth Amendment test is framed as an inquiry into "reasonableness." *See supra* ¶ 71 n.27. But that tells us nothing of relevance to the proper test under ICWA.

conflates those roles, it should accordingly be rejected as contrary to legislative intent." *Id.*[40]

¶ 177  This should be doubly true in a case, like this one, where the statute we interpret is a federal law addressing a domain long governed exclusively by state law. I see no room for the conclusion that Congress meant for this court to put our policymaker hats on and decide on the *best* standard for the acknowledgement or establishment of paternity. Surely it's more likely that its use of settled terms of state law was a signal that Congress was asking us to apply established state law.

### B. Response to Majority

¶ 178  The majority finds it "obvious that the plain language" of ICWA does not dictate the application of state law standards of paternity. *Supra* ¶ 50. It bases that conclusion on its sense of Congress's "purpose" in enacting ICWA, and on analysis in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989), that it views as supportive of its holding. And it claims that my approach violates the traditional meaning of the phrase "term of art." I find none of these points persuasive.

¶ 179  First, the purported "purpose" of ICWA cannot override the terms of the statute. ICWA, as noted, balances multiple purposes. And we overstep our bounds if we fail to credit the compromised balance of those purposes reflected in the statutory text. *Myers v. Myers*, 2011 UT 65, ¶ 27, 266 P.3d 806; *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 23 n.6, 248 P.3d 465.

¶ 180  As noted above, ICWA, at a minimum, is also aimed at preserving the sovereignty of the state courts over adoption and paternity—and in protecting the children whose interests are so keenly implicated in adoption proceedings. Thus, it is entirely correct to say that ICWA was aimed at protecting the integrity of Indian families. But because the statutory purpose was not to advance that purpose at all costs, our inquiry cannot end at that high level of generality. We must

---

[40] *See Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329–30 (2006*)*; *State v. Herrera*, 895 P.2d 359, 362 (Utah 1995); *Bastian v. King*, 661 P.2d 953, 956 (Utah 1983).

consider how Congress struck the balance at the specific level of the terms of the statute.[41]

¶ 181 The *Holyfield* opinion is not to the contrary. Nor does it support the majority's holding in this case. In *Holyfield*, the court interpreted a provision in ICWA granting tribal courts the exclusive jurisdiction over custody proceedings involving an Indian child "who resides or is domiciled within" a tribe's reservation. 490 U.S. at 36 (quoting 25 U.S.C. § 1911(a)). And, as the majority here indicates, the *Holyfield* court interpreted the term "domicile" to prescribe a federal standard. *Id.* at 43–47. In so concluding, moreover, the *Holyfield* court stated a "general assumption that 'in the absence of a plain indication to the contrary, . . . Congress when it enacts a statute is not making the application of the federal act dependent on state law.'" *Id.* at 43 (alteration in original) (quoting *Jerome v. United States*, 318 U.S. 101, 104 (1943)).

¶ 182 Yet *Holyfield* announces no hard and fast rule. Indeed it acknowledges that "Congress sometimes intends that a statutory term be given content by the application of state law." *Id.* And the grounds for the court's holding in *Holyfield* simply do not apply here. *Holyfield* is distinguishable.

¶ 183 *Holyfield* does not conclude that ICWA's purpose of protecting Indian families mandates a uniform federal standard for all terms in the statute. It acknowledges the contrary. *Id.* And it begins its analysis with "'the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Id.* at 47 (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)). Thus, the core holding in *Holyfield*

---

[41] The majority does refer to some textual provisions of the statute in support of its view. For one, it cites ICWA for the proposition that a parent of an Indian child is entitled to the "higher standard of protection" set forth in state or federal law when such laws "provide[] a higher standard of protection" than that set forth in ICWA. *Supra* ¶ 67 (quoting 25 U.S.C. § 1921). And the majority says that this ensures "that parents of Indian children enjoy the highest level of protection of their parental rights available." *Supra* ¶ 67. But this is circular. We cannot say whether a supposedly federal standard yields a higher level of protection than that set forth in state law until we know the contents of the federal standard. And, as noted below, the majority ultimately is unwilling to articulate a federal standard.

is different from the one described by the majority in this case. *Holyfield* is based on the statutory text. And it holds that "domicile" is a statement of a uniform standard *not* because ICWA's broad purpose demands uniformity in all cases, but because "'[d]omicile' is . . . a concept widely used in both federal and state courts for jurisdiction and conflict-of-laws purposes, *and its meaning is generally uncontroverted.*" *Id.* at 48 (emphasis added). And the uncontroverted meaning includes the standards for demonstrating domicile that are almost universally accepted among federal and state jurisdictions. *See id.*

¶ 184 Thus, the *Holyfield* opinion is quite different from the majority opinion in this case. The *Holyfield* court did not construct its own preferred standard of domicile—a standard informed only by a vague sense that Congress must have meant to provide "less exacting" requirements for Indian parents than the laws of many states. *Supra* ¶ 71. The *Holyfield* analysis is textual. It is rooted in the "generally accepted meaning of the term 'domicile.'" *Holyfield*, 490 U.S. at 47.

¶ 185 As noted above, there is no such thing as a "generally accepted meaning" of *acknowledging* or *establishing paternity* in the sense discussed in *Holyfield*. As a product of our federalism, the fifty states have adopted a range of procedures and standards for the acknowledgement or establishment of paternity.[42] This could not have been a surprise for the Congress that enacted ICWA.

¶ 186 The majority takes issue with this analysis. It claims that I am relying on "an erroneous view of the definition of a term of art." *Supra* ¶ 55. Thus, the majority insists that a term of art must have a single "core meaning." *Supra* ¶ 56. And the majority rejects my approach on the ground that the state-by-state definitions of *acknowledge* and *establish* "do not share a common core." *Supra* ¶ 56. From that premise, the majority proceeds to the conclusion that the words *acknowledgement* and *establishment* of *paternity* are ordinary (not legal) terms as used in ICWA. *Supra* ¶ 58. And the court cites a few cases that purportedly support this conclusion. *Supra* ¶ 58.[43]

---

[42] *See supra* ¶ 170 nn. 34–36.

[43] The cited cases say little or nothing of relevance to the interpretation of a federal statute regulating state custody proceedings. Two of the cited cases simply stand for the axiom that courts must not

(cont.)

¶ 187 None of this adds up in my view. The court's starting premise is overbroad; it misses the obvious implications of our American federalism. The law of paternity is like many other pockets of state law, with substantial variation from state to state. State law varies widely on a wide range of questions, such as negligence, strict liability, breach of contract, divorce, child custody, and intestate succession. But a federal statute invoking legal terminology from one of these fields would not properly be understood as using the words of the law in an ordinary (non-legal) sense just because there are legal variations from state to state.[44]

¶ 188 The terms in question here—*acknowledgement* and *establishment* of *paternity*—moreover, are legal terms with a common "core meaning." At the heart of every state's standards for *acknowledgement* of *paternity* is the question whether the purported parents have shown that they accept responsibility for the child.

---

read extratextual requirements into undefined terms. *See State v. Wolfe*, 239 A.2d 509, 512 (Conn. 1968); *Carpenter v. Hawley*, 281 S.E.2d 783, 786 (N.C. Ct. App. 1981). The other two cases are even less helpful to the majority's cause. One was decided long before state paternity schemes were fleshed out, s*ee Blythe v. Ayres*, 31 P. 915, 922 (Cal. 1892), and the other is not a custody proceeding at all. *See Estate of Griswold*, 24 P.3d 1191, 1194–95 (Cal. 2001) (determining whether a father's admission of paternity in a "bastardy proceeding" was sufficient to acknowledge paternity under a different state's probate code). In any event, none of the cases interpret a federal statute. So none of them supports the majority's conclusion that terms utilized by every state's adoption scheme must be given an independent, ordinary (non-legal) meaning under a federal statute regulating those schemes.

[44] One example is evident in ICWA itself. ICWA recognizes as a parent "any Indian person *who has lawfully adopted* an Indian child, including adoptions under tribal law or custom." 25 U.S.C. § 1903(9) (emphasis added). The reference to an adoption clearly invokes state law, as there is no such thing as a federal adoption. Yet under the majority's approach, the term "adopt" would invoke a new federal standard incorporating the ordinary sense of adopt and ignoring state standards of adoption (which vary widely from state to state). That of course makes no sense. And it makes no more sense as applied to the acknowledgement or establishment of paternity.

*Acknowledge*, BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "acknowledge" as "[t]o show that one accepts responsibility for <acknowledge paternity of the child>"). *Establishment* of paternity also has a core meaning. This is the legal notion that the purported parents "settle, make, or fix firmly" that they are the true parents of the child. *Establish*, BLACK'S LAW DICTIONARY (9th ed. 2009).[45] There are variations across the fifty states as to the procedure or standards for acknowledging or establishing paternity. But those variations stem from each state's policy preferences and prerogatives. They do not undefine these legal terms of art.

¶ 189  If a statute speaks the language of the law, then we interpret that term in accordance with established legal conventions. This is a settled tenet of the law of interpretation.[46] And that tenet does not change just because we find a lack of a single, clear meaning of the legal term in question.[47]

---

[45] *See also* 14 C.J.S. *Children Out-of-Wedlock* § 111 (describing the different burdens of proof in suits to establish paternity); UNIF. ACT ON PARENTAGE §§ 3, 6 (1973) (authorizing a "natural father" to establish his paternity through court action).

[46] *See F.A.A. v. Cooper*, 566 U.S. 284, 292 (2012) (citing cases for the "cardinal rule of statutory construction" that "when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken" (citation omitted) (internal quotation marks omitted); *Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 ("When the legislature 'borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)).

[47] *See Cooper*, 566 U.S. at 292–94 (noting that "the meaning of 'actual damages' [in the federal Privacy Act, 5 U.S.C. § 552a(g)(4)(A)] is far from clear," in that it "is sometimes understood to include nonpecuniary harm" but also "has been used . . . more narrowly to authorize damages for only pecuniary harm," but proceeding to find a legal definition based on the "particular context in which the term appears" in the statute).

¶ 190  Where a legal term is employed, we can understand the term only by reference to the norms and conventions of that language. The language of the law is like a distinct dialect.[48] And we will misunderstand the dialect if we ignore its norms and conventions.

¶ 191  Granted, it is possible to speak of *acknowledging* or *establishing paternity* without reference to the law. But a statutory reference to these established legal terms should be viewed against the backdrop of the law. And we will misunderstand or misuse the terminology if we ignore its legal context.[49] The majority commits this fatal error in its approach.

¶ 192  In my view it is beside the point that "Utah law requires the birth mother's signature in addition to the unmarried biological father's signature" as a condition of an acknowledgement "through a declaration of paternity." *Supra* ¶ 67. Surely that does not mean that "the unmarried biological father's option to acknowledge paternity is . . . read out of ICWA."[50] *Supra* ¶ 67. It simply means that E.T. failed to

---

[48] *See* Michael B. Rappaport & John O. McGinnis, *The Constitution and the Language of the Law* (San Diego Legal Studies Paper No. 17-262, 2017), https://ssrn.com/abstract=2928936.

[49] An acknowledgement or establishment of paternity is like a declaration of bankruptcy. We can speak of *declaring* bankruptcy in the ordinary sense of a mere utterance. But in so doing we will be misusing the language—by missing its clear legal connotation. *Cf. The Office: Money* (NBC television broadcast Oct. 18, 2007) (Michael Scott: "I DECLARE BANKRUPTCY!" Oscar: "Hey, I just wanted you to know, that you can't just say the word bankruptcy and expect anything to happen." Michael Scott: "I didn't say it, I declared it." Oscar: "Still … that's … it's not anything.").

[50] I see nothing telling about the fact that the district court in this case did not "seriously analyze whether Birth Father acknowledged paternity under Utah law, instead focusing on whether he complied with the requirements for *establishing* paternity under Utah law." *Supra* ¶ 67. Presumably, that is just a reflection of the parties' advocacy—of the fact that E.T. didn't argue that he secured his paternity through an acknowledgement because he knew he could not qualify under Utah law. That doesn't tell us that *acknowledgement* of paternity is "read out
(cont.)

secure his paternity through an acknowledgement under Utah law. ICWA's bare reference to *acknowledgement* or *establishment* of *paternity* cannot properly be read as a guarantee that a given putative father will qualify under either. It is simply an indication that *either* means of securing rights of paternity in a given state's law will suffice as a matter of federal Indian law. And certainly E.T. *could have* secured his paternity rights under Utah law; he simply failed to do so in any of the means required by our law.

¶ 193  There is likewise nothing "anomalous" about the notion that "an unmarried biological Indian father's status as a parent under ICWA" depends on his compliance with the laws of the state where the child is born. *Supra* ¶ 69. That is not some unforeseen oddity of my reading of ICWA; it is an inherent feature of our longstanding system of federalism that was well-known to Congress—a system in which parental rights are a creature of state law, and thus may be established under the various laws of the fifty states.

¶ 194 The alternative, moreover, is a make-it-up-as-we-go standard—a standard without any real content, except the notion that a biological father must meet an undefined "reasonability standard" that is "less exacting" than the requirements of Utah law. *Supra* ¶ 71. That seems close to an admission that the court has no standard. And the lack of a standard assures that the majority cannot ultimately live up to its premises.

¶ 195  Instead the majority offers only a bare holding—that E.T.'s "actions satisfied the requirements for acknowledging paternity under ICWA using a reasonability standard." *Supra* ¶ 74. And the court simply lists the *facts* it deems sufficient under the circumstances of this case. That is a further admission that we are not stating a legal standard but only a disposition of this case.

¶ 196  Perhaps that's understandable. The logic of the court's opinion, after all, is one that can lead only to the conclusion that *any* bare "acknowledgement" of paternity, however minimal, must suffice as a matter of federal Indian law. To support its holding, the majority points to hurdles set by Utah law that E.T. has not satisfied. *See supra* ¶ 67. And it concludes that Utah law is too "exacting." *Supra* ¶ 71.

---

of ICWA." It says only that E.T. cannot secure his rights through such a filing.

Thus, it is unacceptable, in the court's view, to allow "state law to determine who is a parent under ICWA" because that "would, in some cases, provide a lower level of protection of parental rights than ICWA intends." *Supra* ¶ 67. With this in mind, the court sets forth a vague reasonability standard that purports to be more protective "of parental rights pertaining to Indian children." *Supra* ¶ 71.

¶ 197  But why stop there? The logic of the court's opinion will lead inevitably to the most minimally "exacting" acknowledgement of paternity imaginable. Anything less, after all, could sustain the same conclusion reached in this case—that ICWA's purpose is to protect the rights of Indian tribal members, and that allowing state law (or any law except a minimalist acknowledgement) "to determine who is a parent under ICWA would . . . provide a lower level of protection of parental rights than ICWA intends."[51] *Supra* ¶ 67.

¶ 198 The majority apparently perceives the problem with that approach. If any bare *acknowledgement* by a putative father will do, then the statutory definition will be eviscerated: All unwed putative fathers will become entitled to notice and a right to intervene because any father can plausibly say he made a bare acknowledgement of paternity at some point. And that cannot be. *See VCS, Inc. v. Utah Cmty. Bank*, 2012 UT 89, ¶ 18, 293 P.3d 290 (noting that an interpretation that would "swallow" statutory language "runs afoul of the settled canon of preserving independent meaning for all statutory provisions").

¶ 199 Presumably that is why the court stops short of stating a meaningful standard. Perhaps it acknowledges that we cannot defensibly pick a paternity standard out of the air. But unless we are willing to set the bar at the lowest imaginable level, the logic of the court's opinion will always call for us to set it lower; otherwise we will have a standard that is too "exacting" to satisfy the purpose of ICWA. So the court, naturally, is left to state no meaningful standard at all.

------

[51] This is the problem with the purposivist approach to statutory interpretation. If we view statutes as aimed at accomplishing their perceived purpose at all costs, we are embarked on an endless journey. We may say that ICWA is aimed at articulating a uniform standard to protect the rights of Indian families. But if that's all it is, then we must stop at nothing in our efforts to vindicate that purpose. And the only way to stop at nothing is to say that even the barest acknowledgement of paternity is enough to satisfy the statute.

¶ 200 And that is also untenable—and completely at odds with the core premise of the court's opinion. The majority's premise is that Congress could not have intended a state-law-based notion of *acknowledgement* or *establishment* of *paternity* because it intended a nationwide uniform standard. *See supra* ¶ 71. Yet the court's holding assures the exact opposite. This court today says that Utah law has set the paternity bar too high. But absent any meaningful legal standard, our opinion today assures a complete lack of uniformity. If today's opinion takes hold in other states, it will guarantee chaos and unpredictability—not uniformity. It will invite each court faced with the paternity question to offer its own subjective assessment of what is a "reasonable" acknowledgment of paternity and whether the state or tribal paternity laws in question are too "exacting." *Supra* ¶ 71.

¶ 201 The majority's approach may also produce devastating unintended consequences. By recognizing an unwed father's right to notice and intervention upon a vague, informal "acknowledgement" of paternity, and ignoring the backward-looking requirement of paternity that "has . . . been acknowledged," the court opens the door to the possibility that a putative Indian father will come forward months or even years later and assert a right to disrupt even a finalized adoption. If and when this eventuality arises, perhaps the courts will find a "reasonability" time bar or estoppel basis to avoid this disruption. But I see no basis for it on the face of ICWA. So as the law stands there is no assurance that an adoption of an Indian child will ever be truly final. The court's approach leaves open the possibility of disruption of any adoption of an Indian child whose biological father might one day claim to have "acknowledged" his paternity.

¶ 202 This cannot be what Congress had in mind when it limited the rights of notice and intervention to unwed fathers who have had their paternity *acknowledged* or *established*. Surely Congress meant for courts to apply a fixed legal standard. And because ICWA uses settled terms of art from family law, I would interpret it to incorporate state (and tribal) law on this question. I would accordingly affirm the district court's denial of E.T.'s motion to dismiss.

### III. CONCLUSION

¶ 203 For reasons stated in Part I of this opinion a majority of the court finds no defect in subject-matter jurisdiction. A different majority nonetheless reverses the denial of the motion to intervene. I dissent from that decision for reasons set forth in Part II of my opinion. I would

also affirm the district court's denial of E.T.'s motion to dismiss and remand for finalization of the adoption.

———————————